FILED

# IN THE FEDERAL DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2007 NOV -1  P 2: 12

CLERK
ALEXANDRIA, VIRGINIA

RALPH NADER, :
    53 Hillside Avenue :
    Winsted, Connecticut  06098 :
     :
PETER MIGUEL CAMEJO, :
    1760 Barhead Court :
    Folsom, CA 95630 :
     :
D.B. FANNING :
    827 West Summit Avenue :
    Flagstaff, AZ 86001 :
     :
C.K. IRELAND :
    827 West Summit Avenue :
    Flagstaff, AZ 86001 :
     :
JULIE COYLE :
    4101 Drummond Road :
    Toledo, OH 43613 :
     :
HERMAN BLANKENSHIP :
    235 East Oakland :
    Toledo, OH 43608 :
     :
LLOYD MARBET :
    19142 Southeast Baker's Ferry Road :
    Boring, OR 97009 :
     :
GREGORY KAFOURY :
    320 Stark Street :
    Portland, OR 97204 :
     :
               PLAINTIFFS, :
     :
    v. :
     :
TERRY MCAULIFFE :
    7527 Old Dominion Drive :
    McLean, Virginia  22102 :
     :
     :

**AMENDED COMPLAINT**

1:07CV 1101

**STEVEN RAIKIN**                              :
    **6368 English Ivy Way**        :
    **Springfield, Virginia  22152**    :
                            :
                            :
                            :
           **DEFENDANTS.**        :
                            :

Plaintiffs bring this action against Defendants to redress the deprivation of rights secured them by common law, the First and Fourteenth Amendments, the Qualifications Clause and other provisions of the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs seek damages, injunctive and declaratory relief and such other further relief as this Court shall deem necessary and proper, and allege the following:

## NATURE OF THE ACTION

1.    Defendants Terry McAuliffe and Steven Raikin (the "Defendants") and members, allies or agents of the Democratic Party (the "co-Conspirators" and, together with Defendants, the "Conspirators") conspired to prevent Plaintiffs Ralph Nader and Peter Miguel Camejo (hereinafter, "Nader-Camejo") from running for President and Vice President of the United States in 2004, in an effort to deny Plaintiff-voters and others the choice of voting for them.  Defendants and co-Conspirators blamed Mr. Nader for the Democrats' loss in the 2000 presidential election, and they worried that he would "steal" votes from the Democratic candidates if he ran again in 2004.  Defendants and co-Conspirators therefore agreed and conspired that if Mr. Nader did run in 2004, they would launch a massive, nationwide unlawful assault on his candidacy, using unfounded litigation to harass, obstruct and drain his campaign of resources, deny him ballot access and effectively prevent him from running for public office.  Defendants and co-Conspirators reached this agreement and formed this conspiracy with wrongful intent, before they could possibly have any reason to believe such litigation was warranted or justified.

2.    As the 2004 election approached, Democratic National Committee (DNC) Chairman Defendant Terry McAuliffe publicly appealed to Mr. Nader on numerous

1

occasions not to run. "I wanted to convey to Ralph Nader that…if he were to get in the race again, he could pull votes away from the Democratic nominee. … We can't afford to have Ralph Nader in the race," Defendant McAuliffe told CNN's Wolf Blitzer in February 2004. When Mr. Nader announced his candidacy shortly thereafter, on February 22, 2004, Defendants and co-Conspirators set their obstructive plans and conspiracy in motion.

3.      In a telephone conversation with Mr. Nader on June 23, 2004, Defendant McAuliffe made one last effort to dissuade Mr. Nader. This time, Defendant McAuliffe asked Mr. Nader voluntarily not to campaign in certain so-called "battleground" states. If Mr. Nader agreed, Defendant McAuliffe said, he would support Mr. Nader's campaign in the remaining states. Mr. Nader declined, and objected to the Democratic Party's effort to deny his candidacy ballot access in various states. That same day, Defendants or co-Conspirators filed their first lawsuit against his campaign.

3.      Within the next 12 weeks, between June and September of 2004, Defendants and co-Conspirators filed 24 complaints against the Nader-Camejo Campaign in 17 states, including Arizona, Arkansas, Colorado, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, New Hampshire, Nevada, New Mexico, Ohio, Pennsylvania, Washington, West Virginia and Wisconsin, and intervened in proceedings to remove Nader-Camejo from the ballot in Oregon. Conspirators also filed five complaints before the Federal Election Commission (FEC). In each state court lawsuit, Conspirators challenged Nader-Camejo's nomination papers and asked state elections officials not to certify them as candidates for President and Vice President in the 2004 general election.

4.    The Conspirators' admitted purpose for bringing these lawsuits, however, was not to vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the candidates to spend their limited resources of time, talent and money on the defense of unfounded lawsuits. The Conspirators' motive, which they also admitted, was to help Democratic candidates John Kerry and John Edwards win the election by forcing their political competitors from the race.

5.    Defendants and co-Conspirators dedicated millions of dollars' worth of illegal and unreported campaign contributions to their conspiracy. They recruited at least 95 lawyers from 53 law firms to pursue their unfounded and abusive litigation and organized hundreds of other lawyers to provide support. Defendants and co-Conspirators also incorporated several Section 527 political organizations, including one called The Ballot Project, which they incorporated specifically for the purpose of coordinating and financing their nationwide assault of unfounded and abusive litigation.

6.    In addition to filing 24 state court complaints and five FEC complaints against the Nader-Camejo Campaign within 12 weeks, Conspirators organized and conducted campaigns of harassment, intimidation and sabotage to prevent the Nader-Camejo Campaign from complying with election laws in several states, and to fabricate grounds for the Conspirators' subsequent lawsuits. In one state, for example, Conspirators acting fraudulently and under false pretenses took seats in Nader-Camejo's nominating convention but refused to sign their petitions, causing the convention to fall short of the requisite number of validated attendees. In other states, Conspirators sabotaged Nader-Camejo's nomination papers by crossing names out or otherwise invalidating their petitions and, on information and belief, by signing fake names.

7.     In violation of state rules of professional conduct, the conspiracy's bar members sent misleading letters to campaign petitioners, falsely threatening them with heavy fines and jail sentences if signatures they collected were invalidated, and also sought subpoenas ordering campaign petitioners on short notice to attend depositions and produce unreasonably burdensome amounts of personal documents.    On numerous occasions, the Conspirators, including members of the bar, called campaign petitioners' homes, and even the homes of citizens and potential voters who signed Nader-Camejo's petitions. Private detectives also visited petitioners' homes, unannounced, and claimed to be investigating them.   All of this activity was intended to harass and intimidate said petitioners and prevent them from collecting signatures – an effort that succeeded on dozens of occasions.

8.     In spite of a multi-million dollar legal team of co-Conspirators, and coordinated campaigns of harassment, intimidation and sabotage specifically intended to prevent Nader-Camejo from complying with state election laws, the Conspirators eventually lost the great majority of lawsuits they filed.  In addition, the FEC dismissed all five of Conspirators' FEC complaints without taking action.  Defendants and co-Conspirators nevertheless succeeded in draining Nader-Camejo's campaign of time, money and other resources, and in preventing them from gaining ballot access in several states, thereby denying voters in these states the choice of voting for them, as was their intent. Defendants and co-Conspirators also caused financial injury and other damages to Mr. Nader and Mr. Camejo personally, and did severe damage to the third-party and independent candidacy structure which Mr. Nader had built at great expense in time, money and other resources.

4

9.      Although the 2004 election ended nearly three years ago, Conspirators continue to pursue their wrongful litigation against Mr. Nader to the present day.  To force Nader-Camejo off the ballot in Pennsylvania, Defendants and co-Conspirators enlisted at least 20 lawyers from three law firms, hired handwriting experts and other consultants, and recruited support from approximately 170 Democratic Party operatives. Afterwards, co-Conspirator law firm Reed Smith, which has close ties to the Kerry-Edwards Campaign, submitted a bill of costs in the amount of $81,102.19.  No state in the nation has ever assessed such a post-election penalty against candidates who defend their right to appear on the ballot, but the Commonwealth Court of Pennsylvania approved the bill without opinion.  Misreading the plain meaning of the statute, a divided Pennsylvania Supreme Court affirmed without citing a single case in which a candidate had been assessed such costs.

10.      While this case was before the Pennsylvania Supreme Court, unbeknownst to Mr. Nader and Mr. Camejo, co-Conspirator Reed Smith began representing the Chief Justice as his defense counsel in an ethics investigation before the Pennsylvania Judicial Conduct Board.  In addition, Reed Smith and Conspirators' second law firm gave $10,000 in campaign contributions to a second Justice, who authored the majority opinion.    Reed Smith also has close and long-standing ties with a third Pennsylvania Supreme Court Justice, who served as of counsel at the firm immediately before joining the court. Reed Smith did not disclose these facts at any time during the proceedings before the Pennsylvania Supreme Court, nor thereafter, when the firm induced Mr. Camejo to pay $20,000 to settle the claim against him.  Reed Smith subsequently filed Writs of Attachment against Mr. Nader's personal accounts, and

currently seeks to condemn $61,638.45 of Mr. Nader's personal funds in satisfaction of its unprecedented fraudulently and wrongfully obtained judgment.

11.     Defendants and co-Conspirators conspired to and did in fact abuse judicial processes in an effort to bankrupt the Nader-Camejo Campaign and terminate Nader-Camejo's candidacy during the 2004 presidential election. Conspirators filed 24 state law complaints and five FEC complaints in less than 12 weeks, with the specific intention of causing Plaintiffs financial injury and other damages and violating their constitutional rights. Defendants and co-Conspirators did in fact cause such damages, and co-Conspirators continue to cause such damages, by pursuing their unfounded and abusive litigation to the present day.

### JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the matter raises federal questions under 43 U.S.C. § 1983, and 28 U.S.C. § 1332(a), as the matter in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists among the parties. Jurisdiction is further conferred on this Court pursuant to 28 U.S.C. §§ 1343 and 2201. Plaintiffs also invoke supplemental jurisdiction of this Court over Plaintiffs' state claims against Defendants for common law violations pursuant to 28 U.S.C. § 1367. Jurisdiction supporting Plaintiffs' claim for attorney fees is conferred by 42 U.S.C. § 1988.

13.     Venue in the Eastern District of Virginia is appropriate pursuant to 28 U.S.C. 1391(b), because Mr. McAuliffe is domiciled therein.

### THE PARTIES

14.    Unless otherwise stated, the charges alleged herein do not necessarily apply to every Defendant and every Conspirator or co-Conspirator named in this complaint.

15.    Plaintiff Ralph Nader is a consumer advocate and 2004 independent candidate for President of the United States.  Mr. Nader's address is 53 Hillside Avenue, Winsted, Connecticut, 06098.

16.    Plaintiff Peter Miguel Camejo is an entrepreneur and 2004 independent candidate for Vice President of the United States.  Mr. Camejo's address is 1760 Barhead Court, Folsom, California, 95630.

17.    Plaintiff D.B. Fanning is a registered voter in the state of Arizona.  Mr. Fanning's address is  827 West Summit Avenue, Flagstaff, Arizona, 86001.

18.    Plaintiff C.K. Ireland is a registered voter in the state of Arizona.  Ms. Ireland's address is  827 West Summit Avenue, Flagstaff, Arizona, 86001.

19.    Plaintiff Julie Coyle is a registered voter in the state of Ohio.  Ms. Coyle's address is  4101 Drummond Road, Toledo, Ohio, 43613.

20.    Plaintiff Herman Blankenship is a registered voter in the state of Ohio.  Mr. Blankenship's address is 235 East Oakland Street, Toledo, Ohio, 43608.

21.    Plaintiff Lloyd Marbet is a registered voter in the state of Oregon.  Mr. Marbet's address is 19142 Southeast Baker's Ferry Road, Boring, Oregon, 97009.

22.    Plaintiff Gregory Kafoury is a registered voter in the state of Oregon.  Mr. Kafoury's address is 320 Stark Street, Portland, Oregon, 97204.

23.    Defendant Terry McAuliffe is former Chair of the DNC.  Mr. McAuliffe's address is 7527 Old Dominion Drive, McLean, Virginia, 22102.

24.     Defendant Steven Raikin is director, treasurer and secretary of The Ballot Project and a lawyer.  Mr. Raikin's address is 6368 English Ivy Way, Springfield, Virginia, 22152.

## NON-DEFENDANT CO-CONSPIRATORS

25.     Non-defendant co-Conspirator the Democratic National Committee is the national head of the Democratic Party, and works with national, state and local Democratic Party organizations to elect Democratic candidates.  The DNC's address is 430 S. Capitol Street SE, Washington, D.C., 20003.

26.     Non-defendant co-Conspirator Kerry-Edwards 2004 Inc. is the principal campaign committee of the Kerry-Edwards Campaign.  The committee's address is 10 G Street NE, Suite 710, Washington, D.C., 20002.

