UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                                    :
Ralph  Nader, et al.                :
v.                                  :            Civ. No. 1:07cv1101
Terry McAuliffe, et unum.   :
_____:

### MOTION TO DISMISS

Defendant Terry McAuliffe, by and through counsel, hereby moves this Court pursuant to

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint

because the claims are barred by the statute of limitations, the Plaintiffs have not alleged facts

that give this Court jurisdiction to hear the claims, and the Plaintiffs have not alleged a claim for

which relief can be granted. The grounds for this motion are set forth in Defendant's

Memorandum in Support of Its Motion.

January 31, 2008                              Respectfully submitted,
                                              __/s/_____
.                                             John Hardin Young,
                                              VA Bar No.13553
                                              Joseph E. Sandler
                                              Stephen E. Hershkowitz,
                                              VA Bar No. 14648
                                              Counsel for Terry McAuliffe
                                              Sandler, Reiff & Young, P.C.
                                              50 E Street, S.E, suite 300
                                              Washington, D.C. 200
                                              (202) 479-1111 (office)
                                              (202)479-1115(facsimile)

                                              Young@sandlerreiff.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                                          :
Ralph  Nader, et al.                      :
v.                                        :          Civ. No. 1:07cv1101
Terry McAuliffe, et unum.      :
_____:


**NOTICE OF MOTION**

PLEASE TAKE NOTE that on February 22, 2008, at 10:00 a.m. or as soon thereafter as

counsel can be heard, Defendant Terry McAuliffe will bring his motion to dismiss.

January 31, 2008                          Respectfully submitted,
                                          __/s/_____
.                                         John Hardin Young,
                                          VA Bar No.13553
                                          Joseph E. Sandler
                                          Stephen E. Hershkowitz,
                                          VA Bar No. 14648
                                          Counsel for Terry McAuliffe
                                          Sandler, Reiff & Young, P.C.
                                          50 E Street, S.E, suite 300
                                          Washington, D.C. 200
                                          (202) 479-1111 (office)
                                          (202)479-1115(facsimile)
                                          Young@sandlerreiff.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                                    :
Ralph  Nader, et al.                :
v.                                  :                    Civ. No. 1:07cv1101
Terry McAuliffe, et unum.           :
_____:

## DEFENDANT TERRY MCAULIFFE'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS

### I. BACKGROUND

On October 30, 2007 the Plaintiffs filed a complaint in the Superior Court of the District of Columbia against the Democratic National Committee, Defendant Terry McAuliffe's employer, and The Ballot Project, Defendant  Steven Raikin's employer, and twelve others alleged to be co-conspirators. Attached.  On October 31, 2007, Plaintiffs filed a complaint in the this Court, bearing the caption of the "Superior Court of the District of Columbia", and naming the same plaintiffs and defendants that were set forth in the complaint filed in the District of Columbia. *Nader, v. McAuliffe*, No. 1:07 CV 1101 JCC/TCB.  On November 1, 2007, Plaintiffs filed an "Amended Complaint" in this Court.  While the Amended Complaint changed the caption to this Court, in all other respects it is identical to the complaint filed in this Court on October 31st and in the District of Columbia on October 30, 2008. The Amended Complaint even fails to change the jury demand by seeking a jury trail "Pursuant to Rule 38(b) of the District of Columbia Rules of Civil Procedure … ."    Amended Complaint at p.70.  On December 10, 2007, the Superior Court case was removed to the United States District Court for the District of Columbia.  On January 23, 2008, the Plaintiffs amended the District of Columbia complaint by removing the counts alleging conspiracy to violate 43 U.S.C § 1983 and violation of 43 U.S.C. §

1983, Counts III and IV. The underlying facts and the prayer for relief remain the same. The Plaintiffs also moved to remand the case back to the Superior Court of the District of Columbia because the complaint no longer alleged a violation of any Federal claims.

All of the complaints set forth identical factual allegations and requests for relief. The complaints allege a conspiracy to prevent the Plaintiffs Ralph Nader and Peter Camejo from appearing on various state ballots as candidates for President and Vice President in 2004, respectively, and to cause them financial injury by requiring their campaign to expand resources to defend their right to be on those ballots. Six other voter Plaintiffs claim they were harmed because state officials or courts prevented them from voting for Plaintiff Nader when they found that his campaign had not submitted adequate petitions to place him on the ballot. *Compare* the Complaint ¶¶ 47 through 234 with the District of Columbia complaint ¶¶ 45 through 232. The other defendants in the District of Columbia not named in the Complaint in this court are described as non-defendant co-conspirators in this Complaint. *Compare* the Complaint ¶¶ 25 through 36 with the District of Columbia complaint ¶¶ 23 through 34. Both complaints originally alleged the same counts: conspiracy to commit abuse of process and malicious prosecution, abuse of process and malicious prosecution, conspiracy to violate 43 U.S.C § 1983, and violations of 43 U.S.C. § 1983. *Compare* the Complaint ¶¶ 235 through 255 with the District of Columbia complaint ¶¶ 233 through 257. Both complaints seek identical relief: compensatory damages, punitive damages, injunctions, attorney's fees and court costs.

## II. PLAINTIFFS' ALLEGATIONS

This case and the District of Columbia case are most recent in a long line of cases filed by Plaintiff Ralph Nader or his political supporters complaining about unfair treatment in the 2000 and 2004 Presidential elections. Some cases were filed directly against governmental

agencies alleging that the agencies and their regulations unfairly favored the major party

candidates, and others, like this one, were filed against a major party candidate or his supporters

claiming that they unfairly exploited the governmental agencies or their regulations.  This case is

yet another example of the political contests between major party, and minor party or

independent candidates being fought in the courts instead of the political arena.  In essence, the

Plaintiffs allege that the Defendants engaged in a so-called political "dirty trick" by challenging

Plaintiff Nader's nominating petitions in 18 state agencies or courts.  Significantly, Plaintiffs cite

no law that has been broken or a finding of a procedural violation by a court.  Instead, they allege

that by merely asking the appropriate state official in 18 states to review nominating petitions,

the Defendants have committed an abuse of process, engaged in malicious prosecution and

violated the Constitution.  Regardless of the Plaintiffs' views of proper campaign practices, the

Plaintiffs cannot demonstrate that this Court has the ability to undo the 2004 election.  They have

not alleged a financial injury to themselves -- only a cost of litigation paid by the Nader-Camejo

campaign, entities who are not Plaintiffs.  Specifically, as applied to Counts III and IV, the

Plaintiffs have not described a state actor or anyone acting under color of law responsible for a

violation of the Constitution.  And even if they could prove violative conduct, the two-year

statute of limitations applicable to their claims has expired.

The Plaintiffs allege Plaintiff Nader's Democratic political opponents believed that there

were many voters who would have voted for Democratic Presidential candidate Kerry if Plaintiff

Nader did not run.  Allegedly, Defendant McAuliffe conspired with other Kerry supporters

opposed to Nader's campaign by, among other things, challenging his petitions to obtain ballot

access in 18 states (the "ballot access cases") and filing five administrative complaints with the

Federal Election Commission ("FEC").  Plaintiffs allege that this political opposition satisfies the

legal definition of malice.  Because filing these challenges involved many individuals, Plaintiffs also allege the existence of a conspiracy.  The alleged unifying purpose among the conspirators is a common interest to increase the number of votes cast for Kerry.  As demonstrated by the public statements described and the public nature of the ballot access complaints, there was nothing secret about Kerry supporters' plans or purpose.  Not surprisingly, the Nader-Camejo campaign – not the Plaintiffs -- expended resources to respond to these challenges.

Plaintiffs Nader and Camejo registered two national campaign committees with the Federal Election Commission ("FEC") pursuant to 2 U.S.C. §431(6): Nader For President 2004, the principal campaign committee (FEC registration number C00395038), and Nader For President General Election, an authorized campaign committee (FEC registration number C00397216).  *See* FEC filings at www.FEC.gov.  Both committees were authorized to accept contributions and make expenditures on behalf of the Nader-Camejo 2004 campaign for President and are headquartered in the District of Columbia.  *Id*.  The Defendants assume that the Plaintiffs are referring to one or both of these committees when they use the term "Nader-Camejo campaign" and the "campaign".  *E.g*. ¶¶ 232, 233, and 236.

Specifically, Plaintiffs allege that Defendants and others opposed Plaintiffs Nader's and Camejo's election so that they would not siphon votes from Defendant Kerry's campaign for President (¶¶ 47 - 56) by filing five complaints against the Nader-Camejo campaign with the FEC (¶ 57), and 24 state agency or court complaints alleging that the Nader-Camejo's campaigns' petitions to gain access to those states' ballots were inadequate ("ballot access cases") (¶ 58 and ¶¶ 74-234).  The six voter Plaintiffs are voters from the states of Arizona, Ohio and Oregon (¶¶ 17 through 22).  Plaintiffs allege that Defendants and others filed the ballot access cases and FEC complaints for the following purposes: (1) "Defendants and co-

conspirators unlawfully conspired to cause financial injury of the damages to the Nader-Camejo 2004 presidential campaign;" (2) "Defendants and co-conspirators unlawfully conspired to cause financial injury and other damages to Mr. Nader and Mr. Camejo personally;" (3) "Defendants and co-conspirators unlawfully conspired with state actors and acted under color of state law to violate Nader-Camejo's constitutional rights by preventing them appearing on the ballot as candidates in the 2004 presidential election;" and (4) "Defendants and co-conspirators unlawfully conspired with state actors and acted under color of state law to violate Plaintiffs voters' constitutional rights, and those of others similar situated, by denying voters the free choice of candidates in the 2004 presidential election." (¶ 68)  The Plaintiffs allege that the filing of the state ballot access cases and the FEC complaints constituted a conspiracy to commit abuse of process and malicious prosecution (¶¶ 235-239), abuse of process and malicious prosecution in 18 states and the district of Columbia (¶¶240-244), conspiracy to violate 42 U.S.C. § 1983, the Qualification Clause and the First and Fourteenth Amendments of the United States Constitution (¶¶ 246-251), and violation of 42 U.S.C. § 1983 and the same provisions of the Constitution.

The only relevant allegations are: 18 ballot access cases and five administrative FEC complaints were filed that resulted in Arizona, Ohio, Oregon and other states denying ballot access.  All of the ballot access cases' litigation and the FEC administrative action were completed more than two years ago.  *See* Attached Chart.[1] The Complaint alleges that the Nader-Camejo campaign, not a Plaintiff herein, paid for and its staff participated in the defense of the challenges described above (¶ 230).  Although Plaintiff Nader alleges that he loaned $100,000 to his campaign, speculates that those funds were used "to cover legal bills, staff salaries and operating expenses," and the campaign has not repaid the loan (*id.*), he does not allege that either

---

[1] This Court may take judicial notice of court records, Fed. R. Evid. 201, and other government records, Fed. R. Evid. 803(8) and (10).

his loan or the failure to re-pay the loan was caused by a conspirator. Plaintiffs allege that they were injured because Plaintiffs Nader and Camejo were denied ballot access in their home states (¶233), but they do not allege that any conspirator was responsible for submitting inadequate ballot petitions or otherwise prevented them from voting for Plaintiff Nader.

### III.  THIS CASE SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b).

The legal standard for dismissing claims pursuant to Rule 12(b) is well established.

> Pursuant to Rule 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Defendants may attack subject matter jurisdiction in one of two ways. First, defendants may contend that the complaint fails to allege facts upon which subject matter jurisdiction may be based. In such instances, all facts alleged in the complaint are presumed to be true. Alternatively, defendants may argue that the jurisdictional facts alleged in the complaint are untrue. In that situation, "the Court may 'look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" In either case, the burden of proving subject matter jurisdiction falls on the plaintiff.

*Roe 1 v. Prince William County*, 2007 U.S. Dist. LEXIS 88405, *5-6 (E.D. Va. 2007)(internal citations omitted).

> A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, and should be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In passing on a motion to dismiss, "the material allegations of the complaint are taken as admitted." Moreover, "the complaint is to be liberally construed in favor of plaintiff."

*Id.* at *6-7 (internal citations omitted).

> In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Id.* at*7(citing *Bell Atlantic Corp. v. Twombly*, _ U.S. _, 127 S. Ct. 1955, 1964-65 (2007).

## A.  THE STATUTE OF LIMITATIONS BARS THE PLAINTIFFS' CLAIMS.

Virginia's general statute of limitations provisions for "[p]ersonal actions for which no other limitation is specified," § 8.01-248, states: "Every personal action accruing on or after July 1, 1995, for which no limitation is otherwise prescribed, shall be brought within two years after the right to bring such action has accrued."  The revisors' note states: "Section 8.01-248 is a catch-all provision for actions not otherwise covered by a statute of limitation; e.g., malicious prosecution and abuse of process. *Cf.* § 8.01-249 (3)."  Va. Code Ann. § 8.01-248 (2007); *see also Houghton v. Virgini*a, 1991 U.S. App. LEXIS 26465 (4th Cir. 1991)(the catch-all statue of limitations covers malicious prosecutions).

The same two-year statute of limitations applies to 42 U.S.C. §1983 claims.

Congress has never enacted a specific statute of limitations applicable to sections 1983 or 1985(3). Instead, the United States Supreme Court has held that the state statute of limitations for personal injury actions applies to all section 1983 claims. *Wilson v. Garcia*, 471 U.S. 261, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985). The Commonwealth of Virginia has a two-year limitation period for personal injury actions. Va. Code Ann. § 8.01-243(A) (Michie Supp. 1991). "While the time limitation itself is borrowed from state law, the federal rule fixes the time of accrual of a right of action." *Bireline v. Seagondollar*, 567 F.2d 260, 262 (4th Cir. 1977) (emphasis added), *cert. denied*, 444 U.S. 842, 62 L. Ed. 2d 54, 100 S. Ct. 83 (1979). The general rule for the time of accrual under federal law is "that point . . . where the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.*; *see also Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975).

*Blackmon v. Perez,* 791 F. Supp. 1086, 1090 (E.D. Va. 1992); *Cramer v. Crutchfield*, 648 F.2d 943, 945 (4th Cir. 1981)(same);( *Billups v. Carter*, 604 S.E. 2d 414, 419 (Va. 2004)(same).

All of the ballot access litigation concluded in 2004 and the FEC complaints were dismissed by April 2006, more than two years before this Complaint was filed.  Accordingly, the claims are time barred, and the Complaint should be dismissd. (s*ee* Attached Chart)[2]

---

[2] State and date in 2004 of final action: Arizona – Sept. 10; Arkansas – Oct. 1; Colorado – before Nov. 2004; Florida – Sept. 17; Illinois – Oct. 15; Iowa – Aug. 30; Maine – Oct. 8; Michgan –

### B. THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR VIOLATIONS OF 42 U.S.C. § 1983, THE QUALIFICATION CLAUSE AND THE FIRST AND FOURTEENTH AMENDMENTS (COUNTS III AND IV).

Count III alleges that, by initiating the ballot access cases and filing FEC complaints, the Defendants "conspired and agreed among themselves to use court processes and other means to violate Plaintiffs' constitutional rights…," in violation of 42 U.S.C. §1983 (¶¶ 244 and 250). "Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election…." (¶ 246). It is further alleged that Defendants "engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority….." (¶ 248). Count IV alleges a violation of § 1983 without a conspiracy.

These allegations have already been litigated and dismissed, albeit brought by a different Nader supporter in a different court. In *Fulani v. McAuliffe*, 2005 U.S. Dist. LEXIS 20400 (S.D.N.Y. 2005) ("*Fulani*"), the plaintiffs alleged that the Terry McAuliffe and others "conspired to keep Ralph Nader ('Nader') and Peter Camejo ('Camejo') off of the ballot in states across the country as independent candidates for the offices of President and Vice President of the United States" in the 2004 election in violation of 42 U.S.C. §§ 1983 and 1985. *Id*. at *3.[3] The court

---

Sept. 3; Mississippi – Sept. 7, Nevada – Sept. 1; New Hampshire – Sept. 7; New Mexico – Sept 28; Ohio – Oct. 22; Oregon – Sept. 17; Pennsylvania – Oct. 19; Washington – Sept. 15; West Virginia –August 30; Wisconsin – Sept. 30.

[3] The alleged facts in Fulani are remarkably similar to the allegations here. *Compare Id*. at *5-6 ("According to Plaintiffs, in early 2004, once Nader declared his intention to run for President, Defendants began a concerted, organized conspiracy to 'prevent Nader from obtaining a line on the ballot in as many states as possible, and, thereby, impede the development' of a third national political party. 2 (Compl., P27.) Plaintiffs allege that: (1) Defendant McAuliffe issued public statements 'about the importance of eliminating Nader as a factor' in the election; (2) Defendant Jones 'orchestrated a paid media and propaganda campaign' to combat Nader-Camejo's efforts at ballot access; (3) Defendant Moffet coordinated a national plan to "drain [Nader's] resources" and trained lawyers to help in that effort; (4) Defendant Clifford announced that he was

found that:

> Sections 1983 and 1985 do not in themselves create any substantive right but merely provide remedies for deprivations of rights established elsewhere. *See Albright v. Oliver,* 510 U.S. 266, 271, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994); *United Bhd. of Carpenters and Joiners, Local 610 v. Scott,* 463 U.S. 825, 833, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). Both sections, therefore, require a plaintiff to establish with specificity the rights of which he has been deprived. *See Albright,* 510 U.S. at 271; *Scott,* 463 U.S. at 833.

*Fulani* at *8-9. "Plaintiffs seem to argue that the various lawsuits initiated to challenge the Nader/Camejo nominating petitions deprived Plaintiffs of their voting and equal protection rights. However, 'merely resorting to the courts and being on the winning side of a lawsuit does not make a party' responsible for depriving a plaintiff of his rights." *Id.* at *11 n4 (citing *Dennis v. Sparks,* 449 U.S. 24, 28 (1980). "Consequently, to the extent that Plaintiffs accuse Defendants of using State election law to impede the Nader/Camejo candidacy and violate Plaintiffs' equal protection rights or right to vote (Compl., PP29-30), that claim fails as a matter of law." *Id.* at *11. The court further explained that:

> To state a claim under 42 U.S.C. § 1983, a plaintiff must not only allege a deprivation of a federal right, privilege or immunity, but must allege that the deprivation was attributable, at least in part, to a person acting under color of state law. *See, e.g., Rendell-Baker v. Kohn,* 457 U.S. 830, 835, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982); *Parratt v. Taylor,* 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981); *Gomez v. Toledo,* 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). A private actor may be

---

commencing a criminal investigation of persons collecting Nader-Camejo petition signatures in West Virginia; (5) Defendant McGraw announced that he would file a lawsuit challenging the Nader-Camejo petition in West Virginia; (6) Defendant Merrick caused the Nader-Camejo nominating caucus in Portland to be crowded with Democratic activists, thus preventing Nader-Camejo from reaching the required 1000 supporter threshold; (7) Defendant Madigan directed government workers to challenge the Nader-Camejo petition in Illinois; (8) various defendants persuaded the Michigan Secretary of State not to recognize Nader-Camejo as the 2004 Reform Party candidates; (9) various defendants caused an organization called Citizens for Ethics and Responsibility in Washington to file complaints with the Federal Election Commission ("FEC") against Nader-Camejo; and (10) Democratic Party lawyers and operatives generally reviewed Nader-Camejo nominating petitions 'with a fine tooth comb' and instituted challenges against the petitions in Arizona, Colorado, Illinois, Iowa, Maine, Michigan, Missouri, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania and Wisconsin. (Compl., P29.")

subject to liability under § 1983 if he or she willfully collaborated or conspired with an official state actor in the deprivation of the federal right. *Dwares* [*v. The City of New York, 985 F. 2d 94, 98 (2d Cir. 1993)*]. Defendants here are predominantly non-state actors, private individuals or organizations. Plaintiffs' sole effort to show that Defendants are acting "under color of state law" appears to be an assertion that "public funds are being used in furtherance of the conspiracy" -- *i.e.,* that the "Democratic Party convention and the Kerry-Edwards campaign are funded with federal moneys through the Federal Election Commission." (Compl., PP30, 35.) However, the Supreme Court has held that mere receipt of public funds is insufficient to transform private entities or individuals into state actors. *See, e.g., Rendell-Baker,* 457 U.S. at 841; *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 97 L. Ed. 2d 427, 107 S. Ct. 2971 (1987); *Polk County v. Dodson,* 454 U.S. 312, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981).

*Fulani* at *17-18. This circuit recently applied the same rule in *Kelly v. Maryland*, 2008 U.S.

App. LEXIS 1226, *2 (4th Cir. 2008).

A cause of action under § 1983 requires the deprivation of a civil right by a "person" acting under color of state law. 42 U.S.C. § 1983. It is now well settled that a state cannot be sued under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). This rule applies "to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70. Therefore, because the Center was properly considered an arm of the State of Maryland, it cannot be sued under § 1983 either. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-70, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); *Foremost Guaranty Corp. v. Community Sav. & Loan, Inc.,* 826 F.2d 1383, 1386-88 (4th Cir. 1987).

In addition, just because state officials considered the ballot access cases, that does not

satisfy the "acting under color of state law" requirement because the "public official [is] entitled

to qualified immunity where acting reasonably within discretionary function of official

responsibilities." *Fulani* at *11 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). [4]

If Plaintiffs argue that filing complaints is acting under color of state law, they are wrong.

In *Lugar v. Edmondson Oil Co*., 457 U.S. 922 (1982), the Court held that a plaintiff could bring a

---

[4] Because the Defendants are alleged to have filed challenges with state officials and judges to take action in all of the ballot access cases and the FEC action, the Defendants are protected by the Noerr-Pennington doctrine. "The Noerr-Pennington-Pennington doctrine grants First Amendment immunity to those who engage in petitioning activity." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003).

§ 1983 action to challenge use of a constitutionally defective state court procedure for

attachment, because the deprivation of due process was attributable to the authority of the state.

At the same time, the Court made clear that the mere "private misuse of a state statute does not

describe conduct that can be attributed to the State…." *Id*. at 941. Specifically, the Court held

that the plaintiff in that case did <u>not</u> state a claim under §1983 by alleging (in a separate court)

that defendants had *abused* the state legal procedure, and acted unlawfully under state law.