27.     Non-defendant co-Conspirator The Ballot Project is a Section 527 organization established on June 2, 2004 to coordinate and finance Defendants' and co-Conspirators' litigation against Nader-Camejo.  The organization's address is that of consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

28.     Non-defendant co-Conspirator America Coming Together (ACT) is a Democratic Section 527 organization, funded in part by SEIU, which organized a campaign of harassment, intimidation and sabotage in an effort to deny Nader-Camejo ballot access.  ACT's current address is 1101 Vermont Avenue NW, 9th Floor, Washington, D.C., 20005.

29.    Non-defendant co-Conspirator Service Employees International Union (SEIU) is a labor union with headquarters in Washington, D.C. SEIU's address is 1313 L Street NW, Washington, D.C., 20005.

30.    Non-defendant co-Conspirator John Kerry is a United States Senator from Massachusetts and the 2004 Democratic Party candidate for President. Mr. Kerry's address is United States Senate, 304 Russell Building, Third Floor, Washington, D.C., 20510.

31.    Non-defendant co-Conspirator Jack Corrigan is a lawyer who worked for the DNC and the Kerry-Edwards Campaign to plan and execute Defendants' and co-Conspirators' wrongful litigation against Nader-Camejo. Mr. Corrigan also served as John Kerry's personal liaison to the 2004 Democratic National Convention. Mr. Corrigan's address is 896 Beacon Street, Boston, Massachusetts, 02215.

32.    Non-defendant co-Conspirator Toby Moffett is president of The Ballot Project and a lobbyist with the Livingston Group. Mr. Moffett's address is 499 South Capitol Street SW, Suite 600, Washington, D.C., 20003.

33.    Non-defendant co-Conspirator Elizabeth Holtzman is director of The Ballot Project and a lawyer. Ms. Holtzman's address is 2 Park Avenue, New York, New York, 10016.

34.    Non-defendant co-Conspirator Robert Brandon and his firm Robert Brandon and Associates are consultants to the DNC and other clients. Mr. Brandon's firm housed The Ballot Project in its offices. Mr. Brandon's address is 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

9

35.    Non-defendant co-Conspirator Mark Brewer is Chair of the Michigan Democratic Party and Vice Chair of the DNC.  Mr. Brewer's address is 606 Townsend, Lansing, MI, 48933.

36.    Non-defendant co-Conspirator Reed Smith is a law firm headquartered in Pittsburgh, Pennsylvania.    Reed Smith's address is 435 Sixth Avenue, Pittsburgh, Pennsylvania, 15219.

37.    Non-defendant co-Conspirators include the state Democratic Party affiliates of the national Democratic Party who combined and conspired with Defendants to achieve Defendants' unlawful objectives as herein alleged.

38.    Non-defendant co-Conspirators include the law firms and lawyers who combined and conspired with Defendants and who, acting as Defendants' agents, implemented Defendants' illegal scheme in various states as set forth herein.

39.    Non-defendant co-Conspirator Americans for Jobs is a Section 527 organization established by Timothy Raftis and David W. Jones in 2003 "to accept contributions and make expenditures to influence the election of federal candidates." Americans for Jobs' address is 2000 M Street NW, Suite 800, Washington, D.C., 20036.

40.    Non-defendant co-Conspirator The National Progress Fund is a Section 527 organization established on May 4, 2004 "to engage in election-related activity for the purpose of supporting progressive issues."  The organization was officially terminated on December 31, 2005. The National Progress Fund's address was PO Box 57154, Washington, D.C., 20037.

41.    Non-defendant co-Conspirator United Progressives for Victory is a political committee registered on June 16, 2004 and terminated on September 21, 2005.

10

The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

42.     Non-defendant co-Conspirator Uniting People for Victory is a Section 527 organization founded by United Progressives for Victory and registered with the IRS on July 21, 2004. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

43.     Non-defendant co-Conspirator Citizens for Responsibility and Ethics in Washington (CREW) is a 501(c)(3) legal organization that claims to promote "ethics and accountability in government and public life by targeting government officials – regardless of party affiliation – who sacrifice the common good to special interests." The overwhelming majority of individuals and organizations CREW targets, however, are real or perceived competitors of the Democratic Party. CREW's address is 1400 Eye Street NW, Suite 450, Washington, D.C., 20005.

44.     Non-defendant co-Conspirator Kathleen Sullivan is former Chair of the New Hampshire Democratic Party and a DNC official. Ms. Sullivan's address is 95 Market Street, Manchester, NH 03101.

45.     Non-defendant co-Conspirator Daniel Schneider is, on information and belief, an attorney in Washington, D.C. who filed an FEC complaint against the Nader-Camejo Campaign. Mr. Schneider's address is unknown.

46.     Non-defendant co-Conspirators include the officers and affiliates of the Section 527 organizations and 501(c)(3) organization named herein, including: David W. Jones; Tricia Enright; Chris Kofinis; Karl Frisch; Ginny Hunt; John Hlinko; Katie Aulwes; Karen Mulhauser; Helen Hunt; and Melanie Sloane.

## FACTUAL ALLEGATIONS

**I.    Defendants Conspired to Abuse Judicial Processes with Intent to Cause Plaintiffs Financial Injury and Other Damages and Violate Their Constitutional Rights.**

47.    After the Democrats' defeat in the 2000 election, Defendants and co-Conspirators decided to try to prevent Mr. Nader from running for president if he announced his candidacy in 2004. The Conspirators had already settled on a strategy to accomplish this goal when Mr. Nader made his announcement on February 22, 2004. "Our intent was to drain and distract him," The Ballot Project president Toby Moffett later explained to the *Hartford Courant*. Defendants and co-Conspirators agreed and conspired to launch a nationwide legal assault on Mr. Nader's campaign, which would drain the campaign of money, time and other resources, in a deliberate attempt to use the sheer burden of litigation itself as a means to prevent Mr. Nader from running for public office. Defendants and co-Conspirators reached this agreement with wrongful intent, before they could possibly have any reason to believe litigation against Mr. Nader was warranted or justified, and before there was any colorable or potential legal basis for such litigation.

48.    Having settled on that strategy, the organizers and leaders of the conspiracy met privately to discuss their plans on July 26, 2004, at the Four Seasons Hotel in Boston. DNC consultant Robert Brandon organized the meeting and, on information and belief, the DNC paid for it. Approximately three dozen people attended, including The Ballot Project president Toby Moffett, The Ballot Project director Liz Holtzman and Democratic consultant Stanley Greenberg.

49.    At said Four Seasons meeting, the leaders and organizers of the conspiracy discussed polling, research, and strategy to undermine the Nader-Camejo Campaign in key states where they believed it would adversely affect Democratic candidates John Kerry and John Edwards most, including Arizona, Florida, Iowa, Michigan, Nevada, Oregon, Pennsylvania, Virginia, West Virginia and Wisconsin. The leaders and organizers of the conspiracy specifically agreed to sue and otherwise obstruct Nader-Camejo not only in these "battleground" states, but also in as many other states as possible. According to Conspirator Moffett, however, the purpose of this litigation was simply "to drain [Mr. Nader] of resources and force him to spend his time and money."

50.    Conspirator Moffett had conducted a limited campaign against Mr. Nader's candidacy in the 2000 election. Conspirator Moffett considered that effort a failure, because Mr. Nader was listed on most state ballots in 2000. "We're not going to let him do it again," Conspirator Moffett vowed at the said Four Seasons meeting.

51.    The Democratic National Convention began the same day as the Conspirators' Four Seasons meeting, and was taking place across town at Boston's Fleet Center. The Conspirators planned to use the convention as a platform to introduce their litigation strategy to delegates from state Democratic Parties, and to solicit financial support from major party donors.

52.    The Conspirators prepared a memo for this purpose, which they planned to circulate at the convention. This memo outlined the Conspirators' comprehensive plan of attack against the Nader-Camejo Campaign, which involved not only a nationwide legal assault, but also a communications campaign intended to convince voters not to vote for Nader-Camejo. The memo further stated that Conspirators would coordinate and

finance their activities with three 527 organizations they had established. One was The Ballot Project, and the other two were called the National Progress Fund and Uniting People for Victory.

53.     The Conspirators distributed their memo to donors and delegates at the convention and discussed the perceived threat of Nader-Camejo's candidacy. They briefed donors and delegates about their litigation plans and solicited contributions to their 527 organizations. The Conspirators also recruited state Democratic Party officials to join their effort, and specifically instructed the officials to bring groundless and abusive lawsuits in their states as part of a nationwide strategy to bankrupt the Nader-Camejo Campaign and force Nader-Camejo from the race. "This guy is still a huge threat," Conspirator Moffett said at the convention, in reference to Mr. Nader. "We're just not going to make the same mistake we made in 2000."

54.     Conspirator Moffett told New Mexico Democratic Party Chair and DNC official John Wertheim that he should appoint someone to spearhead the effort to keep Nader-Camejo off the ballot in that state. Mr. Wertheim agreed to do so. "This is a central focus of my own duties as chairman," Mr. Wertheim told *The New Mexican*.

55.     At the close of the Democratic convention, on July 29, 2004, Defendant McAuliffe reiterated his claim that "We can't afford to have Ralph Nader in the race." *Business Week* reported Defendant McAuliffe's statement under the headline, "The Dems' Game Plan to Create a Two-Man Race." That "Game Plan," which Defendants jointly planned and executed with their co-Conspirators, was to file groundless and abusive lawsuits and otherwise obstruct the Nader-Camejo Campaign as many times in as many states as possible during the 2004 election.

56.    Eighteen state or local Democratic Parties eventually joined Defendants''
and co-Conspirators' conspiracy and either initiated or materially supported unfounded
and abusive lawsuits filed against the Nader-Camejo Campaign, or intervened in
proceedings to deny Nader-Camejo ballot access.    The state Democratic Parties of
Arkansas, Colorado, Florida, Maine, Michigan, Mississippi, Nevada, New Hampshire,
Washington and Wisconsin initiated such lawsuits, while the state Democratic Parties of
Arizona, Illinois, Iowa, New Mexico, Ohio, and Pennsylvania materially supported such
lawsuits filed in their states.    In Oregon, state Democratic Party officials intervened in
proceedings to deny Nader-Camejo ballot access.    In West Virginia, local Democratic
Party officials filed a complaint seeking to compel the Secretary of State to refer Nader-
Camejo's nomination papers to the Attorney General's office for investigation.

57.    In addition to the state law complaints, Conspirators filed five FEC
complaints against the Nader-Camejo Campaign.    CREW filed two complaints, Michigan
Democratic Party Chair Mark Brewer filed one, New Hampshire Democratic Party Chair
Kathleen Sullivan filed one, and District of Columbia-based attorney Daniel Schneider
filed Conspirators' fifth FEC complaint.

58.    Of the 24 state court complaints Conspirators filed against Nader-Camejo
nationwide, DNC officials filed seven in their own names, including Scott Maddox of
Florida, Dorothy Melanson of Maine, Mark Brewer of Michigan, Wayne Dowdy of
Mississippi, Kathleen Sullivan of New Hampshire (two) and Paul Berendt of
Washington.    In addition, DNC official James Edmundson of Oregon intervened in the
proceedings filed in that state, and on information and belief, DNC officials Michael
Madigan of Illinois and John Wertheim of New Mexico assisted in complaints filed in

15

their states. Finally, DNC official Anna Burger is Secretary-Treasurer of SEIU, which helped execute Defendants' and co-Conspirators' unlawful plans in Oregon. Thus, on information and belief, at least ten DNC officials directly participated in the Conspirators' nationwide legal assault.

59.    Furthermore, unidentified DNC officials specifically directed state party officials to initiate litigation against Nader-Camejo. The DNC also hired and paid for several state parties' lawyers and, on information and belief, coordinated with The Ballot Project to secure *pro bono* counsel in other states. High-level DNC staff developed and coordinated the conspiracy's nationwide litigation strategy, while rank-and-file DNC staff helped prepare the Conspirators' complaints.

60.    For example, an email DNC employee Caroline Adler sent to DNC staff contained an attachment entitled "Script for Nader Petition Signers," which DNC employees used to help Conspirators manufacture evidence upon which to challenge Nader-Camejo's nomination papers. The electronic document's properties indicate that DNC and Kerry-Edwards Campaign consultant Jack Corrigan authored this document.

61.    The Kerry-Edwards Campaign also joined the conspiracy, coordinating with lawyers and directly participating in the conspiracy's litigation. For example, an email from Judy Reardon, the Kerry-Edwards Campaign's deputy national director for northern New England, indicates Ms. Reardon herself drafted one of the Conspirators' complaints and coordinated with the Democratic Party officials and attorneys who filed it, including New Hampshire Democratic Party Chair Kathleen Sullivan.

62.    The Ballot Project directed the conspiracy in conjunction with the DNC and the Kerry-Edwards Campaign, all headquartered in the District of Columbia, and

coordinated with state Democratic Parties to recruit attorneys to provide counsel for the conspiracy's nationwide legal assault. As Conspirator Moffett told the *New York Times*, "We're doing everything we can to facilitate lawyers in over 20 states."

63.    At least 95 lawyers from 53 law firms eventually joined the litigation. The DNC, state Democratic Parties and The Ballot Project collectively paid these firms nearly $1 million, while their co-Conspirator bar members contributed in excess of $2 million in *pro bono* legal services.