"That respondents invoked the statute without the grounds to do so could in no way be attributed

to a state rule or state decision. Count two, therefore, does not state a cause of action under

§1983 but challenges only private action." *Id.* at 940. The court emphasized that "we do not hold

today that 'a private party's mere invocation of state legal procedures constitutes 'joint

participation' or 'conspiracy' with state officials satisfying the §1983 requirement of action

under color law.'" *Id*. at 939 n.21; *see also Dennis v. Sparks*, 449 U.S. at 28 ("[M]erely resorting

to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or

a joint actor with the judge."); *Lee v. Patel*, 564 F. Supp. 755, 760 (E.D. Va. 1983 (same). *See*

*also Fleming v. Asbill*, 42 F.3d 886, 890 (4th Cir. 1994) ("Private lawyers do not act 'under color

of state law' merely by making use of the state's court system."); *Scott v. Greenville County*, 716

F.2d 1409, 1422 (4th Cir. 1983) ("[P]rivate persons who willfully participate in joint action with

a state official act under the color of law within the meaning of § 1983, notwithstanding the

official's immunity from civil liability.").[5] It makes no difference whether the defendant in the §

---

[5] Other jurisdictions have uniformly followed this same approach. In *Hoai v. Vo*, 935
F.2d 308, 308 (D.C. Cir. 1991) the D. C. Circuit held "what is alleged is an abuse of the D.C.
court system by private litigants and their attorneys" and that "[t]his allegation is insufficient to
support a finding of action under color of law for purposes of section 1983." *Id*. at 313 "It is well
established that mere recourse to state or local court procedures does not by itself constitute
'joint activity' with the state sufficient to subject a private party to liability under section 1983."
*Id*. In *Dahlberg v. Becker*, 748 F.2d 85 (2d Cir. 1984), the court held that plaintiff could not

1983 case won or lost in the prior state court action.  *See Lugar, supra*, 457 U.S. at 940.[6]

Because the allegations do not state a claim that any of the Defendants acted under color

of state law, they do not state a cause of action under § 1983 or a conspiracy to violate § 1983.

---

bring a section 1983 action to challenge the alleged abuse of  New York judicial procedures by plaintiff's ex-wife, resulting in his being held in contempt of court and briefly imprisoned.  "A private party's misuse of New York's Judiciary Law that causes plaintiff to be imprisoned overnight is not fairly attributable to New York State."  *Id*. at 90. In *Henry v. First Nat'l Bank of Clarksdale*, 444 F.2d 1300 (5th Cir. 1971), *cert denied*, 405 U.S. 1019 (1972), a baseless state court action had been filed by a group of white merchants against a civil rights ground for boycotting the merchants.  The merchants filed a federal court action seeking to enjoin the state court action.  The Fifth Circuit held there was no state action for purposes of §1983: "merely by holding its court open to litigation of complaints, regardless of how baseless they eventually prove to be, [the state] does not clothe persons who use its judicial processes with the authority of the state." *Id*. at 1309.  *See Paisey v. Vitale*, 807 F.2d 889, 893-95 (11th Cir. 1986); *Stevens v. Frick*, 372 F.2d 378 (2d Cir. 1967), *cert. denied*, 387 U.S. 920 (1967).  In *O'Bradovich v. Village of Tuckahoe*, 325 F. Supp.2d 413 (S.D.N.Y. 2004), a village attorney, in his personal capacity, sued a group of activists for defamation in retaliation for their pressing various causes against the village.  The defamation suit was frivolous and the village attorney lost it. The activists sued the attorney under section 1983.  The court held there was no state action: *Id*. at 424.  More recently, in *Montesano v. New York*, 2006 U.S. DIST. LEXIS 18677 (S.D.N.Y. 2006), the court held that a plaintiff who lost a state court case could not bring a federal action under section 1983 on the grounds that the state court judgment was obtained fraudulently.  "A private party is not acting under color of state law by simply instituting litigation in state court seeking a judicial determination." *Id*. at *10. *See also, Nelson v. Smith*, 2006 U.S. DIST. LEXIS 71029 at *7  (W. D. Wash. 2006)("[I]t is well established that mere recourse to state court procedures does not by itself constitute 'joint activity' with the state and subject a private party to liability under §1983.").

[6] Plaintiffs might argue that there is state action in the Pennsylvania case, about which they are alleging that Reed Smith's "ties" to various justices of the Pennsylvania Supreme Court corruptly influenced the state Supreme Court's decision.  As noted, in *Dennis v. Sparks*, *supra*, the Court held that a section 1983 case could be brought alleging that private parties corruptly conspired with a judge, by bribing him, to produce a judgment against the plaintiffs. But the Court made clear that its holding was limited to the situation in which "the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge."  449 U.S. at 28.  It is well settled that state court judges are absolutely immune from liability for damages under 42 U.S.C. § 1983 for their judicial acts. *See Mireles v. Waco*, 502 U.S. 9 (1991).  In this case, the Plaintiffs have specifically *not* included any of the Pennsylvania Supreme Court Justices as co-conspirators and have not alleged any conspiracy between any of the Defendants and those judges.  ¶¶ 181-207.  In the absence of such allegations, *Dennis* is inapplicable and there is no state action.

## C.  PLAINTIFFS DO NOT HAVE STANDING TO LITIGATE THEIR CLAIMS.

For the reasons described below, the Plaintiffs do not have Article III standing.

The irreducible minimum requirements for standing are well known:

> To satisfy the constitutional standing requirement, a plaintiff must provide evidence to support the conclusion that: (1) "the plaintiff . . . suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a causal connection between the injury and the conduct complained of"; and (3) "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (quoting *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 560-61 (1992).

> [Plaintifs] bear the burden of establishing the three fundamental standing elements. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 107 L. Ed. 2d 603, 110 S. Ct. 596 (1990). When a defendant raises standing as the basis for a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction, as the [defendant] did in this case, the district court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Because the standing elements are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (explaining that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but in response to a summary judgment motion, "the plaintiff can no longer rest on such "mere allegations," [and] must 'set forth' by affidavit or other evidence 'specific facts'" establishing standing (quoting Fed. R. Civ. P. 56(e)).

*White Tail Park Inc*., 413 F. 3d at 459.

> Courts must therefore examine the allegations in such cases "to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen* [*v. Wright*, 468 U.S. 737, 752 (1984)]. Such scrutiny is necessary to filter the truly afflicted from the abstractly distressed. Courts discharge this duty by asking such questions as: "Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?" *Id*. If the plaintiff can show that his claim to relief is free from excessive abstraction, undue attenuation, and unbridled speculation, the Constitution places no further barriers between the plaintiff and an adjudication of his rights.

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*., 204 F.3d 149, 154-55 (4th Cir. 2000).

### 1. Plaintiffs have not alleged a legally cognizable harm.

### a. Voter Plaintiffs have alleged only a generalized grievance.

Thus, we turn to the injury in fact requirement. For [a plaintiff] to establish this element, it must adduce facts demonstrating that it suffered "an invasion of a legally protected interest," *Lujan*, 504 U.S. at 560, that was "concrete, particularized, and not conjectural or hypothetical." … The standing doctrine, of course, depends not upon the merits,, but on "whether the plaintiff is the proper party to bring [the] suit."… "An analysis of a plaintiff's standing focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry." If a plaintiff's legally protected interest hinged on whether a given claim could succeed on the merits, then "every unsuccessful plaintiff will have lacked standing in the first place." Even though a plaintiff's standing cannot be examined without reference to the "nature and source of the claim asserted," our ultimate aim is to determine whether plaintiff has a sufficiently "personal stake" in the lawsuit to justify the invocation of federal court jurisdiction,

*White Tail Park Inc*., 413 F. 3d at 460-61 (internal citations omitted).

But this does not mean that the threatened loss of any opportunity, no matter how abstract and speculative, will do. One cannot complain about having an opportunity taken away when one does not have a real, concrete opportunity in the first place. To hold otherwise would transform standing doctrine and threaten the core democratic values that it serves.

Indeed, our acceptance of plaintiffs' contention that the mere threatened loss of a remote opportunity is sufficient to confer standing would quickly lead to absurd consequences. A child would then be injured in fact by the prospect of NASA's shutting down its space program because she would no longer have the chance to become an astronaut. Though we do not question the sincerity of plaintiffs' pleas, we decline to launch standing doctrine into outer space.

*Friends for Ferrell Parkway v. Stasko,* 282 F.3d 315, 325 (4th Cir. 2002)(internal citations

omitted).

The injury in fact requirement precludes those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 575. A plaintiff must instead suffer an invasion of a legally protected interest that is "concrete and particularized" before he can bring an action. *Id*. at 560. He must somehow differentiate himself from the mass of people who may find the conduct of which he complains to be objectionable only in an abstract sense. In other words, the alleged injury "must

> affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. Without this
> requirement, the federal judicial process would be transformed into "no more than
> a vehicle for the vindication of the value interests of concerned bystanders."
> *Valley Forge*, 454 U.S. at 473 (internal quotation marks omitted).

*Friends of the Earth, Inc.,* 204 F. 3d at 156.

The Supreme Court in *FEC v. Akins*, 524 U.S. 11 (1998) considered voter standing and

explained that a generalized grievance "shared in substantially equal measure by all or a large

class of citizens" may not be sufficiently concrete to confer standing. *Id*. at 23 (internal citations

omitted).  For example, where the "harm at issue is not only widely shared, but is also of an

abstract and indefinite nature -- for example, harm to the "common concern for obedience to

law," *id*. the Plaintiffs do not have standing. "Often the fact that an interest is abstract and the

fact that it is widely shared go hand in hand. But their association is not invariable, and where

aharm is concrete, though widely shared, the Court has found 'injury in fact.'" *Id*. at 24. The

Court noted that in a previous case it found standing "where large numbers of voters suffer

interference with voting rights conferred by law" and held that "the informational injury at issue

here, directly related to voting, the most basic of political rights, is sufficiently concrete and

specific such that the fact that it is widely shared does not deprive Congress of constitutional

power to authorize its vindication in the federal courts."  *Id*. at 24-25.

Here, the six voter Plaintiffs allege that they were harmed because "Defendants and co-

Conspirators unlawfully conspired with state actors and acted under color of law to violate

Plaintiff-voters' constitutional rights, and those of others similarly situated, by denying voters

their free choice of candidates in the 2004 presidential election." (¶ 66 iv). "More than 1.3

million Americans living in the 17 states that denied Nader-Camejo ballot access in 2004 voted

for Mr. Nader in 2000 (¶ 231).  Nothing distinguishes the voter Plaintiffs from all other voters in

those 17 states.  In essence, they are asking no more than the right to vote for the candidate of

their choice – a common desire with millions of voters.  Their alleged harm is not based on

alleged discrimination, and they fail to disclose whether they were prevented from voting for

Nader by a write-in ballot or other voting procedure.  Therefore, the voter Plaintiffs' grievance,

that they could not vote for the Nader-Camejo ticket, is too general to confer standing.

Plaintiffs' alleged harm is also too remote and speculative to confer standing.  Plaintiff

Nader has not alleged that he will run for President and the probability that the same alleged

conspiracy would recur (and that Defendant McAuliffe would again become chairman of the

Democratic National Committee) are too remote and speculative to confer standing.

### b. The Plaintiffs have not alleged that they were financially harmed.

Although the Complaint herein repeatedly asserts that the Plaintiffs were financially

injured, the Court need not accept factual inferences drawn by a plaintiff if those inferences are

not supported by facts alleged in the complaint.  *Roe 1*, 2007 U.S. Dist. LEXIS 88405, *7(E.D.

Va. 2007)(citing *Bell Atlantic Corp. v. Twombly*, _ U.S. _, 127 S. Ct. 1955, 1964-65 (2007).  In

the specific factual section of the Complaint describing the alleged financial loss (¶¶ 230 – 233),

the Plaintiffs allege that "Defendants' conspiracy caused severe financial injury to Nader-

Camejo's 2004 presidential campaign," and "consumed Nader-Camejo staffers' time" (¶

230)(emphasis added).  "In short, Defendants' and co-Conspirators' efforts to bankrupt the

Nader-Camejo Campaign produced its intended effect: in October 2004, Mr. Nader was forced to

loan the campaign $100,000 to cover legal bills, staff salaries and operating expenses" (¶

230)(emphasis added).  The so-called Nader-Camejo Campaign does not refer to Plaintiffs Nader

and Camejo, but to a non-party entity:  Nader For President 2004, the candidates' principal

campaign committee, or Nader For President General Election, the candidates' other authorized

committee, are both headquartered in Washington, D.C. and registered with the Federal Election

Commission pursuant to 2 U.S.C. § 431(6) to accept contributions and make expenditures. Nader

For President 2004 and/or Nader For President 2004 General Election made the expenditures for

the litigation and its staff salaries alleged to be involved in the litigation.  *See* www. FEC.gov.

Plaintiffs do not allege that the campaign did not have sufficient funds to defend the

ballot access cases or used the funds Plaintiff Nader lent exclusively to defend the ballot access

cases.  The Plaintiffs do not allege the Defendants have prevented the campaign from repaying

the loan. Thus, Plaintiffs claim that "Defendants and co-Conspirators conspired to and did in fact

cause financial injury … to Mr. Nader and Mr. Camejo personally" (¶ 232), is not supported by

and is inconsistent with the alleged facts.  Because none of the Plaintiffs paid the unspecified

legal bills that are the alleged harm, they have failed to allege a harm to confer standing.

### 2. Defendants did not cause the alleged harms.

#### a. Defendants did not cause any state officer or court to deny Plaintiffs Nader and Camejo access to its state's ballot.

The "fairly traceable" requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct. *See Lujan v. Defenders of Wildlife*, 504 U.S. at 560. But traceability "'does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs.'" *Natural Resources Defense Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992)

*Friends of the Earth, Inc.,* 204 F. 3d at 161.

It is true that the "fairly traceable" standard is "not equivalent to a requirement of tort causation." But we do not insist on anything resembling such a strict standard of causation in finding that plaintiffs' claimed injuries are not fairly traceable to [the defendant] with respect to either [of the alleged issues]. Indeed, the "fairly traceable" requirement "is in large part designed to ensure that the injury complained of is 'not the result of the independent action of some third party not before the court.'" That is exactly the situation in the case at bar. Here, "the existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." Under these circumstances, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."

*Friends for Ferrell Parkway,* 282 F.3d at 324 (internal citations omitted).

Here, the voter Plaintiffs' alleged injury – the inability to vote for the Plaintiffs Nader and Camejo – were not caused by the Defendants any more than the state officials and the judges that decided the petitions submitted by the Nader-Camejo campaign were inadequate.[7] *See e.g. Nader v. Brewer*, 2006 U.S. Dist. LEXIS 38500, *17 (D. Ariz. 2006) ("Nader's failure to get on the [Arizona] ballot was caused by his failure to start earlier."); *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) ("By waiting as long as he did to sue, and despite the strenuous efforts by the district court and this court to expedite the litigation, Nader created a situation in which any remedial order would throw the state's preparations for the election into turmoil."); *Blankenship v. Blackwell*, 817 N.E. 2d 382, 387-88 (Ohio 2004) ("[Plaintiffs] failed to act with the requisite diligence in asserting their claims.  Instead, they delayed at least *31 days* before raising their claim concerning unprocessed voter registration applications and about *four months* before challenging the constitutionality of statutory requirements for petition circulators. … [D]elay in raising these claims prejudiced the Secretary of State, the protesters, election officials, and electors.")(emphasis in original).

The alleged harm of not obtaining access to the ballot was not caused by the Defendants, but by a chain of third parties who caused improper ballot petitions to be submitted to state authorities, and those authorities who performed their mandated duties to examine and rule on the quality of those petitions.

---

[7] Even though the Nader-Camejo campaign are not plaintiffs, it is noteworthy that their costs were not caused by the Defendants for the same reason that they did not cause the courts to rule that the campaign failed to submit adequate ballot petitions.

**b. Plaintiff Nader's loss of $100,000 was not caused by the Defendants.**

Plaintiff Nader alleges that he "was forced to loan the campaign $100,000 to cover legal bills, staff salaries and operating expenses" (¶ 220). Plaintiff Nader has not alleged that the loan will not be re-paid. Even if the loan is not re-paid, he does not allege, nor can he, that the Defendants forced him to loan funds to his campaign committee. *C.f. McConnell v. FEC*, 540 U.S. 93, 227 (2003)(plaintiffs' voluntary decision that harms them is insufficient to show causation by the Defendants). Moreover, he has not alleged, nor can he, that the Defendants are responsible for his campaign committee's decision to pay others or its inability to raise funds to repay the loan. Thus, even if Plaintiff Nader were financially harmed, the loss was not fairly traceable to the Defendants.

**3. Plaintiffs alleged harms are not redressable.**

"The redressability requirement ensures that a plaintiff 'personally would benefit in a tangible way from the court's intervention.' A plaintiff seeking injunctive relief shows redressability by 'alleging a continuing violation or the imminence of a future violation' of the statute at issue. … *Steel Co*. held that private plaintiffs may not sue to assess penalties for wholly past violations)." *Friends of the Earth, Inc.,* 204 F.3d at 162 (internal citations omitted).

As described above in the section describing why injunctive claims are moot, even if the Plaintiffs were harmed in connection with the 2004 election, an injunction cannot remedy that harm because this Court cannot void the election and order it to be held again. Thus, the Plaintiffs' request for injunctive relief cannot redress their alleged injury.

With respect to Plaintiff Nader's allegation that he lent $100,000 to his campaign committee, this Court does not have the authority to require the campaign committee, which is not a party here, to re-pay the loan.

### D. THE ROOKER-FELDMAN DOCTRINE PRECLUDES COURT

### JURISDICTION OVER THE 42 U.S.C. § 1983 CLAIMS.

Under this Court's *Shooting Point, L.L.C. v. Cumming* analysis of the Rooker-Feldman

doctrine, 238 F. Supp. 2d 729, 737 (E. D. Va. 2002), *aff'd*, 368 F.3d 379 (4th Cir. 2004), the

Plaintiffs' Federal claims should be dismissed. The Rooker-Feldman doctrine is based on *D.C.*

*Court of Appeals v. Feldman,* 460 U.S. 462 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S.

413 (1923).

> *Rooker* and *Feldman* exhibit the limited circumstances in which this Court's appellate
> jurisdiction over state-court judgments, 28 U.S.C. § 1257 [28 USCS § 1257], precludes a
> United States district court from exercising subject-matter jurisdiction in an action it
> would otherwise be empowered to adjudicate under a congressional grant of authority,
> e.g., § 1330 (suits against foreign states), § 1331 (federal question), and § 1332
> (diversity). In both cases, the losing party in state court filed suit in federal court after the
> state proceedings ended, complaining of an injury caused by the state-court judgment and
> seeking review and rejection of that judgment. Plaintiffs in both cases, alleging federal-
> question jurisdiction, called upon the District Court to overturn an injurious state-court
> judgment. Because § 1257, as long interpreted, vests authority to review a state court's
> judgment solely in this Court, e.g., *Feldman*, 460 U.S., at 476, 75 L. Ed. 2d 206, 103 S.
> Ct. 1303; *Atlantic Coast Line R. Co. v. Locomotive Engineers*, 398 U.S. 281, 286, 26 L.
> Ed. 2d 234, 90 S. Ct. 1739 (1970); *Rooker*, 263 U.S., at 416, 68 L. Ed. 362, 44 S. Ct. 149,
> the District Courts in *Rooker* and *Feldman* lacked subject-matter jurisdiction. *See Verizon*
> *Md. Inc*., 535 U.S., at 644, n. 3, 152 L. Ed. 2d 871, 122 S. Ct. 1753 ("The *Rooker-*
> *Feldman* doctrine merely recognizes that 28 U.S.C. § 1331 [28 USCS § 1331] is a grant
> of original jurisdiction, and does not authorize district courts to exercise appellate
> jurisdiction over state-court judgments, which Congress has reserved to this Court, *see* §
> 1257(a).").

*Exxon Mobil Corp. v. Saudi Basic Inds. Corp*., 544 U.S. 280, 291-92 (2005); *Brown &*

*Root, Inc. v. Breckenridge,* 211 F.3d 194 (4th Cir. 2000)(same); *Jordahl v. Democratic*

*Party of Va.*, 122 F.3d 192, 202-03 (4th Cir. 1997)(same); *Shooting Point, L.L.C.*, 238 F.

Supp. 2d at 737 (same).

The plaintiffs in *Shooting Point*, like the Plaintiffs here, did "not directly

challenge or attack the state court judgment. Indeed, the complaint barely mentions the

prior state proceedings. Rather, plaintiffs brought this section 1983 lawsuit against the

defendants, alleging that they violated the plaintiffs' constitutional rights. Nonetheless, the court must decide whether the issues presented in the federal claims are 'inextricably intertwined' with the state court judgment." *Id*. This Court explained that, "[t]he state court specifically held that the plaintiffs were required to obtain a commercial entrance permit for Shooting Point, but that the permit issued by Cumming was invalid because Shooting Point did not meet the statutory requirements. In so doing, the state court impliedly determined that the requirement was constitutional as applied to the plaintiffs. This court cannot now review those decisions without violating the Rooker-Feldman doctrine." *Id*. at 738. The same issue is before this Court. Various courts determined that Nader's ballot petitions were insufficient, and he was prohibited from appearing on the ballot. Those state court decisions are "inextricably intertwined" with the Plaintiffs' §1983 claim that Defendants violated the Constitution to keep Nader off the ballot. Like the plaintiffs in *Shooting Point*, the Plaintiffs § 1983 claim should be dismissed.

### E. PLAINTIFFS HAVE NOT ALLEGED AN ABUSE OF PROCESS.

The Plaintiffs have not alleged either of the necessary elements of an abuse of process. "To be liable for abuse of process, Defendants must have used 'process not proper in the regular prosecution of proceedings.'" *Tibbetts v. Yale Corp.*, 47 Fed. Appx. 648, 652 (4th Cir. 2002) (citation omitted). "Abuse of process is 'the wrongful *use* of process *after* it has been issued.' 'The gravamen of the tort lies in the abuse or perversion of the process after it has been issued.' The elements of a prima facie case of abuse of process are: (i) existence of an ulterior motive, and (ii) an act in the use of process not proper in the regular prosecution of the proceedings." *Id.*(internal citations omitted)*; Cramer v. Crutchfield,* 496 F. Supp. 949, 954 (ED. Va. 1980)(same). Thus, a court will not find abuse of process, despite evidence of bad intent, if the

defendant after filing an action "engaged in any 'act in the use of the process not proper in the regular prosecution of the proceeding.'" *Tibbetts*, 47 F. App'x at 652 (citation omitted).