64.    Despite their massive expenditure of resources and their campaigns of harassment, intimidation and sabotage, the Conspirators eventually lost the great majority of lawsuits they filed. The FEC also dismissed all five complaints Conspirators filed. The Conspirator's intent, however, was not to vindicate valid claims, but to use the sheer burden of litigation itself as a means to bankrupt and disrupt the Nader-Camejo Campaign, to keep Nader-Camejo off the ballot, and to suppress the candidates' speech and the Plaintiff-voters' rights of association. As Conspirator Moffett admitted to the *Washington Post* in August 2004, "We wanted to neutralize his campaign by forcing him to spend money and resources defending these things, but much to our astonishment we've actually been more successful than we thought we'd be in stopping him from getting on at all."

65.    After the 2004 election, Conspirator Moffett reaffirmed Defendants' and co-Conspirators' unlawful intent. "We had a role in the ballot challenges," Conspirator Moffett told *The Guardian UK* in December 2004. "We distracted him and drained him of resources. I'd be less than honest if I said it was all about the law. It was about stopping Bush from getting elected."

66.    During the election, however, Defendants and co-Conspirators denied and fraudulently concealed their involvement in Conspirators' groundless and abusive litigation against Nader-Camejo. In September 2004, for example, DNC spokesman Jano Cabrera told the Associated Press, "Our state parties made the decision to make sure that if Ralph Nader wanted to get on the ballot, that he was playing by the rules." Mr. Cabrera also specifically denied that the DNC was funding the state parties' litigation. In fact, FEC records now confirm, the DNC hired several of the state parties' law firms.

67.    John Kerry likewise denied involvement in Conspirators' wrongful litigation. "I respect [Mr. Nader]. I'm not going to attack him in any way," Mr. Kerry told the Associated Press in April 2004. "I'm just going to try to talk to his people and point out that we've got to beat George Bush. And I hope that by the end of this race I can make it unnecessary for people to feel they need to vote for someone else." In fact, however, despite John Kerry's prior disavowal, the Kerry-Edwards Campaign directly participated in at least one lawsuit Conspirators filed against Nader-Camejo.

68.    Defendants' and co-Conspirators' conspiracy against the Nader-Camejo Campaign in 2004 was unprecedented in its magnitude and scope. The DNC, the Kerry-Edwards Campaign, The Ballot Project, 18 state or local Democratic Parties, at least 95 lawyers from 53 law firms, and hundreds if not thousands of Democratic Party operatives conspired with the specific intent of using legal and administrative processes to bankrupt the Nader-Camejo Campaign and prevent Nader-Camejo from running for President and Vice President, thereby denying millions of Americans the choice of voting for them. Accordingly, Defendants and co-Conspirators unlawfully conspired to abuse legal and administrative processes to achieve four distinct but related improper purposes:

i.      Defendants and co-Conspirators unlawfully conspired to cause financial injury and other damages to the Nader-Camejo 2004 presidential campaign;

ii.     Defendants and co-Conspirators unlawfully conspired to cause financial injury and other damages to Mr. Nader and Mr. Camejo personally;

iii.    Defendants and co-Conspirators unlawfully conspired with state actors and acted under color of state law to violate Nader-Camejo's constitutional rights by preventing them from appearing on the ballot as candidates in the 2004 presidential election;

iv.     Defendants and co-Conspirators unlawfully conspired with state actors and acted under color of state law to violate Plaintiff-voters' constitutional rights, and those of others similarly situated, by denying voters their free choice of candidates in the 2004 presidential election.

## II.    Defendants or their co-Conspirators Engaged in Acts of Harassment, Intimidation and Sabotage in Furtherance of Their Conspiracy.

69.     The Conspirators knew that litigation alone would be insufficient to prevent Nader-Camejo from gaining ballot access in certain states. Therefore, to support their legal assault, Conspirators in these states engaged in acts of harassment, intimidation and sabotage, often under fraudulent or false pretenses. These acts were specifically intended to prevent Nader-Camejo from complying with state election laws, and to manufacture legal grounds for the Conspirators' otherwise baseless claims.

70.     In Ohio, where Mr. Nader received 117,857 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by collecting 5,000 signatures, Conspirators orchestrated a massive campaign of harassment and intimidation to prevent Nader-Camejo petitioners from collecting signatures. Defendants or co-Conspirators hired private investigators to visit petitioners' homes and warn them that they were the subject of a "background check" the investigators were conducting. Conspirators' lawyers also attempted to subpoena 27 different petitioners, and repeatedly called them at

home to demand their compliance. The subpoenas' demands were so unreasonable and burdensome that compliance would have prevented petitioners from doing anything else -- including collecting signatures. Specifically, the subpoenas demanded that petitioners on short notice report to the offices of law firms throughout the state and produce:

(1) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, and part-petitions, relating to the obtaining of signatures from Ohio residents for part-petitions and/or the Statement of Candidacy and Nominating Petition filed by Ralph Nader;

(2) All documents, including but not limited to correspondence, memoranda, notes, and/or electronic mail, relating to communications with: any persons affiliated with Ralph Nader; and any persons acting as solicitors to obtain signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

(3) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, contracts, bank checks, and bank account statements, relating to your being paid for obtaining signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

(4) All documents, including but not limited to, voter registration cards, drivers' licenses, bank account statements, leases, deeds, property tax assessments, and utility bills, evidencing your residence since January 1, 2000; and

(5) All documents, including but not limited to, voter registration cards, evidencing the states in which you have been registered to vote."

71.    In Oregon, where Mr. Nader received 77,357 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by holding a nominating convention with 1,000 attendees, Conspirators openly admitted their intention to interfere. "If we think it gets to a point where we need to step in and mobilize to make sure he doesn't get on the ballot, then we will," a spokesperson for America Coming Together (ACT), a Democratic 527 founded by SEIU, told CBS News in April 2004. ACT, SEIU, Oregon Democratic Party members and at least one local Oregon Democratic Party official subsequently

20

engaged in a coordinated effort to disrupt two Nader-Camejo nominating conventions, held in April and in June, causing them to fail. When Nader-Camejo later tried to gain ballot access by collecting signatures on nominating petitions, ACT and SEIU organized teams of operatives to sabotage the petitions under false pretenses, by deliberately signing them in the wrong place, thereby invalidating the entire sheet. Conspirators then resorted to the same harassment and intimidation tactics they employed in Ohio. Private detectives visited petitioners' homes and threatened them with jail time, while their co-Conspirator attorneys sent misleading letters falsely threatening petitioners with "conviction of a felony with a fine of up to $100,000 or prison for up to five years" if they submitted signatures that were later invalidated.

72.    In Pennsylvania, where Mr. Nader received 103,392 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by submitting 25,697 signatures, on information and belief Conspirators sabotaged Nader-Camejo's petitions under false pretenses by signing thousands of fake names. Nader-Camejo petitioners expunged approximately 7,000 such names, but did not detect a small number (687 or 1.3% of the total) among the 51,273 signatures they submitted. The Conspirators later used this manufactured evidence as a basis for their lawsuit and subsequent demand for $81,102.19 in litigation costs.

73.    The Conspirators' campaign of harassment, intimidation and sabotage was decisive to the success of their litigation against Nader-Camejo. The Conspirators won their lawsuits in Ohio, Oregon and Pennsylvania, and Illinois, but lost in every other state. Nader-Camejo also withdrew in Arizona, where the Conspirators sued first, due to the prohibitive cost of defending the litigation. Mr. Nader was on the ballot in each of

these states as a candidate in the 2000 presidential election, and Nader-Camejo would have been in 2004 but for the Conspirators' unlawful interference.

### III.    Defendants or Co-Conspirators Filed 24 State Law Complaints and Five FEC Complaints Against the Nader-Camejo Campaign in Furtherance of Their Conspiracy.

#### 1)  Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Arizona.

74.    On June 23, 2004, Dorothy Schultz and Betty Elizabeth Hughes, registered Democrats in Arizona, filed a complaint in the Maricopa County Superior Court challenging Nader-Camejo's nomination papers under A.R.S. § 16-351. The complaint identified Andrew S. Gordon and the law firm of Coppersmith, Gordon, Schermer, Owens and Nelson, P.L.C. as attorneys for Dorothy Schultz and Betty Elizabeth Hughes.

75.    State law prohibits the Arizona Democratic Party from filing challenges in its own name, but Chairman and DNC official Jim Pederson told the Associated Press that the Party had supported the plaintiffs and had informed the Kerry-Edwards Campaign about the lawsuit.

76.    On July 2, 2004, Nader-Camejo was forced to withdraw their nomination papers and end the proceeding due to the prohibitive cost of the litigation.

77.    On August 16, 2004, Nader-Camejo filed a complaint in the United States District Court for the District of Arizona, challenging Arizona's filing deadline.

78.    On August 31, 2004, plaintiff Schultz filed an intervenor's motion to dismiss and requested Rule 11 sanctions in Nader-Camejo's District Court proceeding. Plaintiff Schultz's motion to dismiss identified Thomas K. Irvine, Larry J. Wulkan, the

Irvine Law Firm, P.A., Marty Harper, Kelly J. Flood and Shughart, Thompson and Kilroy, P.C. as her attorneys.

79.    On September 10, 2004, the District Court denied Plaintiff Schultz's Rule 11 motion and denied Nader-Camejo injunctive relief. Nader-Camejo did not appear on the Arizona ballot as candidates in the 2004 presidential election.

80.    In 2004 the DNC transferred at least $253,458 to the Arizona Democratic Party, and at least $2,500 to Arizona Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 2) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Arkansas.

81.    On September 10, 2004, Linda Chesterfield, a registered Democrat in Arkansas, and the Democratic Party of Arkansas filed a complaint in the Circuit Court of Pulaski County, Sixth Division, challenging Nader-Camejo's nomination papers under Ark. Stat. Ann. § 7-7-103(d). The complaint identified Robin J. Carroll, the law firm of Vickery and Carroll, P.A. and Brian D. Greer as plaintiffs' attorneys.

82.    On September 20, 2004, the Circuit Court of Pulaski County ordered the Secretary of State to remove Nader-Camejo from the Arkansas state ballot.

83.    On September 21, 2004, Nader-Camejo appealed to the Supreme Court of Arkansas, which vacated the lower court's order and directed the Secretary of State to certify Nader-Camejo's nomination papers. Nader-Camejo appeared on the Arkansas ballot as candidates in the 2004 presidential election.

84.     In 2004 the DNC transferred at least $266,101 to the Arkansas Democratic Party, and at least $286,364 to Arkansas Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 3) Defendants or co-Conspirators filed two complaints against the Nader-Camejo Campaign in Colorado.

85.     On September 13, 2004, Valentin Vigil, Gary Fedel and Susan Fedel, registered voters in Colorado, and Colorado Democratic Party Executive Director Julie DeWoody, on behalf of the Colorado Democratic Party, filed a complaint in the District Court of Denver County, Colorado challenging Nader-Camejo's nomination papers under C.R.S. 1-4-501(3). The complaint identified David Fine, Michael Belo, the law firm Kelly, Haglund, Garnsey and Kahn, LLC, and the law firm Berenbaum, Wienshienk and Eason as their attorneys.

86.     On September 13, 2004, Nancy Pakieser, a registered Democrat in Colorado, and Maurice O. Nyquist, a registered voter in Colorado, filed a separate complaint in the District Court of Denver County, Colorado, challenging Nader-Camejo's nomination papers under C.R.S. 1-4-501(3). The Pakieser complaint identified Mark G. Grueskin of the firm Isaacson, Rosenbaum, Woods and Levy, P.C. as their attorneys.

87.     In an oral decision, the District Court dismissed both complaints, and Nader-Camejo appeared on the Colorado ballot as candidates in the 2004 presidential election.

88.     IRS records indicate that The Ballot Project coordinated with Isaacson Rosenbaum and reimbursed the firm for its expenses. In addition, in 2004 the DNC

transferred at least $224,930 to the Colorado Democratic Party, and at least $1,973,504 to Colorado Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 4) Defendants or co-Conspirators filed two complaints against the Nader-Camejo Campaign in Florida.

89. On September 2, 2004, Candice Wilson and Alan Herman, registered voters in Florida, Scott Maddox, Chairman of the Florida Democratic Party, and the Florida Democratic Party filed a complaint in the Second Judicial Circuit Court for Leon County, Florida, challenging Nader-Camejo's nomination papers under Fla. Stat. § 102.168. The complaint identified Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Richard Rosenthal, the law firm Podhurst Orseck, P.A., the law firm Messer, Caparello and Self, P.A., and the Law Offices of Richard Rosenthal as attorneys for the plaintiffs.

90. On September 2, 2004, Florida voters Harriet Jane Black, William Chapman, Robert Rackleff and Terry Anderson filed a separate complaint in the Second Judicial Circuit Court for Leon County, Florida, challenging Nader-Camejo's nomination papers under Fla. Stat. § 102.168. The complaint identified Edward Stafman as attorney for the plaintiffs. Subsequent filings identified Brooke Lewis and David Miller of the firm Broad and Cassel, and Joel Perwin of the Law Office of Joel S. Perwin as attorneys for the plaintiffs.