The Plaintiffs allege that Defendants filed ballot access complaints to prevent Plaintiff Nader from appearing on state ballots and to drain the Nader-Camejo's campaign's resources. Some of these complaints were dismissed outright, others were initially upheld and then dismissed on appeal, and still others were upheld. Although Plaintiffs allege these filings abused process, Plaintiffs assert that they were all filed to test Nader's ballot petitions and to keep him off the ballot if those petitions were inadequate.  This is a proper purpose for filing ballot access challenges.  Plaintiffs do not cite any finding or orders that Defendants abused the legal system. At most, they complain that defending complaints cost money, which cannot be an abuse of process.  Courts have taken the position that one who seeks to enforce rights which have been violated is not thereby committing a legal wrong, but may actually be performing a moral duty, and that a citizen should have free access to the courts in having his rights determined without being forced to respond in damages when he has caused a prosecution in good faith and on reasonable grounds. *See* 54 C.J.S., Malicious Prosecution, § 3, page 955. Thus, the abuse of process claim should be dismissed.

**F.  PLAINTIFFS HAVE FAILED TO ALLEGE MALICIOUS PROSECUTION.**

In Virginia, suits for malicious prosecution are not favored and the standard for "maintaining such actions are more stringent than those applying to most other tort claims." *Lee v. Southland Corp.,* 244 S.E.2d 756, 758 (1978). *Commissary Concepts Mgmt. Corp. v. Mziguir,* 591 S.E.2d 915, 917 (2004)."  *Ekizion v. Microstrategy, Inc.,* 71 Va. Cir. 425, 426 (Va. Cir. Ct. 2005*)*; *Westreich v. McFarland*, 429 F.2d 947, 949 (4th Cir. 1970)(same).  "A prima facie case for malicious prosecution requires that: (i) the defendants instituted a prior proceeding against

the plaintiff; (ii) the proceeding was instituted without probable cause; (iii) the proceeding was instituted with malice; (iv) the underlying proceeding terminated in the plaintiff's favor; and (v) the plaintiff sustained special damages as a result of the proceeding." *Tibbetts,* 47 F. App'x. at 653; *Westreich,* 429 F.2d at 949 (same); *Wiggs v. Farme*r, 135 S.E.2d 829, 831 (1964)(same).

**1. The Plaintiffs have not alleged malice.**

It is generally held that the requisite malice is dependent on the existence of an improper motive (as distinguished from malice in the technical legal sense), and has also been described as the existence of an evil purpose or motive, a wicked or mischievous intent, or a willful, wanton, reckless or oppressive disregard to the rights of the plaintiff. 52 Am. Jur. 2d. Malicious Prosecution § 46 (2007).  In short, "torts like malicious prosecution [] require a particular antisocial state of mind." *Smith v. Wade,* 461 U.S. 30, 53 (1983) (citations omitted).

Here, no evil or wicked intent, personal spite, rancor or antisocial motive has been alleged.  Rather, the Plaintiffs ascribe only a political adversary's motive to Defendants, who were concerned that Nader's candidacy would draw votes that otherwise would be cast for the Democratic candidate. The costs defending those challenges were a necessary by-product of our legal system, and not a malicious motive.  Certainly, actions taken to assist a favored candidate by his or her supporters and party by challenging ballot access petitions are adversarial, but they do not rise to the level of legal malice.  Ballot access challenges are not infrequent and are often, as here, found to be justified.  The Nader-Camejo campaign's expenditures in response to legal challenges are no different than expending resources in response to an opponent's advertising. That is part of our political system and certainly is not an example of malicious intent.

**2. Plaintiffs have not alleged a special injury.**

"Under Virginia law, a showing of special damages requires 'proof of a special loss or

unusual hardship resulting from the malicious prosecution [and] excludes the kind of secondary

consequences that are a common and often unavoidable burden. . . .'" *Ayyildiz v. Kidd*, 266

S.E.2d 108, 111 (Va. 1980) (citing *O'Toole v. Franklin*, 569 P.2d 561, 563 (Or. 1977)); *Ely v.

Whitlock*, et al., 385 S.E.2d 893, 895-96 (Va. 1989)." *Tibbetts*, 47 F. App'x.at 653.  The *Ayyildiz*

court held that special injury means more than paying legal fees and suffering the normal

secondary consequences of litigation.  "Plaintiff alleges no arrest of his person or seizure of his

property. His allegations of damages include costs to defend the malpractice action, injury to his

professional reputation and good name, plus the loss of present and future earnings and profits

from his profession. The 'special injury' restriction requires allegation and proof of a special loss

or unusual hardship resulting from the malicious prosecution of the original action." A*yyildiz,*

266 S.E.2d at 1085. The *Avvildiz* court explained at 1085,

> The plaintiff here has suffered no injury that would not stem normally from a medical
> malpractice suit. A defendant in such a suit usually pays his costs and attorney's fees. The
> damage to the professional reputation of a physician who prevails in malpractice
> litigation is debatable; but in any event such damages as may result are common to all
> malpractice actions. Moreover, plaintiff's allegations of injury to his professional
> reputation and good name are conclusory with no facts being alleged to support a special
> injury. The other 'special injury' alleged, concerning loss of present and future income,
> we have observed would fall upon the defending physician in any medical malpractice
> action.

The Plaintiffs here, like the *Ayyildiz* plaintiff, suffered no more than any other candidate

whose ballot petition was challenged.  Being excluded from a ballot and paying litigation costs

(whether or not the candidate is excluded) are the expected consequences of those cases, and not

special injuries that resulted from the ballot access challenges described in the complaint.  Each

state has its own ballot access rules.  Even assuming, *arguendo*, that all of the ballot access cases

were instigated by a conspiracy, the Defendants could not have resolved their challenges in a

single action; the law requires a challenge to be initiated in each state.  Thus, the multiple

proceedings were legally necessary and cannot constitute a special injury.

### G. PLAINTIFFS HAVE FAILED TO ALLEGE A CONSPIRACY.

First, *arguendo* even if there were a conspiracy, the allegations fail to describe Defendant McAuliffe's actions as part of the conspiracy.  He is only alleged to have sought a compromise among competing political campaign interests, and publicly stating the obvious political campaign fact that Nader's candidacy was likely to harm the Democratic candidate.  *See* ¶¶ 1, 2 ,3, 13, 23 and 55.  Moreover, Defendant McAuliffe is no longer an officer of the Democratic National Committee (¶ 23).

Second, the Plaintiffs have failed to allege a conspiracy.[8]  "A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means. The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy."  *Commercial Business Sys. v. Bellsouth Servs.*, 453 S.E.2d 261, 267 (Va. 1995) (internal citations omitted); *Beck v. Prupis,* 529 U.S. 494, 503 n.7 (2000)(same). If there is no unlawful purpose, such as torts or violations of 42 U.S.C. § 1983, there cannot be an actionable conspiracy. As shown above, there are no torts or § 1983 violations alleged and, thus, no conspiracy.

### H. PLAINTIFFS HAVE FAILED TO ALLEGE A CONSPIRACY TO COMMIT A MALICIOUS PROSECUTION AND ABUSE OF PROCESS FOR THE ADMINISTRATIVE COMPLAINTS FILED WITH THE FEC.

Plaintiffs allege that the five administrative complaints filed with the FEC were tortious.

---

[8] "It is worth noting that conspiracy to maliciously prosecute is not a cause of action recognized by the Commonwealth. Regardless of the facts alleged, it is a legal impossibility for the plaintiff to have stated a cause of action upon which the relief demanded can be granted without the Court creating a new cause of action. Especially considering the facts alleged in this case did not satisfy the prosecution element of the tort, the plaintiff's implicit invitation to tread on legislative ground is declined."  *Almy v. Grisham*, 55 Va. Cir. 401, 407-08 (Va. Cir. Ct. 2001).

Even if a complaint were maliciously filed with an administrative agency, that filing by itself

would be insufficient to sustain a malicious prosecution claim if the agency dismissed the

complaint without initiating a proceeding. *Melvin v. Pence*, 130 F.2d 423, 425 (D.C. Cir. 1942)*;*

*Dellums v. Powell,* 566 F.2d 167*,* 192 (D.C.Cir. 1977).  The FEC took no action on and

dismissed all of the administrative complaints.

Second, the agency must be one with the authority to conduct an adjudicative proceeding

and impose sanctions similar to a civil court. *Id.*  Except for one type of violation not applicable

here, the FEC cannot impose sanctions on a respondent; it only has the authority to file civil

action in an appropriate United States district court.  2. U.S.C. § 437g; *Perot v. FEC*, 97 F. 3d

553, 558 (D.C. Cir. 1996). Therefore, even if a Plaintiff were a respondent in an FEC action, the

Plaintiffs have failed to state a claim of malicious prosecution.

## I.  PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IS MOOT.

A claim becomes moot "when the issues presented are no longer 'live' or the parties lack
a legally cognizable interest in the outcome." *Leonard v. Hammond*, 804 F.2d 838, 842
(4th Cir. 1986) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S. Ct. 1181, 71 L. Ed.
2d 353 (1982)). However, there are two exceptions to dismissal under the mootness
doctrine: (1) the existence of collateral consequences; and (2) cases which are capable of
repetition, yet evading review. *Leonard*, 804 F.2d at 842 (internal quotations omitted).

V*anderwall v. Commonwealth of Virginia*, 2006 U.S. Dist. LEXIS 96149 *11 (E.D. Va. 2006);

*White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 457 (4th Cir. 2005)(same).

The Plaintiffs' request for injunctive relief to prevent the Defendants from violating

"Nader-Camejo's constitutional rights by preventing them from appearing on the ballot as

candidates in the 2004 presidential election" (¶ 66 iii), and from violating "Plaintiff-voters'

constitutional rights, and those of others similarly situated, by denying voters their free choice of

candidates in the 2004 presidential election" (¶ 66 iv).  However, the 2004 election has

completely and irrevocably prevented the Defendants from engaging in the alleged violations

that the requested injunctive relief would prevent.  Thus, "the issues presented are no longer

live" and the Plaintiffs "lack a legally cognizable interest in the outcome" of an election that has

already occurred. *Id*. All requests for injunctive relief should be dismissed, and because the

voter-Plaintiffs only request injunctive relief, they should be dismissed from this case.

The "capable of repetition, yet evading review" exception does not apply to the claims

here.  Neither Plaintiff Nader nor Camejo have alleged that they are planning to run for President

and Vice President.  Defendant McAuliffe is no longer the chairman of the Democratic National

Committee (¶ 23), and therefore, no longer in a position to participate in another alleged

conspiracy.  Even if, *arguendo*, Plaintiff Nader were to run for President in the future and a

Defendant McAuliffe filed a ballot access challenge before that election, it is clear from the

ballot access cases that there was ample time to litigate any issues the Plaintiffs desire before a

future election.  Therefore, the exception to mootness does not exist here.

## IV.  EVEN IF THIS COURT DISMISSES ONLY THE FEDERAL CLAIMS, VENUE IS NO LONGER APPROPRIATE IN THIS COURT

When cases pending in more than one court concern the same facts and issues, a "case

should be transferred to [the other court] in order to prevent an extravagantly wasteful and

useless duplication of the time and effort of the federal courts by the simultaneous trial of two

complex and elaborate cases involving substantially the same factual issues." *General Tire &

Rubber Co. v. Watkins*, 373 F. 2d 361, 363 (4th Cir. 1967) (*en banc*).  This case involves the

same issue decided in *General Tire & Rubber*.  There, the plaintiff had filed one case in the

Maryland District Court and another against a different defendant in the Ohio District Court, but

both cases involved the same factual and legal issues.  This Circuit transferred the Maryland case

to Ohio based on the "maintenance of judicial economy" doctrine:

The prompt transfer of the Maryland suit to Ohio will make it available there for

> consolidation and trial in March with the suit against U.S. Rubber.  In view of the complex and time consuming nature of patent cases, the advisability of consolidation is obvious. he district court, in its denial of General's second transfer motion, pointed out that Firestone had expressed a determination to fight consolidation if the case were transferred. While we suspect that Firestone might have a change of heart after transfer, in any event, its opposition would not be determinative of the issue.This record discloses no reason why consolidation should not be as feasible here as in the two other cases.

*Id.* at 369 (internal citations omitted).  The Court's "responsibility for the orderly and efficient administration of justice within this circuit is an adequate basis for the exercise of our power" to order the transfer of a case for judicial economy.  *Royster v. Food Lion*, 73 F.3d 528, 532 n. 10 (4th Cir. 1996) (referencing *General Tire & Rubber Co.*, 373 F.2d  at 369).

Judicial economy mandates either dismissal or transfer of this case for the same reason described by this Circuit in *General Tire & Rubber.*  This Court and the District of Columbia court are faced with the same factual allegations and are being asked to resolve the same legal issues.  There is no reason why both Courts should be asked to engage in the same time consuming effort to try identical allegations. Furthermore, because none of the Plaintiffs reside or are alleged to do business in the Eastern District of Virginia, and none of the alleged improper activity occurred here, the Plaintiffs' choice of this forum carries relatively little weight. *See Sinochem Int'l Co. v. Malay Int'l shipping corp.,* _ U.S. _, 127 S. Ct. 1184, 1191 (2007).  In contrast, many of the alleged co-conspirators reside or do business in the District of Columbia, the Plaintiffs allege that certain events connected to the alleged conspiracy occurred in the District of Columbia, and Plaintiffs Nader's and Camejo's national campaign headquarters is in the District of Columbia.  Accordingly, even under a balancing test, the District of Columbia would be the favored forum.

## CONCLUSION

In view of the above, this Court should dismiss or transfer this case.

January 31, 2008                                    Respectfully submitted,

                                                   __/s/_____
                                                   John Hardin Young,
                                                   VA Bar No.13553
                                                   Joseph E. Sandler
                                                   Stephen E. Hershkowitz,
                                                   VA Bar No. 14648

                                                   Counsel for Terry McAuliffe

                                                   Sandler, Reiff & Young, P.C.

                                                   50 E Street, S.E, suite 300
                                                   Washington, D.C. 200
                                                   (202) 479-1111 (office)
                                                   (202)479-1115(facsimile)

                                                   Young@sandlerreiff.com

**BALLOT ACCESS CASES AND FEC ADMINISTRATIVE COMPLAINTS**

| STATE | ACTIONS | RESULTS |
|---|---|---|
| **Arizona** | On June 23, 2004, a complaint was filed in Arizona challenging Plaintiffs Nader's and Camejo's nomination papers (¶ 75).  On July 2, 2004 the nomination papers were withdrawn (¶ 74).  On August 16, 2004, Plaintiffs Nader and Camejo filed a complaint in Arizona challenging its petition filing deadline (¶ 77).  That action was resolved on September 10, 2004 against the Plaintiffs (¶ 79).   *See also Nader v. Brewer*, 2006 U.S. Dist. LEXIS 38500, *17 (June 8, 2006)("Nader's failure to get on the ballot was caused by his failure to start earlier."). | Final Result: No ballot access, ballot petition withdrawn Final date: September 10, 2004 |
| **Arkansas** | On September 10, 2004 complaint was filed in Arkansas successfully challenging Plaintiffs Nader's and Camejo's nomination papers (¶¶ 80, 82).  The state trial court judge did not make a ruling on the motion to dismiss but took testimony and evidence.  He summarized the arguments by stating I believe these are the areas that are in play. That The Populist Party of Arkansas, at least at some point in time, somebody signed as The Better Life of Arkansas, that it's not qualified as a party or a new party because it didn't receive three percent or more of the vote in the last Presidential election for a candidate. . . And the next thing that happens is that you have to get at least 1,000 signatures that are in the proper form and from qualified folks to sign petitions.  So those are two separate things. Then also the plaintiffs are arguing that the defendants Nader and Camejo have accepted the nomination in other states from | Interim result: Ballot access denied Final result: Ballot access granted Final date: October 1, 2004 |

| | | |
|---|---|---|
| | parties that are different than The Populist Party and that they are therefore ineligible as candidates for that party in Arkansas pursuant to Ark. Code Ann. § 7-7-204 . The petition forms themselves are invalid regardless of the number of signatures, because they do not identify The Populist Party sponsorship of the candidates and they don't contain a canvasser's verification.<br><br>*Populist Party of Ark. v. Chesterfield*, 359 Ark. 58, 62 (Ark. Oct. 1, 2004). Plaintiffs Nader and Camejo appealed and ultimately were successful on October 1, 2004 (¶83). *Id.* (order issued vacating writ of mandamus and directing the Secretary of State to certify Nader-Camejo's nomination papers). | |
| **Colorado** | On September 13, 2004, a case was filed in Colorado challenging Plaintiffs Nader's and Camejo's nomination papers (¶ 85). That case was resolved in the plaintiffs' favor. (¶85). | Final result:<br><br>Ballot access granted<br><br>Final date;<br><br>Before November 2004 |
| **Florida** | On September 2, 2004, two complaints were filed in Florida challenging Plaintiffs Nader's and Camejo's nomination papers (¶ 89). On September 9, 2004, the Florida circuit court denied the Plaintiffs access to the Florida ballot (¶ 91). The Plaintiffs appealed and on September 17, 2004 the Florida Supreme Court reversed the circuit court and Plaintiffs | Interim result:<br><br>Ballot access denied<br><br>Final result:<br><br>Ballot access granted |

| | | |
|---|---|---|
| | appeared on the Florida ballot (¶ 99). *See Reform Party v. Black*, 885 So. 2d 303 (Fla Sept. 17, 2004). | Final date:<br><br>September 17, 2004 |
| **Illinois** | On June 28, 2004 , a complaint was filed in Illinois challenging Plaintiffs Nader and Camejo's nomination papers (¶ 100). The Board of Elections concluded that Plaintiffs did not have the required number of signatures to be on the ballot (¶104). On July 27, 2000, the Plaintiffs appealed to the United States District Court for the Northern District of Illinois (¶ 105). On August 23, 2004, the District Court denied the Plaintiffs' request for a preliminary injunction because the Plaintiffs lacked the likelihood of success on the merits. *Nader v. Keith*, 2004 U.S. Dist. LEXIS 16660 (D. Ill. 2004).  Plaintiffs appealed that decision to the Seventh Circuit, and also appealed Board of Elections decision to the Illinois Appellate Court (¶¶ 108 and 109).  On September 23, 2004 Illinois Appellate Court affirmed the Board of Elections decision denying the Plaintiffs access to the Illinois ballot (¶ 109). *See Nader v. Illinois State Board of Elections et al*., 2004 Ill. App. LEXIS 1277 (October 22, 2004); *Nader v. Ill. State Bd. of Elections*, 354 Ill. App. 3d 335 (Ill. App. Ct., Nov. 18, 2004).  On September 29 2000, the Seventh Circuit denied Plaintiffs' appeal (¶ 111).  *Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) rehearing, en banc, denied, *Nader v. Keith*, 2004 U.S. | Final result:<br><br>Ballot access denied<br><br>Final date:<br><br>October 15, 2004 |

| | App. LEXIS 22473 (7th Cir. Ill., Oct. 15, 2004). | |
|---|---|---|
| **Iowa** | On August 20, 2004, a complaint was filed with the Iowa State Commissioner of Elections challenging Plaintiffs Nader and Camejo's nomination papers (¶113).  On August 30, 2004, the Secretary of State found the nomination papers valid and the Plaintiffs appeared on the ballot (¶116). | Final result: Ballot access granted Final date: August 30, 2004 |
| **Maine** | Two complaints were filed in Maine challenging Plaintiffs Nader's and Camejo's nomination papers (¶¶ 118 and 119).  The complaints were resolved in the Plaintiffs' favor on October 8, 2004 (¶121).  *Melanson v. Secretary of State*, 861 A.2d 641 (Me. 2004). | Final result: Ballot access granted Final date: October 8, 2004 |
| **Michigan** | On July 22, 2004, a complaint was filed with the Michigan State Bureau of Elections challenging Plaintiffs Nader's and Camejo's nomination papers (¶125).   On September 3, the Michigan State Court of Appeals ruled that the Plaintiffs were qualified to appear on the Michigan ballot (¶127). *Deleeuw v. State Bd. of Canvassers*, 263 Mich. App. 497 (Mich. App. 2004). | Final result: Ballot access granted Final date: September 3, 2004 |
| **Mississippi** | On September 3, 2004, a complaint was filed in Mississippi challenging Plaintiff Nader's and Camejo's nomination papers (¶ 131).  On September 7, 2004, the challenge was | Final result: Ballot access granted |