91. On September 9, 2004, the Circuit Court issued a preliminary injunction enjoining the Secretary of State from certifying Nader-Camejo as candidates for President and Vice President in Florida. "I'm quite confident in the ruling," Circuit Court

Judge Kevin P. Davey told the *Washington Post*. "There's at least 15 reasons as to why they won't qualify, at least 15 that I counted up. If it was one or two, I'd be worried about it, but there's a whole lot of reasons Mr. Nader and Mr. Camejo aren't going to appear on the ballot in Florida."

92.    "Florida is huge – huge," Conspirator Moffett told a Knight-Ridder reporter after Judge Davey's decision. "Florida is not only important for the obvious reasons, but also as a symbolic victory."

93.    On September 10, 2004, Nader-Camejo appealed to Florida's First District Court of Appeals for a stay of the Circuit Court's preliminary injunction. Attorneys Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Richard Rosenthal and Joel Perwin filed an opposition to this appeal. The Court of Appeals *sua sponte* certified the case to the Supreme Court of Florida. The Supreme Court accepted jurisdiction but directed the Circuit Court to proceed to final judgment first.

94.    On September 15, 2004, the Circuit Court issued an order enjoining the Secretary of State from certifying Nader-Camejo as candidates for President and Vice President in Florida.

95.    On September 16, 2004, attorneys Edward Stafman, Kelly Overstreet Johnson, David Miller and Brooke Lewis submitted an appellees' brief to the Supreme Court of Florida in support of plaintiffs below. Attorneys Laurence Tribe, Joel Perwin, Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Richard Rosenthal, Martin Lederman, Eric Seiler, Amy Brown and Katherine Pringle submitted a separate appellees' brief in support of plaintiffs below.

96.    Attorney Pringle's bio on her firm's website states that she "served as co-counsel to the Kerry for President Campaign in litigation concerning the 2004 Florida election ballot."

97.    On September 17, 2004, attorney Laurence Tribe argued before the Florida Supreme Court on behalf of the plaintiffs below that Nader-Camejo did not meet the requirements to be candidates for President and Vice President in Florida. Defending his involvement, Mr. Tribe told Harvard Law School's independent newspaper *The Record*, "I believe that Ralph Nader is unfortunately responsible for the fact that Bush rather than Gore became the 43rd President."

98.    A team of attorneys assisted Mr. Tribe, including M. Stephen Turner, Edward Stafman, Kelly Overstreet Johnson, David Miller, Brooke Lewis, Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Thomas Findley, Richard Rosenthal and Joel Perwin.

99.    On September 17, 2004, the Supreme Court of Florida reversed the trial court and vacated the Court of Appeals' injunction. Nader-Camejo appeared on the Florida ballot as candidates in the 2004 presidential election.

100.    The Conspirators reportedly recruited 30 lawyers in total to challenge Nader-Camejo's Florida nomination papers. The Conspirators did not sue other candidates on Florida's ballot, Mr. Moffett told the *Washington Post*, because those candidates didn't pose a threat to the Kerry-Edwards Campaign.

101.    IRS records indicate that The Ballot Project paid $150,000 to Broad and Cassel for representing the Florida plaintiffs, and another $5,000 to attorney Samuel Dubbin. The Ballot Project also paid $20,534 to American University professor Allan

Lichtman to testify as an expert witness. FEC records indicate that the Florida Democratic Party retained Messer, Caparello and Self, and paid the firm $57,481 in 2004. FEC records also indicate that the DNC reimbursed Joel S. Perwin and Martin Lederman $975 and $536, respectively, for travel expenses in 2004. Finally, in 2004 the DNC transferred at least $1,709,626 to the Florida Democratic Party, and at least $4,789,765 to Florida Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 5) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Illinois.

102.      On June 28, 2004, John F. Tully, Jr., a registered Democrat in Illinois, filed a complaint with the Illinois State Board of Elections challenging Nader-Camejo's nomination papers under 10 ILCS 5/10-8. Michael Kasper and Michael Kreloff served as Mr. Tully's attorneys before the Board of Elections and in subsequent proceedings. Mr. Kasper is General Counsel and Treasurer of the Illinois Democratic Party. Mr. Kreloff is a Democratic Party Committeeman from Cook County.

103.      Neither Mr. Kasper nor Mr. Kreloff disclosed his employment by or affiliation with the Illinois Democratic Party in court filings, but the *Illinois Times* reported that Mr. Tully "formally filed the objection" on the Party's behalf. Media reports and records from the Chicago Board of Election Commissioners also indicate that Democratic Speaker of the Illinois State House Michael Madigan's staff secured copies of Nader-Camejo's nomination papers in order, on information and belief, to help prepare Mr. Tully's complaint.

104.    On July 6, 2004, the Board of Elections invalidated thousands of signatures on Nader-Camejo's nomination petition and determined that it was short of the 25,000 required by Illinois law.

105.    On July 27, 2004, Nader-Camejo sought a preliminary injunction in the United States District Court for the Northern District of Illinois, Eastern Division, to enjoin the Board of Elections from removing them from the Illinois ballot.

106.    On August 4, 2004, Mr. Tully, through his Democratic Party attorneys Mr. Kasper and Mr. Kreloff, filed a motion to dismiss Nader-Camejo's complaint in the District Court.

107.    On August 19, 2004, the Board of Elections found that Nader-Camejo were not certified as candidates for President and Vice President in Illinois.

108.    On August 23, 2004, the District Court denied Nader-Camejo's motion for a preliminary injunction. Nader-Camejo immediately appealed to the United States Court of Appeals for the Seventh Circuit.

109.    On August 27, 2004, Nader-Camejo sought expedited review of the Board of Elections' August 19th decision in the Illinois Appellate Court for the First District from the Circuit Court of Cook County.

110.    On September 23, 2004, the Illinois Appellate Court affirmed the Board of Elections' decision to remove Nader-Camejo from the Illinois ballot.

111.    On September 29, 2004, the Seventh Circuit Court of Appeals denied Nader-Camejo's appeal. Nader-Camejo did not appear on the Illinois ballot as candidates in the 2004 presidential election.

112.    The Ballot Project paid Mr. Kreloff $12,000 for legal consulting in 2004. In addition, in 2004 the DNC transferred at least $86,301 to the Illinois Democratic Party, and at least $5,000 to Illinois Victory 2004.  On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 6) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Iowa.

113.    On August 20, 2004, Lee Baldwin Jolliffe, a registered Democrat, filed a complaint with the Iowa State Commissioner of Elections challenging Nader-Camejo's nomination papers under Iowa Code § 44.4.  The complaint identified Steven P. Wandro, the law firm of Wandro, Baer and Casper, P.C., Glenn L. Norris and the law firm of Hawkins and Norris, P.C. as her attorneys.

114.    On August 26, 2004, Ms. Jolliffe told the Des Moines Register that she was a supporter of John Kerry, and that she filed her objection because "I was really upset with the last election," when Democrat Al Gore lost to George W. Bush.  The Des Moines Register also identified Mr. Wandro and Mr. Norris as Democrats.

115.    Ms. Jolliffe filed her complaint based upon a review of Nader-Camejo's petition to determine whether the signers were included as registered voters on the Iowa Democratic Party's Voter Activation Network, a proprietary database of voters.  Ms. Jolliffe thus received valuable material support from the Iowa State Democratic Party in preparing her complaint.

116.    On August 30, 2004, Iowa's Secretary of State found Nader-Camejo's nomination papers valid.  Nader-Camejo appeared on the Iowa ballot as candidates for President and Vice President.

117.    In 2004 the DNC transferred at least $1,294,404 to the Iowa Democratic Party, and at least $1,420,650 to Iowa Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 7) Defendants or co-Conspirators filed two complaints against the Nader-Camejo Campaign in Maine.

118.    On August 23, 2004, Maine Democratic Party Chair and DNC official Dorothy M. Melanson filed a complaint with Maine's Secretary of State challenging Nader-Camejo's nomination papers under 21-A M.R.S. § 356. The complaint identified Michael K. Mahoney and the law firm Preti, Flaherty, Beliveau, Pachios, and Haley as Ms. Melanson's attorneys.

119.    On August 23, 2004, Benjamin Tucker, a registered Democrat in Maine, filed a second complaint challenging Nader-Camejo's nomination papers under 21-A M.R.S. § 356. Mr. Tucker's complaint identified James T. Kilbreth and the law firm Verrill and Dana, LLP as Mr. Tucker's attorneys.

120.    On August 30-31, 2004, the Maine Bureau of Corporations, Elections, and Commissions held a public hearing on Ms. Melanson's and Mr. Tucker's complaints. At the hearing, Ms. Melanson testified that she was a salaried employee of the Democratic Party, and that she had formerly held many positions with the DNC. In fact, Ms. Melanson was and is currently a DNC official. In response to questioning from Nader-Camejo's attorney, Ms. Melanson testified:

> Q:    I'm asking you if the Democratic Party has contacted you personally and said we will support with money with other supports that as you need them to bring a challenge against the

31

petitions of Ralph Nader in Maine. Has the Democratic Party contacted you personally and asked you to do this?

A:    Yes.

Q:    And have they said they will help you pay for it?

A:    They have said they would help in many ways.

Q:    Did they say they would help you pay for it?

A:    Yes.

Q:    Are they paying for your attorneys?

A:    They are.

Q:    Do they expect that you should make a response to them in your capacity as state Democratic Chair once these hearings are concluded and a decision is rendered by the Secretary of State's office?

A:    Are they expecting to hear what the decision is?

Q:    From you personally?

A:    Yes.

Q:    Was this part of the agreement that you made with them? I mean, I characterize what I've heard so far as an agreement between them and you to perform certain deeds for funds and to make a response as part of this agreement. Is that correct? In other words, they're expecting a report?

A:    There are members of the DNC who certainly want to hear what the outcome of this is.

Q:    They're expecting to hear this from you and from no other person?

A:    Or from my attorneys.

121.    On September 8, 2004, the Secretary of State denied both Ms. Melanson's and Mr. Tucker's complaints. Ms. Melanson appealed to the Kennebec Superior Court of Maine on September 10, 2004. The Superior Court denied the appeal

on September 27, 2004. Ms. Melanson appealed that decision to the Maine Supreme Judicial Court, which affirmed the Superior Court on October 8, 2004. Nader-Camejo appeared on the Maine ballot as candidates in the 2004 presidential election.

122.    The DNC retained Preti, Flaherty, Beliveau, Pachios, and Haley in September and October of 2004, and paid the firm $32,282 in legal and political consulting fees. In addition, in 2004 the DNC transferred at least $222,412 to the Maine Democratic Party, and at least $373,559 to Maine Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 8) Defendants or co-Conspirators filed an FEC complaint and a state court complaint against the Nader-Camejo Campaign in Michigan.

123.    On July 9, 2004, Michigan's Secretary of State refused to certify Nader-Camejo's nomination as the Reform Party candidates for President and Vice President in Michigan.

124.    On July 15, 2004, Nader-Camejo filed a nomination petition to gain ballot access as a independent candidates for President and Vice President. The next day, the Michigan Democratic Party issued a press release entitled, "Democrats to File Complaint Unless Nader Withdraws."

125.    On July 22, 2004, Mark Brewer, Michigan Democratic Party Executive Chair and Vice Chair of the DNC, filed a complaint with the Michigan State Bureau of Elections challenging Nader-Camejo's nomination papers under NCLS § 168.552. The complaint identified Mary Ellen Gurewitz, Andrew Nickelhoff, and the law firm of Sachs, Waldman as attorneys for the plaintiffs.

126.    Ms. Gurewitz's bio on the Sachs Waldman website states that Ms. Gurewitz "provides representation to the Michigan Democratic Party and has represented many candidates…in election related matters, including ballot access." Mr. Nickelhoff's bio states that Mr. Nickelhoff "provides representation and advice to the Michigan Democratic Party, as well as Democratic Party organizations and candidates."

127.    On September 3, 2004, the Michigan State Court of Appeals ruled that Nader-Camejo was qualified to appear on Michigan's ballot. Nader-Camejo appeared on the Michigan ballot as candidates in the 2004 presidential election.

128.    On September 17, 2004, Mr. Brewer filed an FEC complaint against the Nader-Camejo Campaign, requesting that the FEC suspend presidential matching fund payments to the campaign. The FEC took no action against the Nader-Camejo Campaign and dismissed the complaint by unanimous vote on June 23, 2005.

129.    In 2004 the DNC transferred at least $251,327 to the Michigan Democratic Party, and at least $2,963,649 to Michigan Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 9) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Mississippi.

130.    On September 3, 2004, Wayne Dowdy, DNC official and Chairman of the Mississippi Democratic Party, filed a complaint on behalf of the party with the Mississippi State Board of Election, challenging Nader-Camejo's nomination papers under Miss. Code Ann, 23-15-963. The complaint identified Samuel L. Begley and Begley Law Firm, PLLC as attorneys for the plaintiffs.