4

| | | |
|---|---|---|
| | resolved in Plaintiffs' favor (¶ 131). | Final date:<br><br>September 7, 2004 |
| **Nevada** | On August 24, 2004, a complaint was filed in Nevada challenging Plaintiff Nader's and Camejo's nomination papers ( ¶ 133).  On September 1, 2004, the complaint was resolved in Plaintiffs' favor, and the complainant appealed to the Nevada Supreme Court (¶ 135).  On September 15, 2004, the Nevada Supreme Court ruled in favor of the Plaintiffs (¶ 137). | Final result:<br><br>Ballot access granted<br><br>Final date:<br><br>September 1, 2004 |
| **New Hampshire** | On September 7, 2004, a complaint was filed in New Hampshire challenging Plaintiff Nader's and Camejo's nomination papers (¶ 138), and a second complaint was filed on September 13, 2004 (¶ 139).  Those complaints were resolved in the Plaintiffs favor on September 24, 2004 (¶ 141). | Final result:<br><br>Ballot access granted<br><br>Final date:<br><br>September 24, 2004 |
| **New Mexico** | On September 15, 2004, a complaint was filed in the New Mexico District Court to prevent the Secretary of State from placing Plaintiffs Nader and Camejo on the ballot (¶145).  On September 17, 2004, the New Mexico District Court issued an order denying Plaintiffs right to run as an independent candidate on the New Mexico ballot (¶ 146).   The Plaintiffs appealed to the New Mexico Supreme Court, which stayed the District Court's Order on September 23, 2004 (¶147).  On the same day, three of the Plaintiffs' supporters sought | Interim result:<br><br>Ballot access denied<br><br>Final result:<br><br>Ballot access granted<br><br>Final date:<br><br>September 28, 2004 |

| | injunctive relief in the United States District Court for the District of New Mexico (¶147). On September 28, 2004, the District Court directed the New Mexico Secretary of State to place Plaintiffs on the ballot (¶ 149). | |
|---|---|---|
| **Ohio** | On August 30, 2004, a complaint was filed with the Ohio Secretary of State challenging Plaintiffs Nader's and Camejo's nomination papers (¶ 152).  On September 2, 2004, a complaint was filed in the Court of Common Pleas to enjoin the Secretary of State from placing the Plaintiffs on the ballot (¶152).  On September 28, 2004, the Secretary of State denied the Plaintiffs a position on the ballot (¶161).  The Plaintiffs asked the Ohio court and the United States District Court for the Southern District of Ohio to order the Secretary of State to put their names on the ballot. The District Court denied the Plaintiffs' request for a preliminary injunction because they lacked a likelihood of success on the merits. *Nader v. Keith*, 2004 U.S. Dist. LEXIS 16660 (D. Ill. 2004). The 7th Circuit upheld the District Court decision on September 22, 2004.  *Nader v. Keith*, 385 F.3d 729, 736-737 (7th Cir. 2004) ("Moreover, it would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season." "By waiting as long as he did to sue, and despite the strenuous efforts by the district court and this court to expedite the litigation, Nader created a situation | Final result:<br><br>Ballot access denied<br><br>Final date:<br><br>October 22, 2004 |

| | in which any remedial order would throw the state's preparations for the election into turmoil." "At argument Nader's lawyer offered no reason for the delay in filing the suit.") rehearing, en banc, denied by *Nader v. Keith*, 2004 U.S. App. LEXIS 22473 (7th Cir. Ill., Oct. 15, 2004). On October 22, 2004, the Ohio Supreme Court denied the Plaintiffs' request for a writ of mandamus to place them on the Ohio ballot. *Blankenship v. Blackwell*, 817 N.E. 2d 382, 387-88, 103 Ohio St. 3d 567, 571 (Ohio 2004), 817 N.E.2d 382 (Ohio 2004). | |
|---|---|---|
| **Oregon** | On August 25, 2004, a complaint was filed with the Oregon Secretary of State challenging Plaintiffs Nader's and Camejo's nomination papers (¶ 175). On September 2, 2004, the challenge was sustained and the Plaintiffs were denied a position on the Oregon ballot (¶ 176). On September 9, 2004, the Plaintiffs appealed that decision and the Marion County Circuit Court reversed the Secretary of State's decision (¶ 177). On September 17, 2004, the Oregon Supreme Court reversed the lower court and reinstated the Secretary of State's decision denying the Plaintiffs a position on the ballot (¶ 178). *Kucera v. Bradbury*, 337 Ore. 384 (Ore. 2004) *cert*. denied, *Kucera v. Bradbury*, 544 U.S. 1056 (U.S., May 23, 2005). | Final result: Ballot access denied Final date: September 17, 2004 |
| **Pennsylvania** | On August 9, 2004, two complaints were filed in Pennsylvania challenging Plaintiffs | Final result: |

| | | |
|---|---|---|
| | Nader's and Camejo's nomination papers (¶¶ 181 and 182).  On August 30, 2004, the Pennsylvania Commonwealth Court ordered the Plaintiffs names stricken from the ballot (¶ 185).  *See In re Nomination Paper of Nader*, 865 A.2d 8, 2004 Pa. Commw. LEXIS 874 (Pa. Commw. Ct., 2004).  The Plaintiffs appealed and the Pennsylvania Supreme Court vacated that order and remanded the case for hearings (¶ 188). *See In re Nomination Paper of Nader*, 865 A.2d 8, 2004 Pa. Commw. LEXIS 874 (Pa. Commw. Ct., 2004).  On October 13, 2004, the court found that Plaintiffs Nader's and Camejo's nomination papers were insufficient (¶ 191).  The Pennsylvania Supreme Court summarily sustained the lower court's decision on October 19, 2004 (Order filed October 22, 2004) (¶ 192).  *In re Nomination Paper of Nader,* 580 Pa. 134; 860 A.2d 1; 2004 Pa. LEXIS 2408 (Pa. 2004).  The United States Supreme Court denied the Plaintiffs' petition for *certiorari* on October 23, 2004 (¶ 192).  *Nader v. Serody,* 543 U.S. 951 (U.S. 2004). | Ballot access denied Final date: October 19, 2004 |
| **Washington** | On August 31, 2004 a complaint was filed with the Washington Secretary of State challenging Plaintiffs Nader's and Camejo's nomination papers (¶ 208).  On September 1, 2004, the Secretary of State denied the complaint and certified the Plaintiffs for placement | Final result: Ballot access granted Final date: |

| | | |
|---|---|---|
| | on the Washington ballot (¶ 209).   Two complaints were filed in Thurston County Superior Court challenging the secretary of State's decision (¶¶ 210 and 211).  On September 15, 2004, the court upheld the Secretary of State's decision (¶ 213). | September 15, 2004 |
| **West Virginia** | On July 29, 2004, the West Virginia Secretary of State determined that Plaintiffs Nader and Camejo satisfied the requirements to be placed on the ballot.  On August 16, 2004, a complaint was filed in the West Virginia Supreme Court of Appeals to require the Secretary of State to initiate an investigation of the Plaintiffs' nomination papers (¶216). On August 19, 2004, the Secretary of State changed his decision and requested the Attorney General to institute an investigation (¶ 218).  On August 23, 2004, the Attorney General filed a complaint in Circuit Court asking the court to issue a show cause order to the Plaintiffs to describe why they should not be on the ballot (¶220).  On August 30, 2004, the circuit court dismissed the complaint and the Plaintiffs appeared on the ballot (¶ 220). | Final result: Ballot access granted Final date: August 30, 2004 |
| **Wisconsin** | On September 10, 2004, a complaint was filed with the Wisconsin Elections Board challenging Plaintiffs Naders' and Camejo's nomination papers (¶ 223).  On September 22, 2004 the Elections Board dismissed the complaint. (¶ 224).  That decision was appealed to the circuit court, and on September 28, 2004 the circuit court ordered the Plaintiffs removed | Interim result: Ballot access denied Final result: Ballot access granted |

|  | from the ballot (¶ 223).  The Plaintiffs appealed, and on September 30, 2004 the Wisconsin Supreme Court reversed the lower court's decision, and Plaintiffs appeared on the ballot (¶227). | Final date:<br><br>September 30, 2004 |
|---|---|---|
| **FEC administrative complaints** | Five complaints were filed with the Federal Election Commission that were dismissed (¶¶ 128, 137 and 229).  They were dismissed on February 10, 2005, June 23, 2005 and April 21, 2006. *Id*. |  |

ATTACHMENT



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

RALPH NADER
Vs.
THE DEMOCRATIC NATIONAL COMMITTEE

C.A. No.     2007 CA 007245 B



### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge JENNIFER M ANDERSON
Date:   October 30, 2007
Initial Conference: 9:30 am, Friday, February 01, 2008
Location:   Courtroom A-50
515 5th Street N.W.
WASHINGTON, DC  20001

Caio.doc

# ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

CA Form 1

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Room JM-170
### Washington, D.C. 20001  Telephone: 879-1133

*Ralph Nader, et al*

*Plaintiff*

0007245-07

vs.

Civil Action No. _____

*Service Employees*
*International Union*

*Defendant*

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

Oliver B. Hall, Esq
_____
Name of Plaintiff's Attorney

1835 16th St NW
_____        By _____
Address                                                                   Deputy Clerk

Washington DC 20009
_____
                                                          Date _____
(617) 993-010
_____
Telephone

**PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170**

**YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170**

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

# IN THE SUPERIOR COURT OF THE
# DISTRICT OF COLUMBIA

**RALPH NADER,**
    53 Hillside Avenue
    Winsted, Connecticut  06098

**PETER MIGUEL CAMEJO,**
    1760 Barhead Court
    Folsom, CA 95630

**D.B. FANNING**
    827 West Summit Avenue
    Flagstaff, AZ 86001

**C.K. IRELAND**
    827 West Summit Avenue
    Flagstaff, AZ 86001

**JULIE COYLE**
    4101 Drummond Road
    Toledo, OH 43613

**HERMAN BLANKENSHIP**
    235 East Oakland
    Toledo, OH 43608

**LLOYD MARBET**
    19142 Southeast Baker's Ferry Road
    Boring, OR 97009

**GREGORY KAFOURY**
    320 Stark Street
    Portland, OR 97204

               **PLAINTIFFS,**

    v.

**THE DEMOCRATIC NATIONAL COMMITTEE**
    430 South Capitol Street, SE
    Washington, DC  20003

**KERRY-EDWARDS 2004 INC.**

RECEIVED
CIVIL CLERK'S OFFICE

OCT 3 0 2007

SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

## COMPLAINT

10 G Street, NE, Suite 700
Washington, DC  20002                          :
                                               :
THE BALLOT PROJECT, INC.                       :
   1730 Rhode Island Avenue, NW      :
   Washington, DC  20036             :
                                               :
AMERICA COMING TOGETHER                        :
   1101 Vermont Avenue NW, 9th Floor  :
   Washington, DC 20005              :
                                               :
SERVICE EMPLOYEES INTERNATIONAL UNION          :
   1313 L Street, NW                 :
   Washington, DC  20005             :
                                               :
JOHN KERRY                                     :
   United States Senate              :
   304 Russell Building, Third Floor :
   Washington, DC  20510             :
                                               :
JACK CORRIGAN                                  :
   896 Beacon Street                 :
   Boston, Massachusetts  02215      :
                                               :
TOBY MOFFETT                                   :
   499 South Capitol Street, SW, Suite 600 :
   Washington, DC  20003             :
                                               :
ELIZABETH HOLTZMAN                             :
   2 Park Avenue                     :
   New York, New York  10016         :
                                               :
ROBERT BRANDON                                 :
   1730 Rhode Island Avenue, NW, Suite 712 :
   Washington, DC  20036             :
                                               :
MARK BREWER                                    :
   606 Townsend                      :
   Lansing, MI 48933                 :
                                               :
   and                               :
                                               :
REED SMITH, LLP                                :
   435 Sixth Avenue                  :
   Pittsburgh, Pennsylvania, 15219.  :
                                               :

**DEFENDANTS.**

:

:

Plaintiffs bring this action against Defendants to redress the deprivation of rights secured them by common law, the First and Fourteenth Amendments, the Qualifications Clause and other provisions of the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs seek damages, injunctive and declaratory relief and such other further relief as this Court shall deem necessary and proper, and allege the following:

## NATURE OF THE ACTION

1.      Defendants are members, allies or agents of the Democratic Party who conspired to prevent Plaintiffs Ralph Nader and Peter Miguel Camejo (hereinafter, "Nader-Camejo") from running for President and Vice President of the United States in 2004, in an effort to deny Plaintiff-voters and others the choice of voting for them. Defendants blamed Mr. Nader for the Democrats' loss in the 2000 presidential election, and they worried that he would "steal" votes from the Democratic candidates if he ran again in 2004. Defendants therefore agreed and conspired that if Mr. Nader did run in 2004, they would launch a massive, nationwide unlawful assault on his candidacy, using unfounded litigation to harass, obstruct and drain his campaign of resources, deny him ballot access and effectively prevent him from running for public office. Defendants reached this agreement and formed this conspiracy with wrongful intent, before they could possibly have any reason to believe such litigation was warranted or justified.

2.      As the 2004 election approached, Democratic National Committee (DNC) Chairman Terry McAuliffe publicly appealed to Mr. Nader on numerous occasions not to run. "I wanted to convey to Ralph Nader that…if he were to get in the race again, he could pull votes away from the Democratic nominee. … We can't afford to have Ralph Nader in the race," Mr. McAuliffe told CNN's Wolf Blitzer in February 2004. When Mr.

Nader announced his candidacy shortly thereafter, on February 22, 2004, Defendants set their obstructive plans and conspiracy in motion.

3.       In a telephone conversation with Mr. Nader on June 23, 2004, Mr. McAuliffe made one last effort to dissuade Mr. Nader. This time, Mr. McAuliffe asked Mr. Nader voluntarily not to campaign in certain so-called "battleground" states. If Mr. Nader agreed, Mr. McAuliffe said, he would support Mr. Nader's campaign in the remaining states. Mr. Nader declined, and objected to the Democratic Party's effort to deny his candidacy ballot access in various states. That same day, Defendants or their co-conspirators filed their first lawsuit against his campaign.

3.       Within the next 12 weeks, between June and September of 2004, Defendants and their co-conspirators filed 24 complaints against the Nader-Camejo Campaign in 17 states, including Arizona, Arkansas, Colorado, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, New Hampshire, Nevada, New Mexico, Ohio, Pennsylvania, Washington, West Virginia and Wisconsin, and intervened in proceedings to remove Nader-Camejo from the ballot in Oregon. Said conspirators also filed five complaints before the Federal Election Commission (FEC). In each state court lawsuit, said conspirators challenged Nader-Camejo's nomination papers and asked state elections officials not to certify them as candidates for President and Vice President in the 2004 general election.

4.       Defendants' admitted purpose for bringing these lawsuits, however, was not to vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the candidates to spend their limited resources of time, talent and money on the defense of unfounded lawsuits. Defendants' motive, which they also admitted, was to

help Democratic candidates John Kerry and John Edwards win the election by forcing their political competitors from the race.

5.    Defendants dedicated millions of dollars' worth of illegal and unreported campaign contributions to their conspiracy.  They recruited at least 95 lawyers from 53 law firms to pursue their unfounded and abusive litigation and organized hundreds of other lawyers to provide support.  Defendants also incorporated several Section 527 political organizations, including one called The Ballot Project, which they incorporated specifically for the purpose of coordinating and financing their nationwide assault of unfounded and abusive litigation.

6.    In addition to filing 24 state court complaints and five FEC complaints against the Nader-Camejo Campaign within 12 weeks, said conspirators organized and conducted campaigns of harassment, intimidation and sabotage to prevent the Nader-Camejo Campaign from complying with election laws in several states, and to fabricate grounds for the conspirators' subsequent lawsuits.  In one state, for example, conspirators acting fraudulently and under false pretenses took seats in Nader-Camejo's nominating convention but refused to sign their petitions, causing the convention to fall short of the requisite number of validated attendees.  In other states, said conspirators sabotaged Nader-Camejo's nomination papers by crossing names out or otherwise invalidating their petitions and, on information and belief, by signing fake names.

7.    In violation of state rules of professional conduct, the conspiracy's bar members sent misleading letters to campaign petitioners, falsely threatening them with heavy fines and jail sentences if signatures they collected were invalidated, and also sought subpoenas ordering campaign petitioners on short notice to attend depositions and

produce unreasonably burdensome amounts of personal documents. On numerous occasions, the conspirators, including members of the bar, called campaign petitioners' homes, and even the homes of citizens and potential voters who signed Nader-Camejo's petitions. Private detectives also visited petitioners' homes, unannounced, and claimed to be investigating them. All of this activity was intended to harass and intimidate said petitioners and prevent them from collecting signatures – an effort that succeeded on dozens of occasions.

8.      In spite of a multi-million dollar legal team of co-conspirators, and coordinated campaigns of harassment, intimidation and sabotage specifically intended to prevent Nader-Camejo from complying with state election laws, the conspirators eventually lost the great majority of lawsuits they filed. In addition, the FEC dismissed all five of conspirators' FEC complaints without taking action. Defendants nevertheless succeeded in draining Nader-Camejo's campaign of time, money and other resources, and in preventing them from gaining ballot access in several states, thereby denying voters in these states the choice of voting for them, as was their intent. Defendants also caused financial injury and other damages to Mr. Nader and Mr. Camejo personally, and did severe damage to the third-party and independent candidacy structure which Mr. Nader had built at great expense in time, money and other resources.

9.      Although the 2004 election ended nearly three years ago, conspirators continue to pursue their wrongful litigation against Mr. Nader to the present day. To force Nader-Camejo off the ballot in Pennsylvania, Defendants enlisted at least 20 lawyers from three law firms, hired handwriting experts and other consultants, and recruited support from approximately 170 Democratic Party operatives. Afterwards, co-

conspirator law firm Reed Smith, which has close ties to the Kerry-Edwards Campaign, submitted a bill of costs in the amount of $81,102.19. No state in the nation has ever assessed such a post-election penalty against candidates who defend their right to appear on the ballot, but the Commonwealth Court of Pennsylvania approved the bill without opinion. Misreading the plain meaning of the statute, a divided Pennsylvania Supreme Court affirmed without citing a single case in which a candidate had been assessed such costs.

10.    While this case was before the Pennsylvania Supreme Court, unbeknownst to Mr. Nader and Mr. Camejo, Defendant Reed Smith began representing the Chief Justice as his defense counsel in an ethics investigation before the Pennsylvania Judicial Conduct Board. In addition, Reed Smith and conspirators' second law firm gave $10,000 in campaign contributions to a second Justice, who authored the majority opinion. Reed Smith also has close and long-standing ties with a third Pennsylvania Supreme Court Justice, who served as of counsel at the firm immediately before joining the court. Reed Smith did not disclose these facts at any time during the proceedings before the Pennsylvania Supreme Court, nor thereafter, when the firm induced Mr. Camejo to pay $20,000 to settle the claim against him. Reed Smith subsequently filed Writs of Attachment against Mr. Nader's personal accounts, and currently seeks to condemn $61,638.45 of Mr. Nader's personal funds in satisfaction of its unprecedented fraudulently and wrongfully obtained judgment.

11.    Defendants and their co-conspirators conspired to and did in fact abuse judicial processes in an effort to bankrupt the Nader-Camejo Campaign and terminate Nader-Camejo's candidacy during the 2004 presidential election. Conspirators filed 24

state law complaints and five FEC complaints in less than 12 weeks, with the specific intention of causing Plaintiffs financial injury and other damages and violating their constitutional rights. Defendants did in fact cause such damages, and Defendants continue to cause such damages, by pursuing their unfounded and abusive litigation to the present day.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code § 1-204.31 (2007) and D.C. Code § 11-921 (2007). Jurisdiction supporting Plaintiffs' claim for attorney fees is conferred by 42 U.S.C. § 1988.

13.     This Court has personal jurisdiction over all Defendants pursuant to D.C. Code § 13-423(a)(1), as each Defendant participated in a conspiracy organized and directed by parties located in the District of Columbia, and substantial overt acts taken in furtherance of that conspiracy took place within the boundaries of the District of Columbia. Personal jurisdiction is alternatively conferred on this Court by D.C. Code §§ 13-423(a)(3) and 13-423(a)(4).

## THE PARTIES

14.     Unless otherwise stated, the terms "Defendants" and "conspirators" or "co-conspirators" and the charges alleged herein do not necessarily apply to every Defendant and every conspirator named in this complaint.

15.     Plaintiff Ralph Nader is a consumer advocate and 2004 independent candidate for President of the United States. Mr. Nader's address is 53 Hillside Avenue, Winsted, Connecticut, 06098.

6

25.     Defendant The Ballot Project is a Section 527 organization established on June 2, 2004 to coordinate and finance Defendants' litigation against Nader-Camejo. The organization's address is that of consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

26.     Defendant America Coming Together (ACT) is a Democratic Section 527 organization, funded in part by SEIU, which organized a campaign of harassment, intimidation and sabotage in an effort to deny Nader-Camejo ballot access. ACT's current address is 1101 Vermont Avenue NW, 9th Floor, Washington, D.C., 20005.

27.     Defendant Service Employees International Union (SEIU) is a labor union with headquarters in Washington, D.C. SEIU's address is 1313 L Street NW, Washington, D.C., 20005.

28.     Defendant John Kerry is a United States Senator from Massachusetts and the 2004 Democratic Party candidate for President. Mr. Kerry's address is United States Senate, 304 Russell Building, Third Floor, Washington, D.C., 20510.

29.     Defendant Jack Corrigan is a lawyer who worked for the DNC and the Kerry-Edwards Campaign to plan and execute Defendants' wrongful litigation against Nader-Camejo. Mr. Corrigan also served as John Kerry's personal liaison to the 2004 Democratic National Convention. Mr. Corrigan's address is 896 Beacon Street, Boston, Massachusetts, 02215.

30.     Defendant Toby Moffett is president of The Ballot Project and a lobbyist with the Livingston Group. Mr. Moffett's address is 499 South Capitol Street SW, Suite 600, Washington, D.C., 20003.

31.     Defendant Elizabeth Holtzman is director of The Ballot Project and a lawyer. Ms. Holtzman's address is 2 Park Avenue, New York, New York, 10016.

32.     Defendant Robert Brandon and his firm Robert Brandon and Associates are consultants to the DNC and other clients. Mr. Brandon's firm housed The Ballot Project in its offices. Mr. Brandon's address is 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

33.     Defendant Mark Brewer is Chair of the Michigan Democratic Party and Vice Chair of the DNC. Mr. Brewer's address is 606 Townsend, Lansing, MI, 48933.

34.     Defendant Reed Smith is a law firm headquartered in Pittsburgh, Pennsylvania. Reed Smith's address is 435 Sixth Avenue, Pittsburgh, Pennsylvania, 15219.

## NON-DEFENDANT CO-CONSPIRATORS

35.     Non-defendant co-conspirators include the state Democratic Party affiliates of the national Democratic Party who combined and conspired with Defendants to achieve Defendants' unlawful objectives as herein alleged.

36.     Non-defendant co-conspirators include the law firms and lawyers who combined and conspired with Defendants and who, acting as Defendants' agents, implemented defendants' illegal scheme in various states as set forth herein.

37.     Non-defendant co-conspirator Americans for Jobs is a Section 527 organization established by Timothy Raftis and David W. Jones in 2003 "to accept contributions and make expenditures to influence the election of federal candidates." Americans for Jobs' address is 2000 M Street NW, Suite 800, Washington, D.C., 20036.

38.     Non-defendant co-conspirator The National Progress Fund is a Section 527 organization established on May 4, 2004 "to engage in election-related activity for the purpose of supporting progressive issues." The organization was officially terminated on December 31, 2005. The National Progress Fund's address was PO Box 57154, Washington, D.C., 20037.