34

131.    On September 7, 2004, the Board of Election Commissioners held a hearing on the complaint. Mr. Begley, Brad Pigott of Pigott, Reeves, Johnson and Minor, P.A., and Richard Davidson represented the Democratic Party at the hearing. At the hearing's conclusion, the Board denied the Democratic Party's complaint. Nader-Camejo appeared on the Mississippi ballot as a candidates in the 2004 presidential election.

132.    The DNC paid the Begley Law Firm legal consulting fees of $6,501 on October 15, 2004. In addition, in 2004 the DNC transferred at least $89,519 to the Mississippi Democratic Party. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 10) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Nevada.

133.    On August 24, 2004, registered Democrats Renee McKinley and Joan T. Ward, joined by registered voter Myrna McKinley and the Nevada State Democratic Party, filed a complaint in Nevada's First Judicial District Court challenging Nader-Camejo's nomination papers under Nev. Rev. Stat. Ann. § 298.109. The complaint and subsequent court filings identified Paul E. Larsen, Allen J. Wilt, and the law firm of Lionel, Sawyer and Collins as attorneys for the plaintiffs.

134.    On August 30, the District Court commenced a three-day expedited hearing to consider the complaint. Ian Glinka, Director of Information Technology for the Nevada State Democratic Party, testified that he had reviewed Nader-Camejo's nomination papers and concluded that thousands of signatures were invalid.

135.    On September 1, 2004, the District Court denied plaintiffs' complaint, and they appealed to the Nevada State Supreme Court, which affirmed the District Court

on September 15, 2004. Nader-Camejo appeared on the Nevada ballot as candidates in the 2004 presidential election.

136.    In 2004 the DNC transferred at least $575,458 to the Nevada Democratic Party, and at least $1,146,292 to Nevada Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 11) Defendants or co-Conspirators filed an FEC complaint and two state court complaints against the Nader-Camejo Campaign in New Hampshire.

137.    On August 10, 2004, New Hampshire Democratic Party Chair Kathleen Sullivan filed an FEC complaint against the Nader-Camejo Campaign. The FEC took no action against the Nader-Camejo Campaign and dismissed the complaint by unanimous vote on June 23, 2005.

138.    On September 7, 2004, DNC official and New Hampshire Democratic Party Chair Kathleen Sullivan and the New Hampshire Democratic State Committee filed a complaint with the New Hampshire Ballot Law Commission challenging Nader-Camejo's nomination papers under RSA 655:44.

139.    On September 13, 2004, Kathleen Sullivan and New Hampshire voters Hazel R. Tremblay, Dorie M. Grizzard and Brian Farias filed a second complaint challenging Nader-Camejo's nomination papers under RSA 655:44. The complaint identified Martha Van Oot, Emily Gray Rice and the law firm Orr and Reno, P.A. as attorneys for the plaintiffs.

140.    Ms. Van Oot and Ms. Rice worked on the lawsuit in coordination with Kathleen Sullivan and Judy Reardon, the Kerry-Edwards Campaign's deputy national

director for Northern New England. Ms. Reardon drafted the complaint, while Ms. Van Oot made hand-written revisions, which were circulated to Ms. Sullivan, Ms. Reardon and attorneys Mark Atkins of Welts, White and Fontain, Burt Nadler of Petrucelly and Nadler, and Martin Honigberg of Sulloway and Hollis.

141.    On September 24, 2004, the Commission voted unanimously to deny the two complaints. Nader-Camejo appeared on the New Hampshire ballot as candidates in the 2004 presidential election.

142.    The Kerry-Edwards Campaign paid Ms. Reardon $64,000 from March to July, 2004. In addition, in 2004 the DNC transferred at least $284,554 to the New Hampshire Democratic Party, and at least $978,590 to New Hampshire Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 12) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in New Mexico.

143.    At the 2004 Democratic National Convention, The Ballot Project president Toby Moffett told New Mexico State Democratic Party Chair and DNC official John Wertheim that he should appoint someone to spearhead the party's efforts to deny Nader-Camejo ballot access in New Mexico. Mr. Wertheim agreed to do so, stating, "This is a central focus of my own duties as chairman."

144.    On September 10, 2004, attorney Eric Sedillo Jeffries, the New Mexico contact for the group Lawyers for Kerry, wrote to New Mexico's Secretary of State that he represented "at least three Democrats who will probably be filing a suit on the Nader petitions received by your office." On the last page of Attorney Jeffries' letter, he

indicated that he had copied several parties, including the clients referenced above and Mr. Nader. Attorney Jeffries used the standard "cc:" designation to indicate this fact. On a separate page of the letter, which was otherwise blank, Attorney Jeffries indicated that he had secretly copied three additional parties via email. Jeffries used the standard "bcc:" designation to indicate this fact. The three additional parties were New Mexico State Democratic Party Deputy Executive Director Gideon Elliot, New Mexico State Democratic Party Chair and DNC Official John Wertheim, and attorney Andrew Schultz.

145.    On September 15, 2004, plaintiffs Moises Griego, Richard W. Kirschner, Abraham Gutman, Vanessa M. Alarid and Laura LaFlamme filed a complaint in the Second Judicial District Court of New Mexico, presumably under N.M. Dist. Ct. R.C.P. 1-096, seeking a preliminary injunction to prevent the Secretary of State from placing Nader-Camejo on New Mexico's ballot as candidates for President and Vice President of the United States. The complaint identified Eric Sedillo Jeffries, Andrew G. Schultz, the law firm Jeffries, Rugge, and Rosales, P.C., and the law firm Rodey, Dickason, Sloan, Akin and Robb, P.A. as attorneys for the plaintiffs.

146.    On September 17, 2004, District Court Judge Wendy York issued an order denying Nader-Camejo's right to run as independent candidates for President and Vice President in New Mexico. Three days later, several New Mexico voters revealed that Judge York had donated $1,000 to Democratic presidential candidate John Kerry's campaign. Judge York's order was vacated, and she recused herself from the case. That same day, District Court Judge Theresa Baca issued an identical order.

147.    On September 23, 2004, pursuant to Nader-Camejo's appeal, the New Mexico State Supreme Court stayed the District Court's order, and directed the Secretary

of State not to destroy or distribute any ballots pending further order. That same day, three registered New Mexico voters filed a complaint seeking injunctive relief in the United States District Court for the District of New Mexico. The complaint requested the federal District Court to direct the Secretary of State to place Nader-Camejo on New Mexico's ballot as candidates for President and Vice President of the United States.

148.    On September 24, 2004, the federal District Court held a hearing. Attorney Jerry Todd Wertheim made an oral motion to intervene on behalf of state court plaintiff Venessa Alarid. The court denied Attorney Wertheim's motion. Jerry Todd Wertheim is a partner with the firm Jones, Snead, Wertheim and Wentworth, P.A., where New Mexico Democratic Party Chair and DNC official John Wertheim is also a partner.

149.    On September 28, 2004, the federal District Court directed the Secretary of State to place Nader-Camejo on New Mexico's ballot. Nader-Camejo appeared on the New Mexico ballot as candidates in the 2004 presidential election .

150.    In 2004 the DNC transferred at least $621,992 to the New Mexico Democratic Party, and at least $1,167,980 to New Mexico Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 13) Defendants or co-Conspirators filed two complaints against the Nader-Camejo Campaign in Ohio.

151.    On August 18, 2004, the Nader-Camejo Campaign submitted to the Ohio Secretary of State's Election Division a nomination petition with 14,473 signatures. State law required the campaign to submit 5,000 valid signatures, and no more than 15,000 signatures in total.

152.    On August 30, 2004, Ohio voters Benson A. Wolman, Jerilyn L. Wolman, Zachary E. Manifold, Julia E. Manifold, Bassel Korkor, Rebecca S. Mosher, Barry C. Keenan, Gerald L. Robinson, Scott Austin, Mary C. Woods, Johnathon Brunner, Max Kravitz and Daniel T. Kobil filed a complaint with Ohio's Secretary of State challenging Nader-Camejo's nomination papers under ORC Ann. 3513.05 and 3513.257. The complaint identified Donald J. McTigue and the law offices of Donald J. McTigue as attorneys for the plaintiffs.

153.    On August 30, 2004, Attorney McTigue requested the Secretary of State to issue subpoenas to nine Nader-Camejo Campaign petitioners, commanding them to appear at the offices of McGinnis and Associates, a court reporting firm, only four days later, on September 3, 2004. Attorney McTigue's request stated:

> Each subpoena should command the individual to bring with them all documents which relate in any manner to the circulation of nominating petitions on behalf of Ralph Nader...in Ohio or any other state, all documents which document any contract or payment from the circulation of such petitions, all documents regarding their voter registration status in Ohio or any other state at anytime, and all assessments, which evidence any residence or residences by such person in Ohio during the years 2000 through 2004.

The Secretary of State did not issue any subpoenas pursuant to this request.

154.    On September 2, 2004, plaintiffs Benson Wolman, Marjorie Bender and Robert Crosby, Jr. filed a second complaint, presumably also under ORC Ann. 3513.05, and 3513.257, for a declaratory judgment and injunctive relief in the Court of Common Pleas for Franklin County. The plaintiffs requested a preliminary injunction enjoining the Secretary of State from placing Nader-Camejo on Ohio's ballot as candidates for President and Vice President.

155.    On September 4, 2004, plaintiffs Benson Wolman, Marjorie Bender and Robert Crosby, Jr. secured subpoenas from the Franklin County Court of Common Pleas for several Nader-Camejo Campaign petitioners.    The subpoenas identified John P. Gilligan and Russell J. Kuttell of the law firm Schottenstein, Zox and Dunn, L.P.A, and Attorney McTigue as attorneys for the plaintiffs.

156.    The subpoenas commanded Nader-Camejo petitioners to appear and give testimony at law firm offices throughout Ohio. Six petitioners were to appear at the offices of Schottenstein, Zox and Dunn, L.P.A. in Cleveland on September 8, 2004.  Six petitioners were to appear at the offices of Beckman, Weil, Shepardson and Faller, LLC in Cincinnati on September 9, 2004.  Eleven petitioners were to appear at the offices of Sebaly, Shillito and Dyer, L.P.A. in Dayton on September 10 and 13, 2004.  Four petitioners were to appear at the offices of Eastman and Smith, Ltd. in Toledo on September 14, 2004.

157.    The subpoenas also commanded each Nader-Camejo petitioner – many of them volunteers – to produce:

1) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, and part-petitions, relating to the obtaining of signatures from Ohio residents for part-petitions and/or the Statement of Candidacy and Nominating Petition filed by Ralph Nader.

2) All documents, including but not limited to correspondence, memoranda, notes, and/or electronic mail, relating to communications with:

   a.  any persons affiliated with Ralph Nader; and

   b.  any persons acting as solicitors to obtain signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio.

3) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, contracts, bank checks, and bank account statements,

41

relating to your being paid for obtaining signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio.

4) All documents, including but not limited to, voter registration cards, drivers' licenses, bank account statements, leases, deeds, property tax assessments, and utility bills, evidencing your residence since January 1, 2000.

5) All documents, including but not limited to, voter registration cards, evidencing the states in which you have been registered to vote.

158.    One volunteer petitioner received repeated phone calls from Andrew Clubock, an attorney in Washington, D.C. with the law firm Kirkland and Ellis, who left only his name and the message, "Call me about the subpoena." Another volunteer petitioner received a visit to her home from a private detective who claimed to be investigating her. He left a card and told her to call his firm.

159.    On September 7, 2004, Ohio's Attorney General filed a motion for a protective order in the Court of Common Pleas to prevent enforcement of plaintiffs' subpoenas. The Attorney General's memorandum in support of the motion stated:

The Plaintiffs in this case seek to prohibit Ralph Nader from securing a spot to run for president on the Ohio ballot. As part of that strategy, either these specific plaintiffs, or those acting in concert with them, have filed protests with the Ohio Secretary of State concerning various Nader petitions.

160.    On September 7, 2004, Attorneys Gilligan, Kuttell and Steven D. Forry of Schottenstein, Zox and Dunn and Attorney McTigue filed a motion to compel depositions and requested oral argument on the motion. The same day, attorney Attorney Clubock of Kirkland and Ellis wrote to Nader-Camejo's counsel, threatening, "we have no choice but to take all appropriate action to enforce the subpoena and seek any other potential remedies for your conduct."

161.    On September 8, 2004, the Secretary of State found that 6,464 signatures on Nader-Camejo's petition were valid and certified the petition. That same day, the Court of Common Pleas granted the Secretary of State's motion for a protective order and stay of discovery.

162.    On September 24, 2004, attorneys Andrew Clubock, Gregory F. Corbett and Jennifer Levy of Kirkland and Ellis conducted a deposition of Nader-Camejo Campaign Manager Theresa Amato, which lasted approximately 1-1/2 hours.

163.    On September 28, 2004, pursuant to hearings on Conspirators' complaints, the Secretary of State invalidated 2,756 more signatures and reversed certification of Nader-Camejo's petition.

164.    On October 6, 2004, Nader-Camejo filed for injunctive relief in the United States District Court for the Southern District of Ohio, Eastern Division. On October 7, 2004, the plaintiffs filed a motion to intervene, asserting that they "are truly the real parties in interest here." The court granted the plaintiffs' motion to intervene and denied Nader-Camejo's motion for injunctive relief on October 12, 2004. Nader-Camejo appealed to the Sixth Circuit Court of Appeals, which denied the appeal on or about October 18, 2004.