39.     Non-defendant co-conspirator United Progressives for Victory is a political committee registered on June 16, 2004 and terminated on September 21, 2005. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

40.     Non-defendant co-conspirator Uniting People for Victory is a Section 527 organization founded by United Progressives for Victory and registered with the IRS on July 21, 2004. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

41.     Non-defendant co-conspirator Citizens for Responsibility and Ethics in Washington (CREW) is a 501(c)(3) legal organization that claims to promote "ethics and accountability in government and public life by targeting government officials -- regardless of party affiliation -- who sacrifice the common good to special interests." The overwhelming majority of individuals and organizations CREW targets, however, are real or perceived competitors of the Democratic Party. CREW's address is 1400 Eye Street NW, Suite 450, Washington, D.C., 20005.

42.     Non-defendant co-conspirator Kathleen Sullivan is former Chair of the New Hampshire Democratic Party and a DNC official. Ms. Sullivan's address is 95 Market Street, Manchester, NH 03101.

43.     Non-defendant co-conspirator Daniel Schneider is, on information and belief, an attorney in Washington, D.C. who filed an FEC complaint against the Nader-Camejo Campaign.  Mr. Schneider's address is unknown.

44.     Non-defendant co-conspirators include the officers and affiliates of the Section 527 organizations and 501(c)(3) organization named herein, including: David W. Jones; Tricia Enright; Chris Kofinis; Karl Frisch; Ginny Hunt; John Hlinko; Katie Aulwes; Karen Mulhauser; Helen Hunt; and Melanie Sloane.

## FACTUAL ALLEGATIONS

**I.     Defendants Conspired to Abuse Judicial Processes with Intent to Cause Plaintiffs Financial Injury and Other Damages and Violate Their Constitutional Rights.**

45.     After the Democrats' defeat in the 2000 election, Defendants and their co-conspirators decided to try to prevent Mr. Nader from running for president if he announced his candidacy in 2004.  Defendants had already settled on a strategy to accomplish this goal when Mr. Nader made his announcement on February 22, 2004.  "Our intent was to drain and distract him," The Ballot Project president Toby Moffett later explained to the *Hartford Courant*.  Defendants agreed and conspired to launch a nationwide legal assault on Mr. Nader's campaign, which would drain the campaign of money, time and other resources, in a deliberate attempt to use the sheer burden of litigation itself as a means to prevent Mr. Nader from running for public office.  Defendants reached this agreement with wrongful intent, before they could possibly have any reason to believe litigation against Mr. Nader was warranted or justified, and before there was any colorable or potential legal basis for such litigation.

46.     Having settled on that strategy, the organizers and leaders of the conspiracy met privately to discuss their plans on July 26, 2004, at the Four Seasons Hotel in Boston.  DNC consultant Robert Brandon organized the meeting and, on information and belief, the DNC paid for it.  Approximately three dozen people attended, including The Ballot Project president Toby Moffett, The Ballot Project director Liz Holtzman and Democratic consultant Stanley Greenberg.

47.     At said Four Seasons meeting, the leaders and organizers of the conspiracy discussed polling, research, and strategy to undermine the Nader-Camejo Campaign in key states where they believed it would adversely affect Democratic candidates John Kerry and John Edwards most, including Arizona, Florida, Iowa, Michigan, Nevada, Oregon, Pennsylvania, Virginia, West Virginia and Wisconsin.  The leaders and organizers of the conspiracy specifically agreed to sue and otherwise obstruct Nader-Camejo not only in these "battleground" states, but also in as many other states as possible.  According to Defendant Moffett, however, the purpose of this litigation was simply "to drain [Mr. Nader] of resources and force him to spend his time and money."

48.     Defendant Moffett had conducted a limited campaign against Mr. Nader's candidacy in the 2000 election.  Mr. Moffett considered that effort a failure, because Mr. Nader was listed on most state ballots in 2000.  "We're not going to let him do it again," Mr. Moffett vowed at the said Four Seasons meeting.

49.     The Democratic National Convention began the same day as the conspirators' Four Seasons meeting, and was taking place across town at Boston's Fleet Center. The conspirators planned to use the convention as a platform to introduce their

litigation strategy to delegates from state Democratic Parties, and to solicit financial support from major party donors.

50.     The conspirators prepared a memo for this purpose, which they planned to circulate at the convention. This memo outlined the conspirators' comprehensive plan of attack against the Nader-Camejo Campaign, which involved not only a nationwide legal assault, but also a communications campaign intended to convince voters not to vote for Nader-Camejo. The memo further stated that Defendants would coordinate and finance their activities with three 527 organizations the conspirators had established. One was The Ballot Project, and the other two were called the National Progress Fund and Uniting People for Victory.

51.     The conspirators distributed their memo to donors and delegates at the convention and discussed the perceived threat of Nader-Camejo's candidacy. They briefed donors and delegates about their litigation plans and solicited contributions to their 527 organizations. The conspirators also recruited state Democratic Party officials to join their effort, and specifically instructed the officials to bring groundless and abusive lawsuits in their states as part of a nationwide strategy to bankrupt the Nader-Camejo Campaign and force Nader-Camejo from the race. "This guy is still a huge threat," Defendant Moffett said at the convention, in reference to Mr. Nader. "We're just not going to make the same mistake we made in 2000."

52.     Defendant Moffett told New Mexico Democratic Party Chair and DNC official John Wertheim that he should appoint someone to spearhead the effort to keep Nader-Camejo off the ballot in that state. Mr. Wertheim agreed to do so. "This is a central focus of my own duties as chairman," Mr. Wertheim told *The New Mexican*.

53.     At the close of the Democratic convention, on July 29, 2004, DNC Chairman McAuliffe reiterated his claim that "We can't afford to have Ralph Nader in the race." *Business Week* reported Mr. McAuliffe's statement under the headline, "The Dems' Game Plan to Create a Two-Man Race." That "Game Plan," which Defendants jointly planned and executed with their co-conspirators, was to file groundless and abusive lawsuits and otherwise obstruct the Nader-Camejo Campaign as many times in as many states as possible during the 2004 election.

54.     Eighteen state or local Democratic Parties eventually joined Defendants' conspiracy and either initiated or materially supported unfounded and abusive lawsuits filed against the Nader-Camejo Campaign, or intervened in proceedings to deny Nader-Camejo ballot access.  The state Democratic Parties of Arkansas, Colorado, Florida, Maine, Michigan, Mississippi, Nevada, New Hampshire, Washington and Wisconsin initiated such lawsuits, while the state Democratic Parties of Arizona, Illinois, Iowa, New Mexico, Ohio, and Pennsylvania materially supported such lawsuits filed in their states. In Oregon, state Democratic Party officials intervened in proceedings to deny Nader-Camejo ballot access.   In West Virginia, local Democratic Party officials filed a complaint seeking to compel the Secretary of State to refer Nader-Camejo's nomination papers to the Attorney General's office for investigation.

55.     In addition to the state law complaints, conspirators filed five FEC complaints against the Nader-Camejo Campaign.   Defendant CREW filed two complaints, Michigan Democratic Party Chair Mark Brewer filed one, New Hampshire Democratic Party Chair Kathleen Sullivan filed one, and District of Columbia-based attorney Daniel Schneider filed conspirators' fifth FEC complaint.

56.     Of the 24 state court complaints conspirators filed against Nader-Camejo nationwide, DNC officials filed seven in their own names, including Scott Maddox of Florida, Dorothy Melanson of Maine, Mark Brewer of Michigan, Wayne Dowdy of Mississippi, Kathleen Sullivan of New Hampshire (two) and Paul Berendt of Washington.  In addition, DNC official James Edmundson of Oregon intervened in the proceedings filed in that state, and on information and belief, DNC officials Michael Madigan of Illinois and John Wertheim of New Mexico assisted in complaints filed in their states.  Finally, DNC official Anna Burger is Secretary-Treasurer of SEIU, the conspirators' Oregon plaintiff.  Thus, on information and belief, at least ten DNC officials directly participated in the conspirators' nationwide legal assault.

57.     Furthermore, unidentified DNC officials specifically directed state party officials to initiate litigation against Nader-Camejo.  The DNC also hired and paid for several state parties' lawyers and, on information and belief, coordinated with The Ballot Project to secure *pro bono* counsel in other states.  High-level DNC staff developed and coordinated the conspiracy's nationwide litigation strategy, while rank-and-file DNC staff helped prepare the conspirators' complaints.

58.     For example, an email DNC employee Caroline Adler sent to DNC staff contained an attachment entitled "Script for Nader Petition Signers," which DNC employees used to help conspirators manufacture evidence upon which to challenge Nader-Camejo's nomination papers.  The electronic document's properties indicate that DNC and Kerry-Edwards Campaign consultant Jack Corrigan authored this document.

59.     The Kerry-Edwards Campaign also joined the conspiracy, coordinating with lawyers and directly participating in the conspiracy's litigation. For example, an

15

email from Judy Reardon, the Kerry-Edwards Campaign's deputy national director for northern New England, indicates Ms. Reardon herself drafted one of the conspirators' complaints and coordinated with the Democratic Party officials and attorneys who filed it, including New Hampshire Democratic Party Chair Kathleen Sullivan.

60.     The Ballot Project directed the conspiracy in conjunction with the DNC and the Kerry-Edwards Campaign, all headquartered in the District of Columbia, and coordinated with state Democratic Parties to recruit attorneys to provide counsel for the conspiracy's nationwide legal assault. As Defendant Moffett told the *New York Times*, "We're doing everything we can to facilitate lawyers in over 20 states."

61.     At least 95 lawyers from 53 law firms eventually joined the litigation. The DNC, state Democratic Parties and The Ballot Project collectively paid these firms nearly $1 million, while their co-conspirator bar members contributed in excess of $2 million in *pro bono* legal services.

62.     Despite their massive expenditure of resources and their campaigns of harassment, intimidation and sabotage, the conspirators eventually lost the vast majority of lawsuits they filed. The FEC also dismissed all five complaints conspirators filed. The conspirator's intent, however, was not to vindicate valid claims, but to use the sheer burden of litigation itself as a means to bankrupt and disrupt the Nader-Camejo Campaign, to keep Nader-Camejo off the ballot, and to suppress the candidates' speech and the Plaintiff-voters' rights of association. As Defendant Moffett admitted to the *Washington Post* in August 2004, "We wanted to neutralize his campaign by forcing him to spend money and resources defending these things, but much to our astonishment

we've actually been more successful than we thought we'd be in stopping him from getting on at all."

63.     After the 2004 election, Defendant Moffett reaffirmed Defendants' unlawful intent. "We had a role in the ballot challenges," Defendant Moffett told *The Guardian UK* in December 2004. "We distracted him and drained him of resources. I'd be less than honest if I said it was all about the law. It was about stopping Bush from getting elected."

64.     During the election, however, Defendants denied and fraudulently concealed their involvement in conspirators' groundless and abusive litigation against Nader-Camejo. In September 2004, for example, DNC spokesman Jano Cabrera told the Associated Press, "Our state parties made the decision to make sure that if Ralph Nader wanted to get on the ballot, that he was playing by the rules." Mr. Cabrera also specifically denied that the DNC was funding the state parties' litigation. In fact, FEC records now confirm, the DNC hired several of the state parties' law firms.

65.     Defendant John Kerry likewise denied involvement in conspirators' wrongful litigation. "I respect [Mr. Nader]. I'm not going to attack him in any way," Mr. Kerry told the Associated Press in April 2004. "I'm just going to try to talk to his people and point out that we've got to beat George Bush. And I hope that by the end of this race I can make it unnecessary for people to feel they need to vote for someone else." In fact, however, despite John Kerry's prior disavowal, the Kerry-Edwards Campaign directly participated in at least one lawsuit conspirators filed against Nader-Camejo.

66.     Defendants' conspiracy against the Nader-Camejo Campaign in 2004 was unprecedented in its magnitude and scope. The DNC, the Kerry-Edwards Campaign,

The Ballot Project, 18 state or local Democratic Parties, at least 95 lawyers from 53 law firms, and hundreds if not thousands of Democratic Party operatives conspired with the specific intent of using legal and administrative processes to bankrupt the Nader-Camejo Campaign and prevent Nader-Camejo from running for President and Vice President, thereby denying millions of Americans the choice of voting for them. Accordingly, Defendants unlawfully conspired to abuse legal and administrative processes to achieve four distinct but related improper purposes:

    i.    Defendants unlawfully conspired to cause financial injury and other damages to the Nader-Camejo 2004 presidential campaign;

    ii.    Defendants unlawfully conspired to cause financial injury and other damages to Mr. Nader and Mr. Camejo personally;

    iii.    Defendants unlawfully conspired with state actors and acted under color of state law to violate Nader-Camejo's constitutional rights by preventing them from appearing on the ballot as candidates in the 2004 presidential election;

    iv.    Defendants unlawfully conspired with state actors and acted under color of state law to violate Plaintiff-voters' constitutional rights, and those of others similarly situated, by denying voters their free choice of candidates in the 2004 presidential election.

## II.    Defendants Engaged in Acts of Harassment, Intimidation and Sabotage in Furtherance of Their Conspiracy.

67.    The conspirators knew that litigation alone would be insufficient to prevent Nader-Camejo from gaining ballot access in certain states. Therefore, to support their legal assault, conspirators in these states engaged in acts of harassment, intimidation and sabotage, often under fraudulent or false pretenses. These acts were specifically intended to prevent Nader-Camejo from complying with state election laws, and to manufacture legal grounds for the conspirators' otherwise baseless claims.

18

68.     In Ohio, where Mr. Nader received 117,857 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by collecting 5,000 signatures, conspirators orchestrated a massive campaign of harassment and intimidation to prevent Nader-Camejo petitioners from collecting signatures.     Conspirators hired private investigators to visit petitioners' homes and warn them that they were the subject of a "background check" the investigators were conducting.     Conspirators' lawyers also attempted to subpoena 27 different petitioners, and repeatedly called them at home to demand their compliance.     The subpoenas' demands were so unreasonable and burdensome that compliance would have prevented petitioners from doing anything else – including collecting signatures.     Specifically, the subpoenas demanded that petitioners on short notice report to the offices of law firms throughout the state and produce:

> (1) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, and part-petitions, relating to the obtaining of signatures from Ohio residents for part-petitions and/or the Statement of Candidacy and Nominating Petition filed by Ralph Nader;

> (2) All documents, including but not limited to correspondence, memoranda, notes, and/or electronic mail, relating to communications with: any persons affiliated with Ralph Nader; and any persons acting as solicitors to obtain signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

> (3) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, contracts, bank checks, and bank account statements, relating to your being paid for obtaining signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

> (4) All documents, including but not limited to, voter registration cards, drivers' licenses, bank account statements, leases, deeds, property tax assessments, and utility bills, evidencing your residence since January 1, 2000; and

> (5) All documents, including but not limited to, voter registration cards, evidencing the states in which you have been registered to vote."

69.     In Oregon, where Mr. Nader received 77,357 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by holding a nominating convention with 1,000 attendees, conspirators openly admitted their intention to interfere. "If we think it gets to a point where we need to step in and mobilize to make sure he doesn't get on the ballot, then we will," a spokesperson for America Coming Together (ACT), a Democratic 527 founded by SEIU, told CBS News in April 2004. ACT, SEIU, Oregon Democratic Party members and at least one local Oregon Democratic Party official subsequently engaged in a coordinated effort to disrupt two Nader-Camejo nominating conventions, held in April and in June, causing them to fail. When Nader-Camejo later tried to gain ballot access by collecting signatures on nominating petitions, ACT and SEIU organized teams of operatives to sabotage the petitions under false pretenses, by deliberately signing them in the wrong place, thereby invalidating the entire sheet. Conspirators then resorted to the same harassment and intimidation tactics they employed in Ohio. Private detectives visited petitioners' homes and threatened them with jail time, while their co-conspirator attorneys sent misleading letters falsely threatening petitioners with "conviction of a felony with a fine of up to $100,000 or prison for up to five years" if they submitted signatures that were later invalidated.

70.     In Pennsylvania, where Mr. Nader received 103,392 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by submitting 25,697 signatures, on information and belief conspirators sabotaged Nader-Camejo's petitions under false pretenses by signing thousands of fake names. Nader-Camejo petitioners expunged approximately 7,000 such names, but did not detect a small number (687 or 1.3% of the total) among the 51,273 signatures they submitted. The conspirators later used this

manufactured evidence as a basis for their lawsuit and subsequent demand for $81,102.19 in litigation costs.

71.    The conspirators' campaign of harassment, intimidation and sabotage was decisive to the success of their litigation against Nader-Camejo. The conspirators won their lawsuits in Ohio, Oregon and Pennsylvania, and Illinois, but lost in every other state. Nader-Camejo also withdrew in Arizona, where the conspirators sued first, due to the prohibitive cost of defending the litigation. Mr. Nader was on the ballot in each of these states as a candidate in the 2000 presidential election, and Nader-Camejo would have been in 2004 but for the conspirators' unlawful interference.

### III.    Defendants or Their Co-Conspirators Filed 24 State Law Complaints and Five FEC Complaints Against the Nader-Camejo Campaign in Furtherance of Their Conspiracy.

#### 1) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Arizona.

72.    On June 23, 2004, Dorothy Schultz and Betty Elizabeth Hughes, registered Democrats in Arizona, filed a complaint in the Maricopa County Superior Court challenging Nader-Camejo's nomination papers under A.R.S. § 16-351. The complaint identified Andrew S. Gordon and the law firm of Coppersmith, Gordon, Schermer, Owens and Nelson, P.L.C. as attorneys for Dorothy Schultz and Betty Elizabeth Hughes.

73.    State law prohibits the Arizona Democratic Party from filing challenges in its own name, but Chairman and DNC official Jim Pederson told the Associated Press that the Party had supported the plaintiffs and had informed the Kerry-Edwards Campaign about the lawsuit.

74.    On July 2, 2004, Nader-Camejo was forced to withdraw their nomination papers and end the proceeding due to the prohibitive cost of the litigation.

75.    On August 16, 2004, Nader-Camejo filed a complaint in the United States District Court for the District of Arizona, challenging Arizona's filing deadline.

76.    On August 31, 2004, plaintiff Schultz filed an intervenor's motion to dismiss and requested Rule 11 sanctions in Nader-Camejo's District Court proceeding. Plaintiff Schultz's motion to dismiss identified Thomas K. Irvine, Larry J. Wulkan, the Irvine Law Firm, P.A., Marty Harper, Kelly J. Flood and Shughart, Thompson and Kilroy, P.C. as her attorneys.

77.    On September 10, 2004, the District Court denied Plaintiff Schultz's Rule 11 motion and denied Nader-Camejo injunctive relief. Nader-Camejo did not appear on the Arizona ballot as candidates in the 2004 presidential election.

78.    In 2004 the DNC transferred at least $253,458 to the Arizona Democratic Party, and at least $2,500 to Arizona Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 2) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Arkansas.

79.    On September 10, 2004, Linda Chesterfield, a registered Democrat in Arkansas, and the Democratic Party of Arkansas filed a complaint in the Circuit Court of Pulaski County, Sixth Division, challenging Nader-Camejo's nomination papers under Ark. Stat. Ann. § 7-7-103(d). The complaint identified Robin J. Carroll, the law firm of Vickery and Carroll, P.A. and Brian D. Greer as plaintiffs' attorneys.

80.     On September 20, 2004, the Circuit Court of Pulaski County ordered the Secretary of State to remove Nader-Camejo from the Arkansas state ballot.

81.     On September 21, 2004, Nader-Camejo appealed to the Supreme Court of Arkansas, which vacated the lower court's order and directed the Secretary of State to certify Nader-Camejo's nomination papers.  Nader-Camejo appeared on the Arkansas ballot as candidates in the 2004 presidential election.

82.     In 2004 the DNC transferred at least $266,101 to the Arkansas Democratic Party, and at least $286,364 to Arkansas Victory 2004.  On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 3) Defendants or their co-conspirators filed two complaints against the Nader-Camejo Campaign in Colorado.

83.     On September 13, 2004, Valentin Vigil, Gary Fedel and Susan Fedel, registered voters in Colorado, and Colorado Democratic Party Executive Director Julie DeWoody, on behalf of the Colorado Democratic Party, filed a complaint in the District Court of Denver County, Colorado challenging Nader-Camejo's nomination papers under C.R.S. 1-4-501(3).  The complaint identified David Fine, Michael Belo, the law firm Kelly, Haglund, Garnsey and Kahn, LLC, and the law firm Berenbaum, Wienshienk and Eason as their attorneys.

84.     On September 13, 2004, Nancy Pakieser, a registered Democrat in Colorado, and Maurice O. Nyquist, a registered voter in Colorado, filed a separate complaint in the District Court of Denver County, Colorado, challenging Nader-Camejo's

nomination papers under C.R.S. 1-4-501(3). The Pakieser complaint identified Mark G.
Grueskin of the firm Isaacson, Rosenbaum, Woods and Levy, P.C. as their attorneys.

85.    In an oral decision, the District Court dismissed both complaints, and
Nader-Camejo appeared on the Colorado ballot as candidates in the 2004 presidential
election.

86.    IRS records indicate that The Ballot Project coordinated with Isaacson
Rosenbaum and reimbursed the firm for its expenses. In addition, in 2004 the DNC
transferred at least $224,930 to the Colorado Democratic Party, and at least $1,973,504 to
Colorado Victory 2004. On information and belief, conspirators used a portion of these
funds to finance acts done in furtherance of the conspiracy.

### 4) Defendants or their co-conspirators filed two complaints against the Nader-Camejo Campaign in Florida.

87.    On September 2, 2004, Candice Wilson and Alan Herman, registered
voters in Florida, Scott Maddox, Chairman of the Florida Democratic Party, and the
Florida Democratic Party filed a complaint in the Second Judicial Circuit Court for Leon
County, Florida, challenging Nader-Camejo's nomination papers under Fla. Stat. §
102.168. The complaint identified Stephen Rosenthal, Michael Olin, Maria Kayanan,
Mark Herron, Richard Rosenthal, the law firm Podhurst Orseck, P.A., the law firm
Messer, Caparello and Self, P.A., and the Law Offices of Richard Rosenthal as attorneys
for the plaintiffs.

88.    On September 2, 2004, Florida voters Harriet Jane Black, William
Chapman, Robert Rackleff and Terry Anderson filed a separate complaint in the Second
Judicial Circuit Court for Leon County, Florida, challenging Nader-Camejo's nomination

papers under Fla. Stat. § 102.168. The complaint identified Edward Stafman as attorney for the plaintiffs. Subsequent filings identified Brooke Lewis and David Miller of the firm Broad and Cassel, and Joel Perwin of the Law Office of Joel S. Perwin as attorneys for the plaintiffs.