165.    On October 19, 2004, the Ohio Supreme Court denied Nader-Camejo's request for a writ of mandamus. Nader-Camejo did not appear on the Ohio ballot as candidates in the 2004 presidential election.

166.    According to the *Toledo Blade*, the Ohio challenge to Nader-Camejo's nomination papers was "filed by attorneys hired by or allied with the Ohio Democratic Party...[as] part of a nationwide effort to prevent Mr. Nader from siphoning votes from

Democratic presidential candidate John Kerry." In fact, Attorney Gilligan of Schottenstein, Zox and Dunn was the Columbus, Ohio contact and Attorney Gregory Corbett of Kirkland and Ellis was the Washington, D.C. contact for the group Lawyers for Kerry. In addition, Attorney McTigue identified the Ohio Democratic Party as his client in an email to Ohio county boards of elections on August 22, 2004. Attorney McTigue also wrote a letter to the Cuyahoga County Board of Elections on December 10, 2004, stating that John Kerry had personally appointed Attorney McTigue "as his legal counsel...with full authority to act on behalf of him and John Edwards" during the Ohio recount of the 2004 presidential election returns.

167.    The DNC retained Schottenstein, Zox and Dunn, L.P.A. and paid the firm $39,486 in legal and political consulting fees in September and October of 2004. The DNC also retained Kirkland and Ellis, and paid the firm $247,711 in legal and political consulting fees in September and November of 2004. In addition, in 2004 the DNC transferred at least $2,585,189 to the Ohio Democratic Party, and at least $3,065,661 to Ohio Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 14) Defendants or co-Conspirators intervened in proceedings to deny Nader-Camejo ballot access in Oregon.

168.    In April 2004, a spokesperson for the Democratic 527 organization ACT told CBS News, "If we think it gets to a point where we need to step in and mobilize to make sure [Nader-Camejo] doesn't get on the ballot, then we will." Later that month, according to CBS, "ACT joined forces with other organizations in the state to discourage people from signing the petition" at Nader-Camejo's April nominating convention,

causing the convention to fall short of the 1,000 signing attendees necessary to qualify for ballot access under state law.

169.    On June 26, 2004, Nader-Camejo held another nominating convention. This time the Conspirators, acting under false pretenses, took seats at the convention but refused to sign Nader-Camejo's petitions.  The Conspirators acted pursuant to an email Multnomah County Democratic Party official Moses Ross sent to party members, stating:

> We need as many Oregon Democrats as possible to fill that room and NOT sign that petition.  If we attend in large numbers and politely refuse to sign, Nader is denied his needed numbers. It's that simple. Please make every attempt to attend this important event.

170.    State officials from Democratic Secretary of State Bill Bradbury's office restricted entry to the convention to one doorway, and counted attendees with a manual clicker.  In violation of state law providing that nominating conventions may last up to 24 hours, state officials shut the doors after counting approximately 1,100 attendees, before Mr. Nader had even addressed the convention.  State officials thereafter refused entry to Nader-Camejo's legitimate supporters.  This action by state officials, together with the actions of Conspirators who attended the convention but refused to sign the petitions, caused the convention to fall short of the 1,000 signing attendees.

171.    On the same day that Conspirators disrupted Nader-Camejo's June convention, they also organized a campaign of harassing phone calls to the office of Plaintiff-voter Gregory Kafoury, which was serving as Nader-Camejo's nomination convention headquarters.  Each caller to Mr. Kafoury's office spoke virtually identical words, as if speaking from a script, and the calls came so rapidly that they incapacitated the office phones for the entire day.

172.    After disrupting Nader-Camejo's two nominating conventions, the Conspirators launched a coordinated campaign of harassment, intimidation and sabotage intended to prevent Nader-Camejo from gaining ballot access by submitting signatures, as Oregon state law alternatively permits.  On August 12, 2004, private investigators hired by SEIU visited petitioners at their homes and falsely threatened them with jail time if signatures they collected were subsequently invalidated.  The investigators also delivered petitioners a letter from attorney Margaret Olney of the law firm Smith, Diamond and Olney, which reiterated the false threat.  The letter stated that the petitioners must certify that they "obtained the signatures of qualified voters," or face "conviction of a felony with a fine of up to $100,000 or prison for up to five years."  This false threat was accompanied by a suggestion that the petitioners call Attorney Olney if they had any information to assist an investigation she claimed her firm was conducting. The blog Blue Oregon subsequently quoted SEIU local 49 chief Alice Dale admitting that SEIU had mailed the letters to 59 petitioners, and that "Two were delivered in person."

173.    SEIU and ACT took even more extreme measures to deny Nader-Camejo ballot access.  According to Portland, Oregon ACT employee William Gillis, the groups jointly orchestrated a campaign to sabotage Nader-Camejo's petitions.  Following is an excerpt from Mr. Gillis' blog, posted in August 2004:

> The offices that I work in, at America Coming Together, are shared by SEIU's election campaign and both organizations are rather heavily tied…For days now, most of the ACT staff had been aware of, if not complicit in, a scheme against the Nader Campaign.

> People were pulled into side rooms and the higher echelons of both staffs exchanged a barrage of unusual whispered conversations. What's more, today was set up to be a massive single-day canvassing effort on the part of ACT.

In the last few days I've heard of a concerted effort among the ACT/SEIU staff to attack the Nader petition drive.

A few of my fellow canvassers who were likely to be in the vicinity of the Nader campaign told me they had been asked to "mistakenly" invalidate petition papers. Misspelling names or information was a classical attack, but the SEIU had figured a better method.

On every page of signatures in an Oregon petition there is a small section on the bottom for the signature gatherer to sign, asserting their valid oversight. If asked to sign the Nader petition, our canvassers were encouraged to accidentally sign their name in that section instead. Upon realizing their mistake, these innocent canvassers would scribble it out, thus invalidating an entire sheet of signatures.

174.    Despite coordinated efforts by the Oregon Democratic Party, SEIU and ACT to prevent Nader-Camejo from complying with state law, on August 24, 2004 the Nader-Camejo Campaign submitted 18,186 signatures, already certified as valid by county elections officials, to Secretary Bradbury's office. This was almost 2,800 more valid signatures than Oregon law required.

175.    On August 25, 2004, attorney Roy Pulvers sent a letter to Secretary Bradbury challenging Nader-Camejo's nomination papers. Mr. Pulvers is a contributor to the DNC and a member of the Oregon Democratic Party's President Council, "the party's largest revenue source for "federal" dollars to support presidential, senatorial, and congressional candidates." Attorney Pulvers sent a second letter the same day, asserting that Nader-Camejo's nomination papers were "misnumbered" and should be disqualified.

176.    On September 2, 2004, Secretary Bradbury sent Nader-Camejo a letter stating that "there are not sufficient qualified signatures for you to gain ballot access." In an unprecedented act, Secretary Bradbury had invalidated thousands of signatures that county elections officials had already certified as valid, and which Nader-Camejo submitted in accordance with instructions from Secretary Bradbury's own office.

47

Secretary Bradbury invalidated hundreds of these signatures due to alleged defects in Nader-Camejo petitioners' own signatures – just as SEIU and ACT had planned.

177.    On September 9, 2004, pursuant to a complaint filed by the Nader-Camejo Campaign, Oregon's Marion County Circuit Court found that Secretary Bradbury's action violated Oregon law.  Of the methods Secretary Bradbury used to disqualify Nader-Camejo's validated signatures, the Court wrote, "Neither action was authorized by administrative rule or statute, and each was inconsistent with both the state elections policy as established by the Legislature...and with the prior policy of the Secretary of State."  The Court ordered Secretary Bradbury to certify Nader-Camejo's nomination papers.

178.    On September 17, 2004, the Oregon Supreme Court deferred to Secretary Bradbury's discretion to interpret and enforce state election laws and granted him a writ of mandamus requiring the Circuit Court to vacate its order.  The Oregon Democratic Party, John Neel Pender, the Party's Executive Director, and James Edmundson, the Party's Chair, intervened as parties to this proceeding.  The United States Supreme Court declined to review the case, and Nader-Camejo did not appear on the Oregon ballot as candidates in the 2004 presidential election.

179.    SEIU maintains close political and financial ties with the DNC.  SEIU's Secretary-Treasurer, Anna Burger, is a DNC official, and SEIU endorsed and publicly committed its resources to electing John Kerry in 2004.  SEIU also donated $1,000,000 to the DNC in 2004, while the DNC made numerous payments to SEIU, including $33,072 in political consulting fees in October and November 2004.  SEIU was also a founding

member of ACT and its largest contributor, donating $26 million in 2004, and housing the 527 in SEIU's Portland office.

180.    In 2004 the DNC transferred at least $261,609 to the Oregon Democratic Party, and at least $896,002 to Oregon Victory 2004.    On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 15) Defendants or co-Conspirators filed two complaints against the Nader-Camejo Campaign in Pennsylvania.

181.    On August 9, 2004, Philadelphia resident Ralph Dade filed a class action complaint against the Nader-Camejo Campaign in Philadelphia Court of Common Pleas, alleging that he and several others were owed approximately $200 each for signatures they had collected for the campaign.   The complaint identified Louis Agre, a Philadelphia Democratic Party Ward leader, and Thomas Martin as attorneys for the plaintiffs.   Nader-Camejo disputed the claim on the ground that plaintiffs had submitted invalid signatures, and the complaint was dismissed.

182.    On August 9, 2004, Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen-Scott, Donald G. Brown and Julia O'Connell, registered Democrats in Pennsylvania, filed a second complaint in the Pennsylvania Commonwealth Court, challenging Nader-Camejo's nomination papers under 25 PS § 2937.   The complaint identified Gregory Harvey, another Philadelphia Democratic Party Ward leader, and Efrem Grail, Daniel Booker, Cynthia Kernick, Brian A. Gordon, Reed Smith LLP, Montgomery McCracken, Walker and Rhoads LLP, and the law offices of Brian A. Gordon as attorneys for the plaintiffs.

183.    The complaint challenged approximately 35,000 of the 51,273 signatures on Nader-Camejo's nominating petition on technical grounds, and alleged numerous procedural grounds for disqualifying Nader-Camejo from Pennsylvania's ballot. Plaintiffs' attorneys prepared the complaint in cooperation with Pennsylvania Democratic Party leaders, including state House Minority Leader Bill DeWeese and former Democratic Whip Mike DeWeese, and with support from approximately 170 Democratic Party volunteers Mr. DeWeese and Mr. Veon recruited.

184.    On numerous occasions before, during and after the litigation, Mr. DeWeese, Mr. Veon and other party officials stated that the purpose of their lawsuit was to help John Kerry win the election. In July 2004, before Plaintiffs filed their complaint, Pennsylvania Democratic Party Executive Director Don Morabito told the *Philadelphia City Paper*, "we want to make sure" Nader-Camejo doesn't detract votes from Mr. Kerry. On August 2, 2004, Mr. DeWeese told the *Pittsburgh Post-Gazette*, "Working with the AFL-CIO, we will do everything humanly possible to fight [Nader-Camejo]....You don't need a Ph.D in mathematics to understand that 100 percent of the vote [Nader-Camejo] gets will be skimmed from Senator Kerry's total." On August 9, 2004, the day plaintiffs filed their complaint, Mr. DeWeese told the *Post-Gazette*, "We are being completely open about our intentions. Our goal is to help elect John Kerry the next President of the United States." After the election, Mr. DeWeese and Mr. Veon issued a press release stating, "our efforts to strike [Nader-Camejo] from the ballot proved successful for John Kerry in Pennsylvania."

185.    On August 30, 2004, the Pennsylvania Commonwealth Court set aside Nader-Camejo's nomination papers and ordered their names stricken from the

Pennsylvania ballot, because they were running as independent candidates in Pennsylvania and as candidates of a political party in other states.

186.    On September 2, 2004, Nader-Camejo appealed to the Pennsylvania Supreme Court.    The Pennsylvania Supreme Court reversed and vacated the Commonwealth Court's order on September 20, 2004, and remanded to the Commonwealth Court for hearings.  The Commonwealth Court immediately scheduled hearings in approximately 48 counties and 13 courtrooms; seven hearings were scheduled simultaneously in six different counties, with two hearings in Philadelphia.

187.    On September 22, 2004, Nader-Camejo's attorneys notified the court that they lacked staff to attend voter review hearings in 48 counties, and that they lacked attorneys to appear in 13 different courtrooms, because the Conspirators' nationwide legal assault had severely depleted the campaign's resources.  Nader-Camejo's attorneys therefore requested the court to hold hearings in only one or two courtrooms.  The Commonwealth Court rejected this request on September 23, 2004.  Several hearings therefore proceeded without counsel present on behalf of Nader-Camejo.

188.    To prepare for these hearings, the Conspirators simply recruited more attorneys.  On August 19, 2004, attorney Daniel Booker of Reed, Smith told the *New York Times* that "eight to ten lawyers in his firm were working on the case, 80 hours each a week for two weeks, and could end up working six more weeks."  Attorney Booker indicated that his firm had also taken on more than 100 volunteers to work on the case.