89. On September 9, 2004, the Circuit Court issued a preliminary injunction enjoining the Secretary of State from certifying Nader-Camejo as candidates for President and Vice President in Florida. "I'm quite confident in the ruling," Circuit Court Judge Kevin P. Davey told the *Washington Post*. "There's at least 15 reasons as to why they won't qualify, at least 15 that I counted up. If it was one or two, I'd be worried about it, but there's a whole lot of reasons Mr. Nader and Mr. Camejo aren't going to appear on the ballot in Florida."

90. "Florida is huge – huge," Mr. Moffett told a Knight-Ridder reporter after Judge Davey's decision. "Florida is not only important for the obvious reasons, but also as a symbolic victory."

91. On September 10, 2004, Nader-Camejo appealed to Florida's First District Court of Appeals for a stay of the Circuit Court's preliminary injunction. Attorneys Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Richard Rosenthal and Joel Perwin filed an opposition to this appeal. The Court of Appeals *sua sponte* certified the case to the Supreme Court of Florida. The Supreme Court accepted jurisdiction but directed the Circuit Court to proceed to final judgment first.

92. On September 15, 2004, the Circuit Court issued an order enjoining the Secretary of State from certifying Nader-Camejo as candidates for President and Vice President in Florida.

93.     On September 16, 2004, attorneys Edward Stafman, Kelly Overstreet Johnson, David Miller and Brooke Lewis submitted an appellees' brief to the Supreme Court of Florida in support of plaintiffs below. Attorneys Laurence Tribe, Joel Perwin, Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Richard Rosenthal, Martin Lederman, Eric Seiler, Amy Brown and Katherine Pringle submitted a separate appellees' brief in support of plaintiffs below.

94.     Attorney Pringle's bio on her firm's website states that she "served as co-counsel to the Kerry for President Campaign in litigation concerning the 2004 Florida election ballot."

95.     On September 17, 2004, attorney Laurence Tribe argued before the Florida Supreme Court on behalf of the plaintiffs below that Nader-Camejo did not meet the requirements to be candidates for President and Vice President in Florida.  Defending his involvement, Mr. Tribe told Harvard Law School's independent newspaper *The Record*, "I believe that Ralph Nader is unfortunately responsible for the fact that Bush rather than Gore became the 43rd President."

96.     A team of attorneys assisted Mr. Tribe, including M. Stephen Turner, Edward Stafman, Kelly Overstreet Johnson, David Miller, Brooke Lewis, Stephen Rosenthal, Michael Olin, Maria Kayanan, Mark Herron, Thomas Findley, Richard Rosenthal and Joel Perwin.

97.     On September 17, 2004, the Supreme Court of Florida reversed the trial court and vacated the Court of Appeals' injunction.  Nader-Camejo appeared on the Florida ballot as candidates in the 2004 presidential election.

26

98.     The conspirators reportedly recruited 30 lawyers in total to challenge Nader-Camejo's Florida nomination papers.   The conspirators did not sue other candidates on Florida's ballot, Mr. Moffett told the *Washington Post*, because those candidates didn't pose a threat to the Kerry-Edwards Campaign.

99.     IRS records indicate that The Ballot Project paid $150,000 to Broad and Cassel for representing the Florida plaintiffs, and another $5,000 to attorney Samuel Dubbin.  The Ballot Project also paid $20,534 to American University professor Allan Lichtman to testify as an expert witness.  FEC records indicate that the Florida Democratic Party retained Messer, Caparello and Self, and paid the firm $57,481 in 2004. FEC records also indicate that the DNC reimbursed Joel S. Perwin and Martin Lederman $975 and $536, respectively, for travel expenses in 2004.  Finally, in 2004 the DNC transferred at least $1,709,626 to the Florida Democratic Party, and at least $4,789,765 to Florida Victory 2004.  On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 5) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Illinois.

100.     On June 28, 2004, John F. Tully, Jr., a registered Democrat in Illinois, filed a complaint with the Illinois State Board of Elections challenging Nader-Camejo's nomination papers under 10 ILCS 5/10-8. Michael Kasper and Michael Kreloff served as Mr. Tully's attorneys before the Board of Elections and in subsequent proceedings.  Mr. Kasper is General Counsel and Treasurer of the Illinois Democratic Party.  Mr. Kreloff is a Democratic Party Committeeman from Cook County.

101.    Neither Mr. Kasper nor Mr. Kreloff disclosed his employment by or affiliation with the Illinois Democratic Party in court filings, but the *Illinois Times* reported that Mr. Tully "formally filed the objection" on the Party's behalf.   Media reports and records from the Chicago Board of Election Commissioners also indicate that Democratic Speaker of the Illinois State House Michael Madigan's staff secured copies of Nader-Camejo's nomination papers in order, on information and belief, to help prepare Mr. Tully's complaint.

102.    On July 6, 2004, the Board of Elections invalidated thousands of signatures on Nader-Camejo's nomination petition and determined that it was short of the 25,000 required by Illinois law.

103.    On July 27, 2004, Nader-Camejo sought a preliminary injunction in the United States District Court for the Northern District of Illinois, Eastern Division, to enjoin the Board of Elections from removing them from the Illinois ballot.

104.    On August 4, 2004, Mr. Tully, through his Democratic Party attorneys Mr. Kasper and Mr. Kreloff, filed a motion to dismiss Nader-Camejo's complaint in the District Court.

105.    On August 19, 2004, the Board of Elections found that Nader-Camejo were not certified as candidates for President and Vice President in Illinois.

106.    On August 23, 2004, the District Court denied Nader-Camejo's motion for a preliminary injunction.   Nader-Camejo immediately appealed to the United States Court of Appeals for the Seventh Circuit.

107.    On August 27, 2004, Nader-Camejo sought expedited review of the Board of Elections' August 19th decision in the Illinois Appellate Court for the First District from the Circuit Court of Cook County.

108.    On September 23, 2004, the Illinois Appellate Court affirmed the Board of Elections' decision to remove Nader-Camejo from the Illinois ballot.

109.    On September 29, 2004, the Seventh Circuit Court of Appeals denied Nader-Camejo's appeal.  Nader-Camejo did not appear on the Illinois ballot as candidates in the 2004 presidential election.

110.    The Ballot Project paid Mr. Kreloff $12,000 for legal consulting in 2004. In addition, in 2004 the DNC transferred at least $86,301 to the Illinois Democratic Party, and at least $5,000 to Illinois Victory 2004.  On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 6) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Iowa.

111.    On August 20, 2004, Lee Baldwin Jolliffe, a registered Democrat, filed a complaint with the Iowa State Commissioner of Elections challenging Nader-Camejo's nomination papers under Iowa Code § 44.4.  The complaint identified Steven P. Wandro, the law firm of Wandro, Baer and Casper, P.C., Glenn L. Norris and the law firm of Hawkins and Norris, P.C. as her attorneys.

112.    On August 26, 2004, Ms. Jolliffe told the Des Moines Register that she was a supporter of John Kerry, and that she filed her objection because "I was really upset with the last election," when Democrat Al Gore lost to George W. Bush.  The Des Moines Register also identified Mr. Wandro and Mr. Norris as Democrats.

113.    Ms. Jolliffe filed her complaint based upon a review of Nader-Camejo's petition to determine whether the signers were included as registered voters on the Iowa Democratic Party's Voter Activation Network, a proprietary database of voters. Ms. Jolliffe thus received valuable material support from the Iowa State Democratic Party in preparing her complaint.

114.    On August 30, 2004, Iowa's Secretary of State found Nader-Camejo's nomination papers valid. Nader-Camejo appeared on the Iowa ballot as candidates for President and Vice President.

115.    In 2004 the DNC transferred at least $1,294,404 to the Iowa Democratic Party, and at least $1,420,650 to Iowa Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 7) Defendants or their co-conspirators filed two complaints against the Nader-Camejo Campaign in Maine.

116.    On August 23, 2004, Maine Democratic Party Chair and DNC official Dorothy M. Melanson filed a complaint with Maine's Secretary of State challenging Nader-Camejo's nomination papers under 21-A M.R.S. § 356. The complaint identified Michael K. Mahoney and the law firm Preti, Flaherty, Beliveau, Pachios, and Haley as Ms. Melanson's attorneys.

117.    On August 23, 2004, Benjamin Tucker, a registered Democrat in Maine, filed a second complaint challenging Nader-Camejo's nomination papers under 21-A M.R.S. § 356. Mr. Tucker's complaint identified James T. Kilbreth and the law firm Verrill and Dana, LLP as Mr. Tucker's attorneys.

118.    On August 30-31, 2004, the Maine Bureau of Corporations, Elections, and Commissions held a public hearing on Ms. Melanson's and Mr. Tucker's complaints. At the hearing, Ms. Melanson testified that she was a salaried employee of the Democratic Party, and that she had formerly held many positions with the DNC. In fact, Ms. Melanson was and is currently a DNC official. In response to questioning from Nader-Camejo's attorney, Ms. Melanson testified:

Q:    I'm asking you if the Democratic Party has contacted you personally and said we will support with money with other supports that as you need them to bring a challenge against the petitions of Ralph Nader in Maine. Has the Democratic Party contacted you personally and asked you to do this?

A:    Yes.

Q:    And have they said they will help you pay for it?

A:    They have said they would help in many ways.

Q:    Did they say they would help you pay for it?

A:    Yes.

Q:    Are they paying for your attorneys?

A:    They are.

Q:    Do they expect that you should make a response to them in your capacity as state Democratic Chair once these hearings are concluded and a decision is rendered by the Secretary of State's office?

A:    Are they expecting to hear what the decision is?

Q:    From you personally?

A:    Yes.

Q:    Was this part of the agreement that you made with them? I mean, I characterize what I've heard so far as an agreement between them and you to perform certain deeds for funds and to make a response

31

as part of this agreement. Is that correct? In other words, they're expecting a report?

A:     There are members of the DNC who certainly want to hear what the outcome of this is.

Q:     They're expecting to hear this from you and from no other person?

A:     Or from my attorneys.

119.     On September 8, 2004, the Secretary of State denied both Ms. Melanson's and Mr. Tucker's complaints. Ms. Melanson appealed to the Kennebec Superior Court of Maine on September 10, 2004. The Superior Court denied the appeal on September 27, 2004. Ms. Melanson appealed that decision to the Maine Supreme Judicial Court, which affirmed the Superior Court on October 8, 2004. Nader-Camejo appeared on the Maine ballot as candidates in the 2004 presidential election.

120.     The DNC retained Preti, Flaherty, Beliveau, Pachios, and Haley in September and October of 2004, and paid the firm $32,282 in legal and political consulting fees. In addition, in 2004 the DNC transferred at least $222,412 to the Maine Democratic Party, and at least $373,559 to Maine Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

## 8) Defendants or their co-conspirators filed an FEC complaint and a state court complaint against the Nader-Camejo Campaign in Michigan.

121.     On July 9, 2004, Michigan's Secretary of State refused to certify Nader-Camejo's nomination as the Reform Party candidates for President and Vice President in Michigan.

122.    On July 15, 2004, Nader-Camejo filed a nomination petition to gain ballot access as a independent candidates for President and Vice President. The next day, the Michigan Democratic Party issued a press release entitled, "Democrats to File Complaint Unless Nader Withdraws."

123.    On July 22, 2004, Mark Brewer, Michigan Democratic Party Executive Chair and Vice Chair of the DNC, filed a complaint with the Michigan State Bureau of Elections challenging Nader-Camejo's nomination papers under NCLS § 168.552. The complaint identified Mary Ellen Gurewitz, Andrew Nickelhoff, and the law firm of Sachs, Waldman as attorneys for the plaintiffs.

124.    Ms. Gurewitz's bio on the Sachs Waldman website states that Ms. Gurewitz "provides representation to the Michigan Democratic Party and has represented many candidates...in election related matters, including ballot access." Mr. Nickelhoff's bio states that Mr. Nickelhoff "provides representation and advice to the Michigan Democratic Party, as well as Democratic Party organizations and candidates."

125.    On September 3, 2004, the Michigan State Court of Appeals ruled that Nader-Camejo was qualified to appear on Michigan's ballot. Nader-Camejo appeared on the Michigan ballot as candidates in the 2004 presidential election.

126.    On September 17, 2004, Mr. Brewer filed an FEC complaint against the Nader-Camejo Campaign, requesting that the FEC suspend presidential matching fund payments to the campaign. The FEC took no action against the Nader-Camejo Campaign and dismissed the complaint by unanimous vote on June 23, 2005.

127.    In 2004 the DNC transferred at least $251,327 to the Michigan Democratic Party, and at least $2,963,649 to Michigan Victory 2004. On information

and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 9) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Mississippi.

128.    On September 3, 2004, Wayne Dowdy, DNC official and Chairman of the Mississippi Democratic Party, filed a complaint on behalf of the party with the Mississippi State Board of Election, challenging Nader-Camejo's nomination papers under Miss. Code Ann, 23-15-963.  The complaint identified Samuel L. Begley and Begley Law Firm, PLLC as attorneys for the plaintiffs.

129.    On September 7, 2004, the Board of Election Commissioners held a hearing on the complaint.  Mr. Begley, Brad Pigott of Pigott, Reeves, Johnson and Minor, P.A., and Richard Davidson represented the Democratic Party at the hearing.  At the hearing's conclusion, the Board denied the Democratic Party's complaint.  Nader-Camejo appeared on the Mississippi ballot as a candidates in the 2004 presidential election.

130.    The DNC paid the Begley Law Firm legal consulting fees of $6,501 on October 15, 2004.  In addition, in 2004 the DNC transferred at least $89,519 to the Mississippi Democratic Party.  On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 10) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Nevada.

131.    On August 24, 2004, registered Democrats Renee McKinley and Joan T. Ward, joined by registered voter Myrna McKinley and the Nevada State Democratic Party, filed a complaint in Nevada's First Judicial District Court challenging Nader-

Camejo's nomination papers under Nev. Rev. Stat. Ann. § 298.109. The complaint and subsequent court filings identified Paul E. Larsen, Allen J. Wilt, and the law firm of Lionel, Sawyer and Collins as attorneys for the plaintiffs.

132.    On August 30, the District Court commenced a three-day expedited hearing to consider the complaint. Ian Glinka, Director of Information Technology for the Nevada State Democratic Party, testified that he had reviewed Nader-Camejo's nomination papers and concluded that thousands of signatures were invalid.

133.    On September 1, 2004, the District Court denied plaintiffs' complaint, and they appealed to the Nevada State Supreme Court, which affirmed the District Court on September 15, 2004. Nader-Camejo appeared on the Nevada ballot as candidates in the 2004 presidential election.

134.    In 2004 the DNC transferred at least $575,458 to the Nevada Democratic Party, and at least $1,146,292 to Nevada Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

11) **Defendants or their co-conspirators filed an FEC complaint and two state court complaints against the Nader-Camejo Campaign in New Hampshire.**

135.    On August 10, 2004, New Hampshire Democratic Party Chair Kathleen Sullivan filed an FEC complaint against the Nader-Camejo Campaign. The FEC took no action against the Nader-Camejo Campaign and dismissed the complaint by unanimous vote on June 23, 2005.

136.    On September 7, 2004, DNC official and New Hampshire Democratic Party Chair Kathleen Sullivan and the New Hampshire Democratic State Committee filed

a complaint with the New Hampshire Ballot Law Commission challenging Nader-Camejo's nomination papers under RSA 655:44.

137.    On September 13, 2004, Kathleen Sullivan and New Hampshire voters Hazel R. Tremblay, Dorie M. Grizzard and Brian Farias filed a second complaint challenging Nader-Camejo's nomination papers under RSA 655:44.   The complaint identified Martha Van Oot, Emily Gray Rice and the law firm Orr and Reno, P.A. as attorneys for the plaintiffs.

138.    Ms. Van Oot and Ms. Rice worked on the lawsuit in coordination with Kathleen Sullivan and Judy Reardon, the Kerry-Edwards Campaign's deputy national director for Northern New England.  Ms. Reardon drafted the complaint, while Ms. Van Oot made hand-written revisions, which were circulated to Ms. Sullivan, Ms. Reardon and attorneys Mark Atkins of Welts, White and Fontain, Burt Nadler of Petrucelly and Nadler, and Martin Honigberg of Sulloway and Hollis.

139.    On September 24, 2004, the Commission voted unanimously to deny the two complaints.  Nader-Camejo appeared on the New Hampshire ballot as candidates in the 2004 presidential election.

140.    The Kerry-Edwards Campaign paid Ms. Reardon $64,000 from March to July, 2004.  In addition, in 2004 the DNC transferred at least $284,554 to the New Hampshire Democratic Party, and at least $978,590 to New Hampshire Victory 2004.  On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 12) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in New Mexico.

141.    At the 2004 Democratic National Convention, The Ballot Project president Toby Moffett told New Mexico State Democratic Party Chair and DNC official John Wertheim that he should appoint someone to spearhead the party's efforts to deny Nader-Camejo ballot access in New Mexico.  Mr. Wertheim agreed to do so, stating, "This is a central focus of my own duties as chairman."

142.    On September 10, 2004, attorney Eric Sedillo Jeffries, the New Mexico contact for the group Lawyers for Kerry, wrote to New Mexico's Secretary of State that he represented "at least three Democrats who will probably be filing a suit on the Nader petitions received by your office."  On the last page of Attorney Jeffries' letter, he indicated that he had copied several parties, including the clients referenced above and Mr. Nader.  Attorney Jeffries used the standard "cc:" designation to indicate this fact.  On a separate page of the letter, which was otherwise blank, Attorney Jeffries indicated that he had secretly copied three additional parties via email. Jeffries used the standard "bcc:" designation to indicate this fact.  The three additional parties were New Mexico State Democratic Party Deputy Executive Director Gideon Elliot, New Mexico State Democratic Party Chair and DNC Official John Wertheim, and attorney Andrew Schultz.

143.    On September 15, 2004, plaintiffs Moises Griego, Richard W. Kirschner, Abraham Gutman, Vanessa M. Alarid and Laura LaFlamme filed a complaint in the Second Judicial District Court of New Mexico, presumably under N.M. Dist. Ct. R.C.P. 1-096, seeking a preliminary injunction to prevent the Secretary of State from placing Nader-Camejo on New Mexico's ballot as candidates for President and Vice President of the United States.  The complaint identified Eric Sedillo Jeffries, Andrew G. Schultz, the

law firm Jeffries, Rugge, and Rosales, P.C., and the law firm Rodey, Dickason, Sloan, Akin and Robb, P.A. as attorneys for the plaintiffs.

144.    On September 17, 2004, District Court Judge Wendy York issued an order denying Nader-Camejo's right to run as independent candidates for President and Vice President in New Mexico.  Three days later, several New Mexico voters revealed that Judge York had donated $1,000 to Democratic presidential candidate John Kerry's campaign. Judge York's order was vacated, and she recused herself from the case.  That same day, District Court Judge Theresa Baca issued an identical order.

145.    On September 23, 2004, pursuant to Nader-Camejo's appeal, the New Mexico State Supreme Court stayed the District Court's order, and directed the Secretary of State not to destroy or distribute any ballots pending further order.  That same day, three registered New Mexico voters filed a complaint seeking injunctive relief in the United States District Court for the District of New Mexico.  The complaint requested the federal District Court to direct the Secretary of State to place Nader-Camejo on New Mexico's ballot as candidates for President and Vice President of the United States.

146.    On September 24, 2004, the federal District Court held a hearing. Attorney Jerry Todd Wertheim made an oral motion to intervene on behalf of state court plaintiff Venessa Alarid.  The court denied Attorney Wertheim's motion.  Jerry Todd Wertheim is a partner with the firm Jones, Snead, Wertheim and Wentworth, P.A., where New Mexico Democratic Party Chair and DNC official John Wertheim is also a partner.

147.    On September 28, 2004, the federal District Court directed the Secretary of State to place Nader-Camejo on New Mexico's ballot.  Nader-Camejo appeared on the New Mexico ballot as candidates in the 2004 presidential election .

148. In 2004 the DNC transferred at least $621,992 to the New Mexico Democratic Party, and at least $1,167,980 to New Mexico Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 13) Defendants or their co-conspirators filed two complaints against the Nader-Camejo Campaign in Ohio.

149. On August 18, 2004, the Nader-Camejo Campaign submitted to the Ohio Secretary of State's Election Division a nomination petition with 14,473 signatures. State law required the campaign to submit 5,000 valid signatures, and no more than 15,000 signatures in total.

150. On August 30, 2004, Ohio voters Benson A. Wolman, Jerilyn L. Wolman, Zachary E. Manifold, Julia E. Manifold, Bassel Korkor, Rebecca S. Mosher, Barry C. Keenan, Gerald L. Robinson, Scott Austin, Mary C. Woods, Johnathon Brunner, Max Kravitz and Daniel T. Kobil filed a complaint with Ohio's Secretary of State challenging Nader-Camejo's nomination papers under ORC Ann. 3513.05 and 3513.257. The complaint identified Donald J. McTigue and the law offices of Donald J. McTigue as attorneys for the plaintiffs.

151. On August 30, 2004, Attorney McTigue requested the Secretary of State to issue subpoenas to nine Nader-Camejo Campaign petitioners, commanding them to appear at the offices of McGinnis and Associates, a court reporting firm, only four days later, on September 3, 2004. Attorney McTigue's request stated:

> Each subpoena should command the individual to bring with them all documents which relate in any manner to the circulation of nominating petitions on behalf of Ralph Nader…in Ohio or any other state, all documents which document any contract or payment from the circulation of such petitions, all documents

regarding their voter registration status in Ohio or any other state at anytime, and all assessments, which evidence any residence or residences by such person in Ohio during the years 2000 through 2004.

The Secretary of State did not issue any subpoenas pursuant to this request.

152.     On September 2, 2004, plaintiffs Benson Wolman, Marjorie Bender and Robert Crosby, Jr. filed a second complaint, presumably also under ORC Ann. 3513.05, and 3513.257, for a declaratory judgment and injunctive relief in the Court of Common Pleas for Franklin County. The plaintiffs requested a preliminary injunction enjoining the Secretary of State from placing Nader-Camejo on Ohio's ballot as candidates for President and Vice President.