189.    In fact, Attorney Booker's estimate was low: Reed, Smith attorneys Ira Lefton, Christopher K. Walters, Milind Shah, Jeremy Feinstein, Mark Tamburi, James Doerfler, John McIntyre, Lisa Campoli, Barbara (Kiely) Hager, Andrea (Simonson)

Weingarten, Jeffrey Bresch, Kim Watterson, Melissa Oretsky and James Williamson joined the litigation, for a total of at least 17 Reed, Smith attorneys. On October 1, 2004, *American Lawyer* reported that these attorneys had logged 1,300 *pro bono* hours on the case. "And that's just the pre-election challenge," the magazine reported.

190.    On October 13, 2004, following three weeks of hearings in counties across Pennsylvania, Commonwealth Court Judge James Gardner Colins, who was elected to the bench as a Democrat, issued an opinion invalidating more than 30,000 of Nader-Camejo's signatures on technical grounds. For example, approximately 9,000 signatures were invalidated because qualified electors – who could vote – had not yet registered on the day they signed Nader-Camejo's nomination petition (even though Pennsylvania law specifies no such requirement).    Another 6,000 signatures were invalidated because voters' current addresses didn't match their registered addresses. Thus, after striking a total of 32,455 signatures on these and other technical grounds, Judge Colins concluded that only 18,818 signatures were valid, and set aside Nader-Camejo's nomination papers.

191.    On October 14, 2004, Judge Colins issued an order directing Mr. Nader and Mr. Camejo personally to pay all litigation costs arising from plaintiffs' challenge. No state in the nation – including Pennsylvania – has ever ordered candidates to pay such costs after defending their right to ballot access.

192.    On October 19, 2004, a divided Pennsylvania Supreme Court affirmed the Commonwealth Court's order removing Nader-Camejo from the Pennsylvania ballot. The United States Supreme Court denied Nader-Camejo's petition for a writ of certiorari

on October 23, 2004. Nader-Camejo did not appear on the Pennsylvania ballot as candidates in the 2004 presidential election.

193.    On December 3, 2004, attorneys Efrem Grail, Daniel Booker and Cynthia Kernick of Reed Smith, Gregory Harvey of Montgomery, McCracken, Walker and Rhoads, and Brian A. Gordon, a solo practitioner, submitted a bill of costs to the Commonwealth Court of Pennsylvania in the amount of $81,102.19. The attorneys claimed that the bill "is true and correct and accurately reflects costs incurred by [plaintiffs]." In fact, however, the plaintiffs did not incur any costs, being nominal parties Conspirators recruited to sue the Nader-Camejo Campaign. As the true party in interest seeking to collect the costs, Reed Smith nevertheless submitted its bill on the plaintiffs' behalf, claiming "Justice requires that this Court award [plaintiffs] the costs incurred." Reed Smith's attorneys never informed the Pennsylvania Commonwealth Court that the DNC had already paid the firm $136,142, nor did they clarify or correct their many public claims to be working on the case pro bono.

194.    Reed Smith lawyers also falsely claimed, in the brief they filed before the Pennsylvania Supreme Court in support of their bill of costs, that Nader-Camejo's nomination papers included "literally thousands of forged petition signatures." In fact, however, Judge Colins counted only 687 out of 51,273 signatures (or 1.3%) as "forgeries," which were submitted by people engaged in mischief or sabotage. Pennsylvania Supreme Court Justice Thomas Saylor previously emphasized this fact in a dissenting opinion, in an effort to correct prior distortions of the record. Justice Saylor also noted that the record contained "no evidence" to support Reed Smith's allegations of fraud by anyone associated with the Nader-Camejo Campaign.

195.    To the contrary, Nader-Camejo Campaign staff voluntarily expunged approximately 7,000 apparently fictitious names from Nader-Camejo's nomination petitions, in an effort to lessen the Commonwealth Court's burden.  On information and belief, Conspirators including Ralph Dade and the other plaintiffs in the dismissed class action complaint signed these names under false pretenses, in a deliberate attempt to sabotage Nader-Camejo's petitions and manufacture evidence to support their Commonwealth Court complaint.

196.    On January 14, 2005, Judge Colins entered an order approving the bill of costs without opinion, despite the fact that the record contains "no evidence" – much less a finding – of wrongdoing by anyone associated with the Nader-Camejo Campaign.  A divided Pennsylvania Supreme Court nevertheless affirmed without citing a single case as precedent for the order, thus upholding what appears to be the first post-election penalty assessed against a candidate in the history of American jurisprudence.

197.    During the proceedings before Pennsylvania Supreme Court, Reed Smith never disclosed several ties the firm had with Justices of the court, which give rise to an obvious appearance of impropriety that would have provided grounds for Nader-Camejo to seek the Justices' disqualification.  Specifically:

- Reed Smith represented Chief Justice Ralph Cappy as his defense counsel in an ethics investigation that was ongoing while this case was before the Pennsylvania Supreme Court;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave $10,000 in campaign contributions ($5,000 from each firm) to Justice Sandra Newman, who authored the majority opinion, in November 2005, while this case was before the Pennsylvania Supreme Court, and Reed Smith gave Justice Newman another $6,100 during her previous election;

- Reed Smith extended an open-ended offer of employment to Justice Ronald Castille in 1985, which he accepted in 1991 and served of counsel at Reed

Smith for nearly three years immediately before he joined the Pennsylvania Supreme Court in 1993;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave at least $67,900 in campaign contributions to four out of five Justices who voted to affirm judgment in Reed Smith's favor, and to one Justice who concurred and dissented; at least $58,900 of this total came from Reed Smith and its lawyers.

198.    The appearance of impropriety arising from these ties between Reed Smith and the Justices of the Pennsylvania Supreme Court is manifest and unmistakable. In this case, moreover, the appearance of impropriety is compounded by Reed Smith's status not merely as plaintiffs' counsel, but also as the true party in interest seeking to collect a money judgment in the proceedings. Nevertheless, at no time during these proceedings did Reed Smith disclose its ties with four out of five Justices who voted to affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

199.    By contrast, the lone dissenter, Justice Thomas Saylor, has no apparent ties to Reed Smith. Justice Saylor dissented on the ground that Pennsylvania law – like the laws of every other state in the nation – simply does not authorize a taxation of costs against candidates who defend their nomination papers, but only against parties who challenge candidates' nomination papers.

200.    Reed Smith's concealment of its ties with the Pennsylvania Supreme Court Justices thus constitutes a fraud upon the court, because the firm induced its judgment in a manner that deprived Nader-Camejo of the opportunity to move for the Justices' disqualification, in violation of basic principles of fairness, impartiality and due process.

201.    Even while concealing their own fraud, Reed Smith's attorneys repeatedly slandered Mr. Nader in the news media with accusations of fraud, and libeled

him on the *pro bono* page of their website, where they published the following defamatory statement:

> Our intensive effort to remove Ralph Nader from the 2004 Presidential ballot in Pennsylvania won national headlines, with the courts upholding our claim that 30,000 signatures supporting Mr. Nader were forged or otherwise fraudulent.

202.    On March 8, 2007, Mr. Nader wrote to the partners of Reed Smith to protest this ongoing defamation, as well as the fraud and misrepresentation by which the firm obtained its judgment. Mr. Nader had not yet discovered that the judgment itself was tainted by an overwhelming appearance of impropriety arising from the foregoing undisclosed ties with the Pennsylvania Supreme Court Justices. Reed Smith immediately removed the libelous language from its website, but otherwise did not respond.

203.    Neither Mr. Nader nor Mr. Camejo discovered Reed Smith's ties to the Pennsylvania Supreme Court Justices until September 2007. Thus, prior to that time, Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, without disclosing the fraud upon the court the firm had perpetrated. Mr. Nader did not settle. Reed Smith therefore commenced attachment proceedings against his personal accounts.

204.    On July 13, 2007, Reed Smith served Amalgamated Bank with an Application for Writ of Attachment, filed with the Superior Court of the District of Columbia, stating that "any money, property or credits of Ralph Nader in Amalgamated Bank's possession are hereby seized by this Writ of Attachment." In fact, however, the Superior Court had entered no such writ. Amalgamated Bank nevertheless froze Mr. Nader's accounts on July 13, 2007.

205.    On July 17, 2007, the Superior Court of the District of Columbia entered writs of attachment against Amalgamated Bank, M&T Bank and PNC Bank as garnishees

of Mr. Nader's accounts. Pursuant to these writs, Amalgamated Bank froze $27,420.16, and PNC Bank froze $34,218.29, for a total of $61,638.45. Reed Smith filed a motion to condemn these funds on August 28, 2007, which was denied, and another on September 25, 2007, which is pending.

206.    Reed Smith attorneys repeatedly told the news media in 2004 that the Democratic Party had not retained or paid Reed Smith, thereby fraudulently concealing the firm's involvement in Defendants' and co-Conspirators' conspiracy. In fact, however, the DNC retained Reed Smith and paid the firm $136,142 for "political consulting" and "legal consulting" during the election. In addition, Reed Smith has represented John Kerry, Teresa Heinz Kerry, the HJ Heinz Corporation and the Heinz Family Foundation. Reed Smith most recently defended Senator Kerry in a civil lawsuit for defamation, which arose out of the 2004 election and was decided in August 2006. Furthermore, "Heinz is still a major and active client," *Legal Business* reported in December 2006/January 2007.

207.    On August 3, 2004, The Ballot Project paid attorney Gregory Harvey's firm Montgomery, McCracken, Walker and Rhoads $6,000 for reimbursed costs. In October and November of 2004, the DNC paid Reed Smith $136,142 in legal and political consulting fees. In addition, in 2004 the DNC transferred at least $182,825 to the Pennsylvania Democratic Party, and at least $5,132,220 to Pennsylvania Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

16) **Defendants or co-Conspirators filed two complaints against the Nader-Camejo Campaign in Washington.**

208.    On August 31, 2004, attorney Parker Folse III sent Washington's Secretary of State a letter stating, "I represent a voter who has an interest in whether Mr. Nader has complied with the law." Mr. Folse asked Secretary Reed not to certify Mr. Nader as a candidate for President of the United States in Washington until Mr. Folse could examine the nomination papers. Mr. Folse indicated that attorney Drew D. Hansen would assist him. Later that day Attorney Folse sent the Secretary of State another letter alleging that Nader-Camejo's nomination papers included an insufficient number of valid signatures. On September 1, 2004, Attorney Folse sent another letter outlining additional concerns and requesting an investigation.

209.    On September 1, 2004, the Secretary of State certified Nader-Camejo's nomination papers and ordered their placement on the Washington ballot as candidates for President and Vice President.

210.    On September 3, 2004, attorney James Foley filed a complaint on behalf of attorney Ken Valz in the Thurston County Superior Court of Washington, challenging Nader-Camejo's nomination papers under RWC 29A.20.191. The complaint's "legal argument" was one paragraph long, and concluded with a request that Nader-Camejo's nominating signatures be declared invalid.

211.    On September 8, 2004, Attorneys Folse, Hansen and Rachel Black filed a separate complaint in the Thurston County Superior Court on behalf of the Washington State Democratic Central Committee, Josh Castle, DiAnne Grieser, Randy Poplock, Ann Thoeny and Elizabeth Walter, challenging Nader-Camejo's nomination papers under RWC 29A.20.191. The complaint requested the court to overrule the Secretary of State

and to remove Nader-Camejo from the Washington ballot as candidates for President and Vice President.

212.    DiAnne Grieser signed an online petition to support John Kerry as the Democratic Party's presidential nominee in 2008, identifying herself as the 2003-2004 moderator for the Kerry-Edwards Campaign blog. Randy Poplock identified himself on the John Kerry Meetup Online Message Board as an affiliate of the 527 United Progressives for Victory, and an organizer for the Kerry-Edwards Campaign.

213.    On September 15, 2004, the court upheld the Secretary of State's decision, and Nader-Camejo appeared on the Washington ballot as candidates in the 2004 presidential election.

214.    In 2004 the DNC transferred at least $490,000 to the Washington Democratic Party, and at least $534,894 to Washington Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 17) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in West Virginia.

215.    On July 29, 2004, the Nader-Camejo Campaign submitted nomination papers with a petition including more than 23,000 signatures to satisfy West Virginia's requirement of 12,962 signatures. Secretary of State Joe Manchin certified 15,302 signatures as valid and determined that Nader-Camejo qualified as candidates for President and Vice President in West Virginia.

216.    On August 16, 2004, Kanawha County Democratic Executive Committee Chairman Norris Light, Democratic Party presidential elector Phil Hancock, and

registered voters Deirdre Purdy, Gary Collias and Karen Coria filed a petition in the West Virginia Supreme Court of Appeals seeking a writ of mandamus ordering Secretary Manchin either to initiate an investigation into Nader-Camejo's nomination papers, or to refer the matter to the Attorney General's office. The petition identified Jason E. Huber and the law firm of Forman and Huber, L.C. as petitioners' attorneys.