153.     On September 4, 2004, plaintiffs Benson Wolman, Marjorie Bender and Robert Crosby, Jr. secured subpoenas from the Franklin County Court of Common Pleas for several Nader-Camejo Campaign petitioners. The subpoenas identified John P. Gilligan and Russell J. Kuttell of the law firm Schottenstein, Zox and Dunn, L.P.A, and Attorney McTigue as attorneys for the plaintiffs.

154.     The subpoenas commanded Nader-Camejo petitioners to appear and give testimony at law firm offices throughout Ohio. Six petitioners were to appear at the offices of Schottenstein, Zox and Dunn, L.P.A. in Cleveland on September 8, 2004. Six petitioners were to appear at the offices of Beckman, Weil, Shepardson and Faller, LLC in Cincinnati on September 9, 2004. Eleven petitioners were to appear at the offices of Sebaly, Shillito and Dyer, L.P.A. in Dayton on September 10 and 13, 2004. Four petitioners were to appear at the offices of Eastman and Smith, Ltd. in Toledo on September 14, 2004.

155. The subpoenas also commanded each Nader-Camejo petitioner – many of them volunteers – to produce:

1) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, and part-petitions, relating to the obtaining of signatures from Ohio residents for part-petitions and/or the Statement of Candidacy and Nominating Petition filed by Ralph Nader.

2) All documents, including but not limited to correspondence, memoranda, notes, and/or electronic mail, relating to communications with:

   a. any persons affiliated with Ralph Nader; and

   b. any persons acting as solicitors to obtain signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio.

3) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, contracts, bank checks, and bank account statements, relating to your being paid for obtaining signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio.

4) All documents, including but not limited to, voter registration cards, drivers' licenses, bank account statements, leases, deeds, property tax assessments, and utility bills, evidencing your residence since January 1, 2000.

5) All documents, including but not limited to, voter registration cards, evidencing the states in which you have been registered to vote.

156. One volunteer petitioner received repeated phone calls from Andrew Clubock, an attorney in Washington, D.C. with the law firm Kirkland and Ellis, who left only his name and the message, "Call me about the subpoena." Another volunteer petitioner received a visit to her home from a private detective who claimed to be investigating her. He left a card and told her to call his firm.

157. On September 7, 2004, Ohio's Attorney General filed a motion for a protective order in the Court of Common Pleas to prevent enforcement of plaintiffs' subpoenas. The Attorney General's memorandum in support of the motion stated:

41

The Plaintiffs in this case seek to prohibit Ralph Nader from securing a spot to run for president on the Ohio ballot. As part of that strategy, either these specific plaintiffs, or those acting in concert with them, have filed protests with the Ohio Secretary of State concerning various Nader petitions.

158. On September 7, 2004, Attorneys Gilligan, Kuttell and Steven D. Forry of Schottenstein, Zox and Dunn and Attorney McTigue filed a motion to compel depositions and requested oral argument on the motion. The same day, attorney Attorney Clubock of Kirkland and Ellis wrote to Nader-Camejo's counsel, threatening, "we have no choice but to take all appropriate action to enforce the subpoena and seek any other potential remedies for your conduct."

159. On September 8, 2004, the Secretary of State found that 6,464 signatures on Nader-Camejo's petition were valid and certified the petition. That same day, the Court of Common Pleas granted the Secretary of State's motion for a protective order and stay of discovery.

160. On September 24, 2004, attorneys Andrew Clubock, Gregory F. Corbett and Jennifer Levy of Kirkland and Ellis conducted a deposition of Nader-Camejo Campaign Manager Theresa Amato, which lasted approximately 1-1/2 hours.

161. On September 28, 2004, pursuant to hearings on conspirators' complaints, the Secretary of State invalidated 2,756 more signatures and reversed certification of Nader-Camejo's petition.

162. On October 6, 2004, Nader-Camejo filed for injunctive relief in the United States District Court for the Southern District of Ohio, Eastern Division. On October 7, 2004, the plaintiffs filed a motion to intervene, asserting that they "are truly the real parties in interest here." The court granted the plaintiffs' motion to intervene and

denied Nader-Camejo's motion for injunctive relief on October 12, 2004. Nader-Camejo appealed to the Sixth Circuit Court of Appeals, which denied the appeal on or about October 18, 2004.

163.    On October 19, 2004, the Ohio Supreme Court denied Nader-Camejo's request for a writ of mandamus. Nader-Camejo did not appear on the Ohio ballot as candidates in the 2004 presidential election.

164.    According to the *Toledo Blade*, the Ohio challenge to Nader-Camejo's nomination papers was "filed by attorneys hired by or allied with the Ohio Democratic Party...[as] part of a nationwide effort to prevent Mr. Nader from siphoning votes from Democratic presidential candidate John Kerry." In fact, Attorney Gilligan of Schottenstein, Zox and Dunn was the Columbus, Ohio contact and Attorney Gregory Corbett of Kirkland and Ellis was the Washington, D.C. contact for the group Lawyers for Kerry. In addition, Attorney McTigue identified the Ohio Democratic Party as his client in an email to Ohio county boards of elections on August 22, 2004. Attorney McTigue also wrote a letter to the Cuyahoga County Board of Elections on December 10, 2004, stating that John Kerry had personally appointed Attorney McTigue "as his legal counsel...with full authority to act on behalf of him and John Edwards" during the Ohio recount of the 2004 presidential election returns.

165.    The DNC retained Schottenstein, Zox and Dunn, L.P.A. and paid the firm $39,486 in legal and political consulting fees in September and October of 2004. The DNC also retained Kirkland and Ellis, and paid the firm $247,711 in legal and political consulting fees in September and November of 2004. In addition, in 2004 the DNC transferred at least $2,585,189 to the Ohio Democratic Party, and at least

$3,065,661 to Ohio Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 14) Defendants or their co-conspirators intervened in proceedings to deny Nader-Camejo ballot access in Oregon.

166.    In April 2004, a spokesperson for the Democratic 527 organization ACT told CBS News, "If we think it gets to a point where we need to step in and mobilize to make sure [Nader-Camejo] doesn't get on the ballot, then we will." Later that month, according to CBS, "ACT joined forces with other organizations in the state to discourage people from signing the petition" at Nader-Camejo's April nominating convention, causing the convention to fall short of the 1,000 signing attendees necessary to qualify for ballot access under state law.

167.    On June 26, 2004, Nader-Camejo held another nominating convention. This time the conspirators, acting under false pretenses, took seats at the convention but refused to sign Nader-Camejo's petitions. The conspirators acted pursuant to an email Multnomah County Democratic Party official Moses Ross sent to party members, stating:

> We need as many Oregon Democrats as possible to fill that room and NOT sign that petition. If we attend in large numbers and politely refuse to sign, Nader is denied his needed numbers. It's that simple. Please make every attempt to attend this important event.

168.    State officials from Democratic Secretary of State Bill Bradbury's office restricted entry to the convention to one doorway, and counted attendees with a manual clicker. In violation of state law providing that nominating conventions may last up to 24 hours, state officials shut the doors after counting approximately 1,100 attendees, before Mr. Nader had even addressed the convention. State officials thereafter refused entry to Nader-Camejo's legitimate supporters. This action by state officials, together with the

actions of conspirators who attended the convention but refused to sign the petitions, caused the convention to fall short of the 1,000 signing attendees.

169.    On the same day that conspirators disrupted Nader-Camejo's June convention, they also organized a campaign of harassing phone calls to the office of Plaintiff-voter Gregory Kafoury, which was serving as Nader-Camejo's nomination convention headquarters.  Each caller to Mr. Kafoury's office spoke virtually identical words, as if speaking from a script, and the calls came so rapidly that they incapacitated the office phones for the entire day.

170.    After disrupting Nader-Camejo's two nominating conventions, the conspirators launched a coordinated campaign of harassment, intimidation and sabotage intended to prevent Nader-Camejo from gaining ballot access by submitting signatures, as Oregon state law alternatively permits.  On August 12, 2004, private investigators hired by SEIU visited petitioners at their homes and falsely threatened them with jail time if signatures they collected were subsequently invalidated.  The investigators also delivered petitioners a letter from attorney Margaret Olney of the law firm Smith, Diamond and Olney, which reiterated the false threat.  The letter stated that the petitioners must certify that they "obtained the signatures of qualified voters," or face "conviction of a felony with a fine of up to $100,000 or prison for up to five years."  This false threat was accompanied by a suggestion that the petitioners call Attorney Olney if they had any information to assist an investigation she claimed her firm was conducting. The blog Blue Oregon subsequently quoted SEIU local 49 chief Alice Dale admitting that SEIU had mailed the letters to 59 petitioners, and that "Two were delivered in person."

171.    SEIU and ACT took even more extreme measures to deny Nader-Camejo ballot access.  According to Portland, Oregon ACT employee William Gillis, the groups jointly orchestrated a campaign to sabotage Nader-Camejo's petitions.  Following is an excerpt from Mr. Gillis' blog, posted in August 2004:

> The offices that I work in, at America Coming Together, are shared by SEIU's election campaign and both organizations are rather heavily tied...For days now, most of the ACT staff had been aware of, if not complicit in, a scheme against the Nader Campaign.

> People were pulled into side rooms and the higher echelons of both staffs exchanged a barrage of unusual whispered conversations. What's more, today was set up to be a massive single-day canvassing effort on the part of ACT.

> In the last few days I've heard of a concerted effort among the ACT/SEIU staff to attack the Nader petition drive.

> A few of my fellow canvassers who were likely to be in the vicinity of the Nader campaign told me they had been asked to "mistakenly" invalidate petition papers. Misspelling names or information was a classical attack, but the SEIU had figured a better method.

> On every page of signatures in an Oregon petition there is a small section on the bottom for the signature gatherer to sign, asserting their valid oversight. If asked to sign the Nader petition, our canvassers were encouraged to accidentally sign their name in that section instead. Upon realizing their mistake, these innocent canvassers would scribble it out, thus invalidating an entire sheet of signatures.

172.    Despite coordinated efforts by the Oregon Democratic Party, SEIU and ACT to prevent Nader-Camejo from complying with state law, on August 24, 2004 the Nader-Camejo Campaign submitted 18,186 signatures, already certified as valid by county elections officials, to Secretary Bradbury's office.  This was almost 2,800 more valid signatures than Oregon law required.

173.    On August 25, 2004, attorney Roy Pulvers sent a letter to Secretary Bradbury challenging Nader-Camejo's nomination papers.  Mr. Pulvers is a contributor

to the DNC and a member of the Oregon Democratic Party's President Council, "the party's largest revenue source for "federal" dollars to support presidential, senatorial, and congressional candidates." Attorney Pulvers sent a second letter the same day, asserting that Nader-Camejo's nomination papers were "misnumbered" and should be disqualified.

174.    On September 2, 2004, Secretary Bradbury sent Nader-Camejo a letter stating that "there are not sufficient qualified signatures for you to gain ballot access." In an unprecedented act, Secretary Bradbury had invalidated thousands of signatures that county elections officials had already certified as valid, and which Nader-Camejo submitted in accordance with instructions from Secretary Bradbury's own office. Secretary Bradbury invalidated hundreds of these signatures due to alleged defects in Nader-Camejo petitioners' own signatures – just as SEIU and ACT had planned.

175.    On September 9, 2004, pursuant to a complaint filed by the Nader-Camejo Campaign, Oregon's Marion County Circuit Court found that Secretary Bradbury's action violated Oregon law. Of the methods Secretary Bradbury used to disqualify Nader-Camejo's validated signatures, the Court wrote, "Neither action was authorized by administrative rule or statute, and each was inconsistent with both the state elections policy as established by the Legislature…and with the prior policy of the Secretary of State." The Court ordered Secretary Bradbury to certify Nader-Camejo's nomination papers.

176.    On September 17, 2004, the Oregon Supreme Court deferred to Secretary Bradbury's discretion to interpret and enforce state election laws and granted him a writ of mandamus requiring the Circuit Court to vacate its order. The Oregon Democratic Party, John Neel Pender, the Party's Executive Director, and James Edmundson, the

Party's Chair, intervened as parties to this proceeding. The United States Supreme Court declined to review the case, and Nader-Camejo did not appear on the Oregon ballot as candidates in the 2004 presidential election.

177. SEIU maintains close political and financial ties with the DNC. SEIU's Secretary-Treasurer, Anna Burger, is a DNC official, and SEIU endorsed and publicly committed its resources to electing John Kerry in 2004. SEIU also donated $1,000,000 to the DNC in 2004, while the DNC made numerous payments to SEIU, including $33,072 in political consulting fees in October and November 2004. SEIU was also a founding member of ACT and its largest contributor, donating $26 million in 2004, and housing the 527 in SEIU's Portland office.

178. In 2004 the DNC transferred at least $261,609 to the Oregon Democratic Party, and at least $896,002 to Oregon Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 15) Defendants or their co-conspirators filed two complaints against the Nader-Camejo Campaign in Pennsylvania.

179. On August 9, 2004, Philadelphia resident Ralph Dade filed a class action complaint against the Nader-Camejo Campaign in Philadelphia Court of Common Pleas, alleging that he and several others were owed approximately $200 each for signatures they had collected for the campaign. The complaint identified Louis Agre, a Philadelphia Democratic Party Ward leader, and Thomas Martin as attorneys for the plaintiffs. Nader-Camejo disputed the claim on the ground that plaintiffs had submitted invalid signatures, and the complaint was dismissed.

180.    On August 9, 2004, Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen-Scott, Donald G. Brown and Julia O'Connell, registered Democrats in Pennsylvania, filed a second complaint in the Pennsylvania Commonwealth Court, challenging Nader-Camejo's nomination papers under 25 PS § 2937. The complaint identified Gregory Harvey, another Philadelphia Democratic Party Ward leader, and Efrem Grail, Daniel Booker, Cynthia Kernick, Brian A. Gordon, Reed Smith LLP, Montgomery McCracken, Walker and Rhoads LLP, and the law offices of Brian A. Gordon as attorneys for the plaintiffs.

181.    The complaint challenged approximately 35,000 of the 51,273 signatures on Nader-Camejo's nominating petition on technical grounds, and alleged numerous procedural grounds for disqualifying Nader-Camejo from Pennsylvania's ballot. Plaintiffs' attorneys prepared the complaint in cooperation with Pennsylvania Democratic Party leaders, including state House Minority Leader Bill DeWeese and former Democratic Whip Mike DeWeese, and with support from approximately 170 Democratic Party volunteers Mr. DeWeese and Mr. Veon recruited.

182.    On numerous occasions before, during and after the litigation, Mr. DeWeese, Mr. Veon and other party officials stated that the purpose of their lawsuit was to help John Kerry win the election. In July 2004, before Plaintiffs filed their complaint, Pennsylvania Democratic Party Executive Director Don Morabito told the *Philadelphia City Paper*, "we want to make sure" Nader-Camejo doesn't detract votes from Mr. Kerry. On August 2, 2004, Mr. DeWeese told the *Pittsburgh Post-Gazette*, "Working with the AFL-CIO, we will do everything humanly possible to fight [Nader-Camejo]....You don't need a Ph.D in mathematics to understand that 100 percent of the vote [Nader-Camejo]

gets will be skimmed from Senator Kerry's total." On August 9, 2004, the day plaintiffs filed their complaint, Mr. DeWeese told the *Post-Gazette*, "We are being completely open about our intentions. Our goal is to help elect John Kerry the next President of the United States." After the election, Mr. DeWeese and Mr. Veon issued a press release stating, "our efforts to strike [Nader-Camejo] from the ballot proved successful for John Kerry in Pennsylvania."

183.     On August 30, 2004, the Pennsylvania Commonwealth Court set aside Nader-Camejo's nomination papers and ordered their names stricken from the Pennsylvania ballot, because they were running as independent candidates in Pennsylvania and as candidates of a political party in other states.

184.     On September 2, 2004, Nader-Camejo appealed to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court reversed and vacated the Commonwealth Court's order on September 20, 2004, and remanded to the Commonwealth Court for hearings. The Commonwealth Court immediately scheduled hearings in approximately 48 counties and 13 courtrooms; seven hearings were scheduled simultaneously in six different counties, with two hearings in Philadelphia.

185.     On September 22, 2004, Nader-Camejo's attorneys notified the court that they lacked staff to attend voter review hearings in 48 counties, and that they lacked attorneys to appear in 13 different courtrooms, because the conspirators' nationwide legal assault had severely depleted the campaign's resources. Nader-Camejo's attorneys therefore requested the court to hold hearings in only one or two courtrooms. The Commonwealth Court rejected this request on September 23, 2004. Several hearings therefore proceeded without counsel present on behalf of Nader-Camejo.

50

186.     To prepare for these hearings, the conspirators simply recruited more attorneys.  On August 19, 2004, attorney Daniel Booker of Reed, Smith told the *New York Times* that "eight to ten lawyers in his firm were working on the case, 80 hours each a week for two weeks, and could end up working six more weeks."  Attorney Booker indicated that his firm had also taken on more than 100 volunteers to work on the case.

187.     In fact, Attorney Booker's estimate was low: Reed, Smith attorneys Ira Lefton, Christopher K. Walters, Milind Shah, Jeremy Feinstein, Mark Tamburi, James Doerfler, John McIntyre, Lisa Campoli, Barbara (Kiely) Hager, Andrea (Simonson) Weingarten, Jeffrey Bresch, Kim Watterson, Melissa Oretsky and James Williamson joined the litigation, for a total of at least 17 Reed, Smith attorneys.  On October 1, 2004, *American Lawyer* reported that these attorneys had logged 1,300 *pro bono* hours on the case.  "And that's just the pre-election challenge," the magazine reported.

188.     On October 13, 2004, following three weeks of hearings in counties across Pennsylvania, Commonwealth Court Judge James Gardner Colins, who was elected to the bench as a Democrat, issued an opinion invalidating more than 30,000 of Nader-Camejo's signatures on technical grounds. For example, approximately 9,000 signatures were invalidated because qualified electors – who could vote – had not yet registered on the day they signed Nader-Camejo's nomination petition (even though Pennsylvania law specifies no such requirement).   Another 6,000 signatures were invalidated because voters' current addresses didn't match their registered addresses.  Thus, after striking a total of 32,455 signatures on these and other technical grounds, Judge Colins concluded that only 18,818 signatures were valid, and set aside Nader-Camejo's nomination papers.

189.    On October 14, 2004, Judge Colins issued an order directing Mr. Nader and Mr. Camejo personally to pay all litigation costs arising from plaintiffs' challenge. No state in the nation – including Pennsylvania – has ever ordered candidates to pay such costs after defending their right to ballot access.

190.    On October 19, 2004, a divided Pennsylvania Supreme Court affirmed the Commonwealth Court's order removing Nader-Camejo from the Pennsylvania ballot. The United States Supreme Court denied Nader-Camejo's petition for a writ of certiorari on October 23, 2004.   Nader-Camejo did not appear on the Pennsylvania ballot as candidates in the 2004 presidential election.

191.    On December 3, 2004, attorneys Efrem Grail, Daniel Booker and Cynthia Kernick of Reed Smith, Gregory Harvey of Montgomery, McCracken, Walker and Rhoads, and Brian A. Gordon, a solo practitioner, submitted a bill of costs to the Commonwealth Court of Pennsylvania in the amount of $81,102.19.   The attorneys claimed that the bill "is true and correct and accurately reflects costs incurred by [plaintiffs]."   In fact, however,  the plaintiffs did not incur any costs, being nominal parties conspirators recruited to sue the Nader-Camejo Campaign.   As the true party in interest seeking to collect the costs, Reed Smith nevertheless submitted its bill on the plaintiffs' behalf, claiming "Justice requires that this Court award [plaintiffs] the costs incurred."   Reed Smith's attorneys never informed the Pennsylvania Commonwealth Court that the DNC had already paid the firm $136,142, nor did they clarify or correct their many public claims to be working on the case pro bono.

192.    Reed Smith lawyers also falsely claimed, in the brief they filed before the Pennsylvania Supreme Court in support of their bill of costs, that Nader-Camejo's

nomination papers included "literally thousands of forged petition signatures." In fact, however, Judge Colins counted only 687 out of 51,273 signatures (or 1.3%) as "forgeries," which were submitted by people engaged in mischief or sabotage. Pennsylvania Supreme Court Justice Thomas Saylor previously emphasized this fact in a dissenting opinion, in an effort to correct prior distortions of the record. Justice Saylor also noted that the record contained "no evidence" to support Reed Smith's allegations of fraud by anyone associated with the Nader-Camejo Campaign.

193.    To the contrary, Nader-Camejo Campaign staff voluntarily expunged approximately 7,000 apparently fictitious names from Nader-Camejo's nomination petitions, in an effort to lessen the Commonwealth Court's burden. On information and belief, conspirators including Ralph Dade and the other plaintiffs in the dismissed class action complaint signed these names under false pretenses, in a deliberate attempt to sabotage Nader-Camejo's petitions and manufacture evidence to support their Commonwealth Court complaint.

194.    On January 14, 2005, Judge Colins entered an order approving the bill of costs without opinion, despite the fact that the record contains "no evidence" – much less a finding – of wrongdoing by anyone associated with the Nader-Camejo Campaign. A divided Pennsylvania Supreme Court nevertheless affirmed without citing a single case as precedent for the order, thus upholding what appears to be the first post-election penalty assessed against a candidate in the history of American jurisprudence.

195.    During the proceedings before Pennsylvania Supreme Court, Reed Smith never disclosed several ties the firm had with Justices of the court, which give rise to an

obvious appearance of impropriety that would have provided grounds for Nader-Camejo

to seek the Justices' disqualification. Specifically:

- Reed Smith represented Chief Justice Ralph Cappy as his defense counsel in an ethics investigation that was ongoing while this case was before the Pennsylvania Supreme Court;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave $10,000 in campaign contributions ($5,000 from each firm) to Justice Sandra Newman, who authored the majority opinion, in November 2005, while this case was before the Pennsylvania Supreme Court, and Reed Smith gave Justice Newman another $6,100 during her previous election;

- Reed Smith extended an open-ended offer of employment to Justice Ronald Castille in 1985, which he accepted in 1991 and served of counsel at Reed Smith for nearly three years immediately before he joined the Pennsylvania Supreme Court in 1993;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave at least $67,900 in campaign contributions to four out of five Justices who voted to affirm judgment in Reed Smith's favor, and to one Justice who concurred and dissented; at least $58,900 of this total came from Reed Smith and its lawyers.