217.    Attorney Huber had previously written an open letter to the West Virginia Mountain Party, which was already qualified for ballot listing in the 2004 election, urging the party not to nominate Mr. Nader as its presidential candidate. "The most obvious risk with horrendous consequences," Attorney Huber wrote, "is that a Nader nomination will cost Kerry the presidential race...This risk is most apparent in key states like West Virginia." The letter continued:

> Considering this, we must take every precaution to assure that Kerry wins West Virginia even if it includes keeping Nader off the ballot. ... It is for these reasons that I ask all those who support a Nader nomination to cast aside your third-party ideals for this one election (like I have done)...hold your nose and vote Kerry in 2004.

218.    On August 19, 2004, Secretary Manchin, a Democrat who was running for governor, reversed his prior decision, "accompanied by intense political pressure from the Democratic Party," the *Wall Street Journal* reported. Secretary Manchin thus wrote to West Virginia Attorney General Darrell McGraw, also a Democrat, stating that "a measure of doubt exists as to the validity" of Nader-Camejo's petition. The letter requested Attorney General McGraw to institute a *quo warranto* proceeding to determine the validity of Nader-Camejo's nomination papers under West Virginia Code § 3-5-23.

219.    The basis for Secretary Manchin's newfound doubt was that a group of citizens had complained that Nader-Camejo petitioners did not display proper credentials

or did not display the petition appropriately. Several citizens filed affidavits to this effect, but only four out of approximately 23,000 people who actually signed the petition raised such complaints.

220.    On August 23, 2004, Attorney General McGraw filed a Complaint in Quo Warranto "in the name of the state of West Virginia" in Kanawha County Circuit Court. The complaint stated, "the State of West Virginia prays that this Court immediately issue an order requiring Defendant Ralph Nader to appear at said hearing and show cause why he should not be precluded from being nominated." The complaint sought "such declaratory and injunctive relief regarding the purported nomination of Ralph Nader as may be warranted by the evidence."

221.    On or about August 30, 2004, the Circuit Court dismissed Attorney General McGraw's complaint. The Court called the complaint "extraordinary" and noted that "the testimony of a half dozen citizens" was insufficient to invalidate an entire petition signed by 23,000 citizens. Attorney General McGraw nevertheless appealed to the West Virginia Supreme Court of Appeals, which denied the appeal on September 9, 2004. Nader-Camejo appeared on the West Virginia ballot as candidates in the 2004 presidential election.

222.    In 2004 the DNC transferred at least $152,433 to the West Virginia Democratic Party, and at least $878,315 to West Virginia Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 18) Defendants or co-Conspirators filed a complaint against the Nader-Camejo Campaign in Wisconsin.

223.    On September 10, 2004, the Democratic Party of Wisconsin and Kim Warkentin, its Executive Director, filed a complaint before the Wisconsin Elections Board challenging Nader-Camejo's nomination papers. The complaint identified Jeralyn B. Wendelberger, the Democratic Party of Wisconsin's counsel, as plaintiffs' attorney. In subsequent proceedings Lester Pines, Tamara Packard, the law firm Cullen, Weston, Pines & Bach LLP, Brenda Lewison, Tricia Knight, James Troupis, Eric McLeod, John Scheller, Brian Rybarik and the law firm Michael Best & Friedrich, LLP also represented the plaintiffs.

224.    On September 22, 2004, the Elections Board dismissed plaintiffs' complaint and ordered Nader-Camejo to be placed on the Wisconsin ballot as candidates for President and Vice President.

225.    On September 24, 2004, the Democratic Party of Wisconsin and Executive Director Warkentin appealed the Elections Board decision to Wisconsin's Dane County Circuit Court. The Circuit Court found that the Elections Board applied an incorrect standard when reviewing plaintiffs' complaint. On September 28, 2004, the Circuit Court ordered Nader-Camejo removed from the ballot.

226.    On September 28, 2004, Nader-Camejo filed an Emergency Petition for Writ of Mandamus requesting the Wisconsin Supreme Court to assume original jurisdiction over the matter. The Supreme Court granted Nader-Camejo's petition and held a hearing on the same day.

227.    On September 30, 2004, the Wisconsin Supreme Court found that the Elections Board did not abuse its discretion and vacated the Circuit Court decision.

Nader-Camejo appeared on the Wisconsin ballot as candidates in the 2004 presidential election.

228.    On October 18, 2004, the Wisconsin Democratic Party paid Cullen, Weston, Pines & Bach LLP $553 for "Nader Ballot Challenge Legal Support." In addition, in 2004 the DNC transferred at least $544,542 to the Wisconsin Democratic Party, and at least $2,688,997 to Wisconsin Victory 2004. On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 19) Defendants or co-Conspirators in Washington, D.C. filed three FEC complaints against the Nader-Camejo Campaign.

229.    In addition to the foregoing litigation Conspirators initiated or supported in 18 states, co-Conspirator CREW filed two FEC complaints and co-Conspirator Daniel Schneider filed one FEC complaint in the District of Columbia. The basis for CREW's first FEC complaint was nothing more than a newspaper article reporting that the Nader-Camejo Campaign shared office space with a non-profit organization. The FEC took no action against the Nader-Camejo Campaign and dismissed the complaint by unanimous vote on February 10, 2005. The FEC took no action against the Nader-Camejo Campaign and dismissed CREW's second complaint by unanimous vote on June 23, 2005. The FEC took no action against the Nader-Camejo Campaign and dismissed Mr. Schneider's complaint by unanimous vote on April 21, 2006. Campaign staff and attorneys dedicated a significant amount of time, energy and resources to respond to these complaints.

### IV.    Defendants' and co-Conspirators' Conspiracy Caused Plaintiffs Financial Injury and Other Damages and Violated their Constitutional Rights.

230.    Defendants' and co-Conspirators' conspiracy caused severe financial injury to Nader-Camejo's 2004 presidential campaign. Defendants' and co-Conspirators' nationwide legal assault in the form of abuse of process and malicious prosecution forced Nader-Camejo to secure counsel in 18 states, while their campaign of harassment, intimidation and sabotage consumed Nader-Camejo Campaign staffers' time. Nader-Camejo's campaign manager herself was personally compelled to attend depositions and other legal proceedings rather than running the campaign. In short, Defendants' and co-Conspirators' efforts to bankrupt the Nader-Camejo Campaign produced its intended effect: in October 2004, Mr. Nader was forced to loan the campaign $100,000 to cover legal bills, staff salaries and operating expenses. The campaign has not repaid this loan.

231.    Not content merely to try to bankrupt Nader-Camejo's campaign, co-Conspirator Reed Smith sought to collect payment on a wrongfully obtained, fraudulently induced judgment from Mr. Nader and Mr. Camejo personally. Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, and currently seeks to condemn $61,638.45 of Mr. Nader's funds, which it has already attached.

232.    Furthermore, although Nader-Camjeo prevailed in the great majority of lawsuits filed against them, Defendants' and co-Conspirators' conspiracy largely succeeded in achieving its unlawful objectives. Five states denied Nader-Camejo ballot access as a direct result of Defendants' and co-Conspirators unlawful conduct. Moreover, the burden of defending their right to ballot access in lawsuits in 18 states – many of them simultaneous – prevented Nader-Camejo from dedicating resources necessary to gain ballot access in a dozen others. Denial of ballot access in these states

also deprived Nader-Camejo of valuable fundraising opportunities to solicit voters for contributions as qualified candidates.

233.    More than 1.3 million Americans living in the 17 states that denied Nader-Camejo ballot access in 2004 voted for Mr. Nader in 2000.    Hundreds of thousands signed Nader-Camejo's petitions in 2004.    Defendants and co-Conspirators therefore denied Plaintiff-voters and every other voter similarly situated in 17 states their free choice of candidates in the 2004 presidential election.    Defendants' and co-Conspirators' conspiracy thus violated not only Mr. Nader's and Mr. Camejo's constitutional rights, but also those of Plaintiff-voters and millions of other voters.

234.    In summary: Defendants and co-Conspirators conspired to and did in fact cause financial injury and other damages to Ralph Nader's and Peter Miguel Camejo's 2004 presidential campaign and to the third-party and independent candidacy structure previously built by Mr. Nader; Defendants and co-Conspirators conspired to and did in fact cause financial injury and other damages to Mr. Nader and Mr. Camejo personally; Defendants and co-Conspirators conspired to and did in fact violate Ralph Nader's and Peter Miguel Camejo's constitutional rights by unlawfully interfering with and obstructing their campaign in the 2004 presidential election; and Defendants and co-Conspirators conspired to and did in fact violate Plaintiff-voters' and millions of other voters' constitutional rights by denying them their free choice of candidates in the 2004 presidential election, all in an effort to preserve their electoral monopoly and perceived entitlement to votes.    The 2004 election has long since concluded, yet co-Conspirator Reed Smith persists in its flagrant and willful abuse of process in an effort to enforce an unprecedented, wrongfully obtained, fraudulently induced and unquestionably tainted

judgment. Defendants and co-Conspirators thus leave Plaintiffs no alternative but to seek relief from this Court.

## COUNT I
### (Conspiracy To Commit Abuse Of Process and Malicious Prosecution)

235.    Plaintiffs incorporate by reference paragraphs 1-234 as if set forth fully herein.

236.    Defendants conspired and agreed with co-Conspirators to violate Plaintiffs' constitutional rights and cause them financial injury and other damages by orchestrating a nationwide legal assault on the Nader-Camejo 2004 presidential campaign.

237.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

238.    In furtherance of the conspiracy, Conspirators filed 24 complaints against the Nader-Camejo Campaign within 12 weeks between June and September of 2004, pursuing unfounded and abusive litigation against the campaign in 18 different states. Conspirators also engaged in acts of harassment, intimidation and sabotage, often under fraudulent pretenses, as described herein.

239.    Plaintiffs were damaged by Defendants' acts.

## COUNT II
### (Abuse of Process and Malicious Prosecution:  Arizona, Arkansas, Colorado, District of Columbia, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, Nevada, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania, Washington, West Virginia and Wisconsin)

240.    Plaintiffs incorporate by reference paragraphs 1 through 239 as if set forth fully herein.

241.    Defendants conspired and agreed with co-Conspirators to abuse judicial processes and engage in malicious prosecution in order to cause Plaintiffs financial injury and other damages and violate Plaintiffs' constitutional rights by filing 24 complaints against the Nader-Camejo Campaign in less than 12 weeks between June and September of 2004.

242.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

243.    Defendants' conduct as set forth herein violated the common law of abuse of process and malicious prosecution under the state law of Arizona, Arkansas, Colorado, District of Columbia, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, Nevada, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania, Washington, West Virginia and Wisconsin.

244.    In furtherance of their conspiracy to abuse judicial processes and engage in malicious prosecution, Defendants and co-Conspirators either initiated or materially supported litigation filed against the Nader-Camejo Campaign in their states.  The DNC,

The Ballot Project under direction of Defendant Raikin and the Kerry-Edwards Campaign coordinated with State Democratic Parties to hire or secure *pro bono* counsel to prosecute this litigation.

245.    Plaintiffs were damaged by Defendants' acts.

### COUNT III
### (Conspiracy To Violate 43 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution)

246.    Plaintiffs incorporate by reference paragraphs 1 through 245 as if set forth fully herein.

247.    Defendants conspired and agreed with co-Conspirators to use court processes and other means to violate Plaintiffs' constitutional rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

248.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

249.    In furtherance of the conspiracy, the DNC under the leadership of Defendant McAuliffe, among other things, directed and agreed with state Democratic Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states. Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and

assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project under the direction of Defendant Raikin.

250.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

251.    Plaintiffs were damaged by Defendants' acts.

## COUNT IV
### (Violation of 43 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution)

252.    Plaintiffs incorporate by reference paragraphs 1 through 251 as if set forth fully herein.

253.    Defendants abused court processes and engaged in malicious prosecution and used other means to violate Plaintiffs' constitutional rights and cause them financial injury and other damages.  Defendants violated Plaintiffs' rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

254.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

255.    In furtherance of the conspiracy, the DNC under the leadership of Defendant McAuliffe, among other things, directed and agreed with state Democratic

Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states. Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project under the direction of Defendant Raikin.

256.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

257.    Plaintiffs were damaged by Defendants' acts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1) Compensatory damages in an amount to be determined at trial;

2) Punitive damages in an amount to be determined at trial;

3) Permanent injunctive relief against all ongoing and future violations of law by Defendants and co-Conspirators as set forth herein;

4) Attorneys' fees pursuant to 42. U.S.C. § 1988(b) and as otherwise permitted;

5) Court costs; and

6) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the District of Columbia Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action.

Dated: Alexandria, VA
November 1, 2007

Respectfully Submitted,

Michael Sgarlat, Esquire
VA. Bar No. 18158
801 North Pitt Suite 109
Alexandria, Virginia 22314
(703) 549-2000
*Counsel of Record*

Oliver B. Hall, Esquire
D.C. Bar No. 976463
1835 16th Street NW
Washington, D.C. 20009
(617) 953-0161
*Of Counsel*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Gonzalez & Leigh, LLP
Matt Gonzalez, Esquire
G. Whitney Leigh, Esquire
Bryan Vereschagin, Esquire
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*