196.    The appearance of impropriety arising from these ties between Reed

Smith and the Justices of the Pennsylvania Supreme Court is manifest and unmistakable.

In this case, moreover, the appearance of impropriety is compounded by Reed Smith's

status not merely as plaintiffs' counsel, but also as the true party in interest seeking to

collect a money judgment in the proceedings. Nevertheless, at no time during these

proceedings did Reed Smith disclose its ties with four out of five Justices who voted to

affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

197.    By contrast, the lone dissenter, Justice Thomas Saylor, has no apparent

ties to Reed Smith. Justice Saylor dissented on the ground that Pennsylvania law – like

the laws of every other state in the nation – simply does not authorize a taxation of costs

against candidates who defend their nomination papers, but only against parties who challenge candidates' nomination papers.

198.    Reed Smith's concealment of its ties with the Pennsylvania Supreme Court Justices thus constitutes a fraud upon the court, because the firm induced its judgment in a manner that deprived Nader-Camejo of the opportunity to move for the Justices' disqualification, in violation of basic principles of fairness, impartiality and due process.

199.    Even while concealing their own fraud, Reed Smith's attorneys repeatedly slandered Mr. Nader in the news media with accusations of fraud, and libeled him on the *pro bono* page of their website, where they published the following defamatory statement:

> Our intensive effort to remove Ralph Nader from the 2004 Presidential ballot in Pennsylvania won national headlines, with the courts upholding our claim that 30,000 signatures supporting Mr. Nader were forged or otherwise fraudulent.

200.    On March 8, 2007, Mr. Nader wrote to the partners of Reed Smith to protest this ongoing defamation, as well as the fraud and misrepresentation by which the firm obtained its judgment. Mr. Nader had not yet discovered that the judgment itself was tainted by an overwhelming appearance of impropriety arising from the foregoing undisclosed ties with the Pennsylvania Supreme Court Justices. Reed Smith immediately removed the libelous language from its website, but otherwise did not respond.

201.    Neither Mr. Nader nor Mr. Camejo discovered Reed Smith's ties to the Pennsylvania Supreme Court Justices until September 2007. Thus, prior to that time, Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, without

disclosing the fraud upon the court the firm had perpetrated. Mr. Nader did not settle. Reed Smith therefore commenced attachment proceedings against his personal accounts.

202.    On July 13, 2007, Reed Smith served Amalgamated Bank with an Application for Writ of Attachment, filed with the Superior Court of the District of Columbia, stating that "any money, property or credits of Ralph Nader in Amalgamated Bank's possession are hereby seized by this Writ of Attachment." In fact, however, the Superior Court had entered no such writ. Amalgamated Bank nevertheless froze Mr. Nader's accounts on July 13, 2007.

203.    On July 17, 2007, the Superior Court of the District of Columbia entered writs of attachment against Amalgamated Bank, M&T Bank and PNC Bank as garnishees of Mr. Nader's accounts. Pursuant to these writs, Amalgamated Bank froze $27,420.16, and PNC Bank froze $34,218.29, for a total of $61,638.45. Reed Smith filed a motion to condemn these funds on August 28, 2007, which was denied, and another on September 25, 2007, which is pending.

204.    Reed Smith attorneys repeatedly told the news media in 2004 that the Democratic Party had not retained or paid Reed Smith, thereby fraudulently concealing the firm's involvement in Defendants' conspiracy. In fact, however, the DNC retained Reed Smith and paid the firm $136,142 for "political consulting" and "legal consulting" during the election. In addition, Reed Smith has represented John Kerry, Teresa Heinz Kerry, the HJ Heinz Corporation and the Heinz Family Foundation. Reed Smith most recently defended Senator Kerry in a civil lawsuit for defamation, which arose out of the 2004 election and was decided in August 2006. Furthermore, "Heinz is still a major and active client," *Legal Business* reported in December 2006/January 2007.

205. On August 3, 2004, The Ballot Project paid attorney Gregory Harvey's firm Montgomery, McCracken, Walker and Rhoads $6,000 for reimbursed costs. In October and November of 2004, the DNC paid Reed Smith $136,142 in legal and political consulting fees. In addition, in 2004 the DNC transferred at least $182,825 to the Pennsylvania Democratic Party, and at least $5,132,220 to Pennsylvania Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 16) Defendants or their co-conspirators filed two complaints against the Nader-Camejo Campaign in Washington.

206. On August 31, 2004, attorney Parker Folse III sent Washington's Secretary of State a letter stating, "I represent a voter who has an interest in whether Mr. Nader has complied with the law." Mr. Folse asked Secretary Reed not to certify Mr. Nader as a candidate for President of the United States in Washington until Mr. Folse could examine the nomination papers. Mr. Folse indicated that attorney Drew D. Hansen would assist him. Later that day Attorney Folse sent the Secretary of State another letter alleging that Nader-Camejo's nomination papers included an insufficient number of valid signatures. On September 1, 2004, Attorney Folse sent another letter outlining additional concerns and requesting an investigation.

207. On September 1, 2004, the Secretary of State certified Nader-Camejo's nomination papers and ordered their placement on the Washington ballot as candidates for President and Vice President.

208. On September 3, 2004, attorney James Foley filed a complaint on behalf of attorney Ken Valz in the Thurston County Superior Court of Washington, challenging

57

Nader-Camejo's nomination papers under RWC 29A.20.191. The complaint's "legal argument" was one paragraph long, and concluded with a request that Nader-Camejo's nominating signatures be declared invalid.

209.    On September 8, 2004, Attorneys Folse, Hansen and Rachel Black filed a separate complaint in the Thurston County Superior Court on behalf of the Washington State Democratic Central Committee, Josh Castle, DiAnne Grieser, Randy Poplock, Ann Thoeny and Elizabeth Walter, challenging Nader-Camejo's nomination papers under RWC 29A.20.191. The complaint requested the court to overrule the Secretary of State and to remove Nader-Camejo from the Washington ballot as candidates for President and Vice President.

210.    DiAnne Grieser signed an online petition to support John Kerry as the Democratic Party's presidential nominee in 2008, identifying herself as the 2003-2004 moderator for the Kerry-Edwards Campaign blog. Randy Poplock identified himself on the John Kerry Meetup Online Message Board as an affiliate of the 527 United Progressives for Victory, and an organizer for the Kerry-Edwards Campaign.

211.    On September 15, 2004, the court upheld the Secretary of State's decision, and Nader-Camejo appeared on the Washington ballot as candidates in the 2004 presidential election.

212.    In 2004 the DNC transferred at least $490,000 to the Washington Democratic Party, and at least $534,894 to Washington Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 17) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in West Virginia.

213.     On July 29, 2004, the Nader-Camejo Campaign submitted nomination papers with a petition including more than 23,000 signatures to satisfy West Virginia's requirement of 12,962 signatures.  Secretary of State Joe Manchin certified 15,302 signatures as valid and determined that Nader-Camejo qualified as candidates for President and Vice President in West Virginia.

214.     On August 16, 2004, Kanawha County Democratic Executive Committee Chairman Norris Light, Democratic Party presidential elector Phil Hancock, and registered voters Deirdre Purdy, Gary Collias and Karen Coria filed a petition in the West Virginia Supreme Court of Appeals seeking a writ of mandamus ordering Secretary Manchin either to initiate an investigation into Nader-Camejo's nomination papers, or to refer the matter to the Attorney General's office.  The petition identified Jason E. Huber and the law firm of Forman and Huber, L.C. as petitioners' attorneys.

215.     Attorney Huber had previously written an open letter to the West Virginia Mountain Party, which was already qualified for ballot listing in the 2004 election, urging the party not to nominate Mr. Nader as its presidential candidate.  "The most obvious risk with horrendous consequences," Attorney Huber wrote, "is that a Nader nomination will cost Kerry the presidential race…This risk is most apparent in key states like West Virginia."  The letter continued:

> Considering this, we must take every precaution to assure that Kerry wins West Virginia even if it includes keeping Nader off the ballot. … It is for these reasons that I ask all those who support a Nader nomination to cast aside your third-party ideals for this one election (like I have done)…hold your nose and vote Kerry in 2004.

216.     On August 19, 2004, Secretary Manchin, a Democrat who was running for governor, reversed his prior decision, "accompanied by intense political pressure from the Democratic Party," the *Wall Street Journal* reported.  Secretary Manchin thus wrote to West Virginia Attorney General Darrell McGraw, also a Democrat, stating that "a measure of doubt exists as to the validity" of Nader-Camejo's petition.  The letter requested Attorney General McGraw to institute a *quo warranto* proceeding to determine the validity of Nader-Camejo's nomination papers under West Virginia Code § 3-5-23.

217.     The basis for Secretary Manchin's newfound doubt was that a group of citizens had complained that Nader-Camejo petitioners did not display proper credentials or did not display the petition appropriately.  Several citizens filed affidavits to this effect, but only four out of approximately 23,000 people who actually signed the petition raised such complaints.

218.     On August 23, 2004, Attorney General McGraw filed a Complaint in Quo Warranto "in the name of the state of West Virginia" in Kanawha County Circuit Court.  The complaint stated, "the State of West Virginia prays that this Court immediately issue an order requiring Defendant Ralph Nader to appear at said hearing and show cause why he should not be precluded from being nominated."  The complaint sought "such declaratory and injunctive relief regarding the purported nomination of Ralph Nader as may be warranted by the evidence."

219.     On or about August 30, 2004, the Circuit Court dismissed Attorney General McGraw's complaint.  The Court called the complaint "extraordinary" and noted that "the testimony of a half dozen citizens" was insufficient to invalidate an entire petition signed by 23,000 citizens.  Attorney General McGraw nevertheless appealed to

60

the West Virginia Supreme Court of Appeals, which denied the appeal on September 9, 2004. Nader-Camejo appeared on the West Virginia ballot as candidates in the 2004 presidential election.

220. In 2004 the DNC transferred at least $152,433 to the West Virginia Democratic Party, and at least $878,315 to West Virginia Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 18) Defendants or their co-conspirators filed a complaint against the Nader-Camejo Campaign in Wisconsin.

221. On September 10, 2004, the Democratic Party of Wisconsin and Kim Warkentin, its Executive Director, filed a complaint before the Wisconsin Elections Board challenging Nader-Camejo's nomination papers. The complaint identified Jeralyn B. Wendelberger, the Democratic Party of Wisconsin's counsel, as plaintiffs' attorney. In subsequent proceedings Lester Pines, Tamara Packard, the law firm Cullen, Weston, Pines & Bach LLP, Brenda Lewison, Tricia Knight, James Troupis, Eric McLeod, John Scheller, Brian Rybarik and the law firm Michael Best & Friedrich, LLP also represented the plaintiffs.

222. On September 22, 2004, the Elections Board dismissed plaintiffs' complaint and ordered Nader-Camejo to be placed on the Wisconsin ballot as candidates for President and Vice President.

223. On September 24, 2004, the Democratic Party of Wisconsin and Executive Director Warkentin appealed the Elections Board decision to Wisconsin's Dane County Circuit Court. The Circuit Court found that the Elections Board applied an

incorrect standard when reviewing plaintiffs' complaint. On September 28, 2004, the Circuit Court ordered Nader-Camejo removed from the ballot.

224. On September 28, 2004, Nader-Camejo filed an Emergency Petition for Writ of Mandamus requesting the Wisconsin Supreme Court to assume original jurisdiction over the matter. The Supreme Court granted Nader-Camejo's petition and held a hearing on the same day.

225. On September 30, 2004, the Wisconsin Supreme Court found that the Elections Board did not abuse its discretion and vacated the Circuit Court decision. Nader-Camejo appeared on the Wisconsin ballot as candidates in the 2004 presidential election.

226. On October 18, 2004, the Wisconsin Democratic Party paid Cullen, Weston, Pines & Bach LLP $553 for "Nader Ballot Challenge Legal Support." In addition, in 2004 the DNC transferred at least $544,542 to the Wisconsin Democratic Party, and at least $2,688,997 to Wisconsin Victory 2004. On information and belief, conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### 19) Defendants or their co-conspirators in Washington, D.C. filed three FEC complaints against the Nader-Camejo Campaign.

227. In addition to the foregoing litigation conspirators initiated or supported in 18 states, co-conspirator CREW filed two FEC complaints and co-conspirator Daniel Schneider filed one FEC complaint in the District of Columbia. The basis for CREW's first FEC complaint was nothing more than a newspaper article reporting that the Nader-Camejo Campaign shared office space with a non-profit organization. The FEC took no action against the Nader-Camejo Campaign and dismissed the complaint by unanimous

vote on February 10, 2005. The FEC took no action against the Nader-Camejo Campaign and dismissed CREW's second complaint by unanimous vote on June 23, 2005. The FEC took no action against the Nader-Camejo Campaign and dismissed Mr. Schneider's complaint by unanimous vote on April 21, 2006. Campaign staff and attorneys dedicated a significant amount of time, energy and resources to respond to these complaints.

### IV.     Defendants' Conspiracy Caused Plaintiffs Financial Injury and Other Damages and Violated their Constitutional Rights.

228.    Defendants' conspiracy caused severe financial injury to Nader-Camejo's 2004 presidential campaign. Defendants' nationwide legal assault in the form of abuse of process and malicious prosecution forced Nader-Camejo to secure counsel in 18 states, while their campaign of harassment, intimidation and sabotage consumed Nader-Camejo Campaign staffers' time. Nader-Camejo's campaign manager herself was personally compelled to attend depositions and other legal proceedings rather than running the campaign. In short, Defendants' efforts to bankrupt the Nader-Camejo Campaign produced its intended effect: in October 2004, Mr. Nader was forced to loan the campaign $100,000 to cover legal bills, staff salaries and operating expenses. The campaign has not repaid this loan.

229.    Not content merely to try to bankrupt Nader-Camejo's campaign, Defendant Reed Smith sought to collect payment on a wrongfully obtained, fraudulently induced judgment from Mr. Nader and Mr. Camejo personally. Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, and currently seeks to condemn $61,638.45 of Mr. Nader's funds, which it has already attached.

230.    Furthermore, although Nader-Camjeo prevailed in the great majority of lawsuits filed against them, Defendants' conspiracy largely succeeded in achieving its unlawful objectives. Five states denied Nader-Camejo ballot access as a direct result of Defendants' unlawful conduct. Moreover, the burden of defending their right to ballot access in lawsuits in 18 states – many of them simultaneous – prevented Nader-Camejo from dedicating resources necessary to gain ballot access in a dozen others. Denial of ballot access in these states also deprived Nader-Camejo of valuable fundraising opportunities to solicit voters for contributions as qualified candidates.

231.    More than 1.3 million Americans living in the 17 states that denied Nader-Camejo ballot access in 2004 voted for Mr. Nader in 2000. Hundreds of thousands signed Nader-Camejo's petitions in 2004. Defendants therefore denied Plaintiff-voters and every other voter similarly situated in 17 states their free choice of candidates in the 2004 presidential election. Defendants' conspiracy thus violated not only Mr. Nader's and Mr. Camejo's constitutional rights, but also those of Plaintiff-voters and millions of other voters.

232.    In summary: Defendants conspired to and did in fact cause financial injury and other damages to Ralph Nader's and Peter Miguel Camejo's 2004 presidential campaign and to the third-party and independent candidacy structure previously built by Mr. Nader; Defendants conspired to and did in fact cause financial injury and other damages to Mr. Nader and Mr. Camejo personally; Defendants conspired to and did in fact violate Ralph Nader's and Peter Miguel Camejo's constitutional rights by unlawfully interfering with and obstructing their campaign in the 2004 presidential election; and Defendants conspired to and did in fact violate Plaintiff-voters' and millions of other

voters' constitutional rights by denying them their free choice of candidates in the 2004 presidential election, all in an effort to preserve their electoral monopoly and perceived entitlement to votes. The 2004 election has long since concluded, yet Defendant Reed Smith persists in its flagrant and willful abuse of process in an effort to enforce an unprecedented, wrongfully obtained, fraudulently induced and unquestionably tainted judgment. Defendants thus leave Plaintiffs no alternative but to seek relief from this Court.

## COUNT I
### (Conspiracy To Commit Abuse Of Process and Malicious Prosecution)

233.    Plaintiffs incorporate by reference paragraphs 1-232 as if set forth fully herein.

234.    Defendants conspired and agreed among themselves to violate Plaintiffs' constitutional rights and cause them financial injury and other damages by orchestrating a nationwide legal assault on the Nader-Camejo 2004 presidential campaign.

235.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

236.    In furtherance of Defendants' conspiracy, conspirators filed 24 complaints against the Nader-Camejo Campaign within 12 weeks between June and September of 2004, pursuing unfounded and abusive litigation against the campaign in 18

different states. Conspirators also engaged in acts of harassment, intimidation and sabotage, often under fraudulent pretenses, as described herein.

237.    Plaintiffs were damaged by Defendants' acts.

## COUNT II
### (Abuse of Process and Malicious Prosecution:  Arizona, Arkansas, Colorado, District of Columbia, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, Nevada, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania, Washington, West Virginia and Wisconsin)

238.    Plaintiffs incorporate by reference paragraphs 1 through 237 as if set forth fully herein.

239.    Defendants conspired and agreed among themselves to abuse judicial processes and engage in malicious prosecution in order to cause Plaintiffs financial injury and other damages and violate Plaintiffs' constitutional rights by filing 24 complaints against the Nader-Camejo Campaign in less than 12 weeks between June and September of 2004.

240.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

241.    Defendants' conduct as set forth herein violated the common law of abuse of process and malicious prosecution under the state law of Arizona, Arkansas, Colorado, District of Columbia, Florida, Illinois, Iowa, Maine, Michigan, Mississippi,

Nevada, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania, Washington, West Virginia and Wisconsin.

242.     In furtherance of their conspiracy to abuse judicial processes and engage in malicious prosecution, the Defendants named herein and others either initiated or materially supported litigation filed against the Nader-Camejo Campaign in their states. The DNC, The Ballot Project and the Kerry-Edwards Campaign coordinated with State Democratic Parties to hire or secure *pro bono* counsel to prosecute this litigation.

243.     Plaintiffs were damaged by Defendants' acts.

### COUNT III
### (Conspiracy To Violate 43 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution)

244.     Plaintiffs incorporate by reference paragraphs 1 through 243 as if set forth fully herein.

245.     Defendants conspired and agreed among themselves to use court processes and other means to violate Plaintiffs' constitutional rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

246.     Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

247.     In furtherance of Defendants' conspiracy, the DNC, under the leadership of Chairman McAuliffe, among other things, directed and agreed with state Democratic

Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states. Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project.

248.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

249.    Plaintiffs were damaged by Defendants' acts.

## COUNT IV
### (Violation of 43 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution)

250.    Plaintiffs incorporate by reference paragraphs 1 through 249 as if set forth fully herein.

251.    Defendants abused court processes and engaged in malicious prosecution and used other means to violate Plaintiffs' constitutional rights and cause them financial injury and other damages. Defendants violated Plaintiffs' rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

252.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

253.    In furtherance of Defendants' conspiracy, the DNC, under the leadership of Chairman McAuliffe, among other things, directed and agreed with state Democratic Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states.  Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project.

254.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

255.    Plaintiffs were damaged by Defendants' acts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1) Compensatory damages in an amount to be determined at trial;

2) Punitive damages in an amount to be determined at trial;

3) Permanent injunctive relief against all ongoing and future violations of law by Defendants and their co-conspirators as set forth herein;

4) Attorneys' fees pursuant to 42. U.S.C. § 1988(b) and as otherwise permitted;

5) Court costs; and

6) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the District of Columbia Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action.

Dated: Washington, D.C.
    October 30, 2007

Respectfully Submitted,

_____

Oliver B. Hall, Esquire
D.C. Bar No. 976463
1835 16th Street NW
Washington, D.C. 20009
(617) 953-0161
*Counsel of Record*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Matt Gonzalez, Esquire
Gonzalez & Leigh, LLP
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*

G. Whitney Leigh, Esquire
Gonzalez & Leigh, LLP
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                          :
Ralph  Nader, et al.      :
v.                        :           Civ. No. 1:07cv1101
Terry McAuliffe, et unum. :
_____:

**PROPOSED ORDER**

Defendant Terry McAuliffe, having moved this Court to dismiss the Complaint and the

Plaintiffs having been heard, IT IS ORDERED that this case is dismissed.

_____
United States District Court Judge

February  , 2008

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                                    :
Ralph  Nader, et al.                :
v.                                  :          Civ. No. 1:07cv1101
Terry McAuliffe, et unum            :
_____:

### Certificate of Service

I certify that on January 31, 2008, I electronically filed Defendant Terry McAuliffe's motion to dismiss, notice of motion and memorandum with the Clerk of the Court by using the Court's CM/ECF system, which will notice the electronic filing to Michael Sgarlat counsel of record for the Plaintiffs..

I further certify that I emailed such filing to the following counsel: Michael Sgarlat at msgarlat@aol.com; and Oliver Hall at oliverbhall@gmail.com.

I further certify that I caused such filing (but not the attached District of Columbia complaint) to be served by first class mail to the following counsel for Plaintiffs:

Bruce Afran, 10 Braeburn Drive, Princeton, NJ 08540;

Mark R. Brown, 303 East Broad Street, Columbus, OH 43215;

Carl J. Mayer, Mayer Law Group, LLC, 1040 Avenue of the Americas, suite 2400, New York, NY 10018;

Gonzalez & Leigh, LLP, attn: Matt Gonzalez, G. Whitney Leigh and Bryan Vereschagin, Two Shaw Alley, San Francisco, CA 94105, and

Skadden, Arps, Slate, Meagher & Flom LLP, attn: Lawrence Noble and Preeta Bansal, 1440
    New York Avenue, N.W., Washington, D.C. 20005

January 31, 2008                              Respectfully submitted,

                                              /s/_____
.                                             John Hardin Young,
                                              VA Bar No.13553
                                              Joseph E. Sandler
                                              Stephen E. Hershkowitz,
                                              VA Bar No. 14648

                                              Counsel for Terry McAuliffe

                                              Sandler, Reiff & Young, P.C.

                                              50 E Street, S.E, suite 300
                                              Washington, D.C. 200
                                              (202) 479-1111 (office)
                                              (202)479-1115(facsimile)

                                              Young@sandlerreiff.com