**IN THE FEDERAL DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |  |
|---|---|---|
| | : | |
| **RALPH NADER,** | : | |
| Winsted, Connecticut 06098 | : | |
| | : | |
| **PETER MIGUEL CAMEJO,** | : | |
| Folsom, CA 95630 | : | |
| | : | |
| **D.B. FANNING** | : | |
| Flagstaff, AZ 86001 | : | |
| | : | |
| **C.K. IRELAND** | : | |
| Flagstaff, AZ 86001 | : | |
| | : | |
| **JULIE COYLE** | : | **SECOND AMENDED** |
| Toledo, OH 43613 | : | **COMPLAINT** |
| | : | |
| **HERMAN BLANKENSHIP** | : | |
| Toledo, OH 43608 | : | **CASE NO.** |
| | : | **1:07-cv-01101-JCC-TCB** |
| **LLOYD MARBET** | : | |
| Boring, OR 97009 | : | |
| | : | |
| **GREGORY KAFOURY** | : | |
| Portland, OR 97204 | : | |
| | : | |
| **PLAINTIFFS,** | : | |
| | : | |
| v. | : | |
| | : | |
| **THE DEMOCRATIC NATIONAL** | : | |
| **COMMITTEE** | : | |
| 430 South Capitol Street, SE | : | |
| Washington, DC 20003 | : | |
| | : | |
| **KERRY-EDWARDS 2004 INC.** | : | |
| 10 G Street, NE, Suite 700 | : | |
| Washington, DC 20002 | : | |
| | : | |
| **REED SMITH, LLP** | : | |
| 435 Sixth Avenue | : | |

**Pittsburgh, Pennsylvania, 15219** :
                                    :
**JOHN KERRY** :
    **United States Senate** :
    **304 Russell Building, Third Floor** :
    **Washington, DC  20510** :
                                    :
**TERRY MCAULIFFE** :
    **McLean, Virginia  22102** :
                                    :
**STEVEN RAIKIN** :
    **Springfield, Virginia  22152** :
                                    :
         **DEFENDANTS.** :
                                    :

Plaintiffs bring this action against Defendants to redress the deprivation of rights secured them by the First and Fourteenth Amendments, the Qualifications Clause and other provisions of the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs seek damages, injunctive and declaratory relief and such other further relief as this Court shall deem necessary and proper, and allege the following:

## NATURE OF THE ACTION

1.     Defendants Democratic National Committee (DNC), Kerry-Edwards 2004, Inc., Reed Smith, LLP, John Kerry, Terry McAuliffe and Steven Raikin (the "Defendants") are members, allies or agents of the Democratic Party who combined and conspired with other such parties (the "co-Conspirators" and, together with Defendants, the "Conspirators") to bankrupt the 2004 independent presidential campaign of Plaintiffs Ralph Nader and Peter Miguel Camejo (hereinafter, "Nader-Camejo"). Defendants' purpose was to prevent Mr. Nader and Mr. Camejo from running for President and Vice President of the United States in the 2004 general election, and to deny Plaintiff-voters and others the choice of voting for them. Defendants and co-Conspirators blamed Mr. Nader for the Democrats' loss in the 2000 presidential election, and they worried that he would "steal" votes from the Democratic candidates if he ran again in 2004. Defendants and co-Conspirators therefore agreed and conspired that if Mr. Nader did run in 2004, they would launch a massive, nationwide unlawful assault on his candidacy, using unfounded litigation to harass, obstruct and drain his campaign of resources, deny him ballot access and effectively prevent him from running for public office. Defendants and co-Conspirators reached this agreement and formed this conspiracy with wrongful intent,

1

before they could possibly have any reason to believe such litigation was warranted or justified.

2.    As the 2004 election approached, Defendant Terry McAuliffe, then-Chair of Defendant DNC, publicly appealed to Mr. Nader on numerous occasions not to run. "I wanted to convey to Ralph Nader that…if he were to get in the race again, he could pull votes away from the Democratic nominee. … We can't afford to have Ralph Nader in the race," Defendant McAuliffe told CNN's Wolf Blitzer in February 2004. When Mr. Nader announced his candidacy shortly thereafter, on February 22, 2004, Defendants and co-Conspirators set their obstructive plans and conspiracy in motion.

3.    In a telephone conversation with Mr. Nader on June 23, 2004, Defendant McAuliffe made one last effort to dissuade Mr. Nader. This time, Defendant McAuliffe asked Mr. Nader voluntarily not to campaign in certain so-called "battleground" states. If Mr. Nader agreed, Defendant McAuliffe said, he would support Mr. Nader's campaign in the remaining states. Mr. Nader declined, and objected to the Democratic Party's effort to deny his candidacy ballot access in various states. That same day, Defendants or co-Conspirators filed their first lawsuit against his campaign.

3.    Within the next 12 weeks, between June and September of 2004, Defendants and co-Conspirators filed 24 complaints against the Nader-Camejo Campaign in 17 states, including Arizona, Arkansas, Colorado, Florida, Illinois, Iowa, Maine, Michigan, Mississippi, New Hampshire, Nevada, New Mexico, Ohio, Pennsylvania, Washington, West Virginia and Wisconsin, and intervened in proceedings to remove Nader-Camejo from the ballot in Oregon. Conspirators also filed five complaints before the Federal Election Commission (FEC). In each state court lawsuit, Conspirators

challenged Nader-Camejo's nomination papers and asked state elections officials not to certify them as candidates for President and Vice President in the 2004 general election.

4.      The Conspirators' admitted purpose for bringing these lawsuits, however, was not to vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the candidates to spend their limited resources of time, talent and money on the defense of unfounded lawsuits.  The Conspirators' motive, which they also admitted, was to help Democratic candidates John Kerry and John Edwards win the election by forcing their political competitors from the race.

5.      Defendants and co-Conspirators dedicated millions of dollars' worth of illegal and unreported campaign contributions to their conspiracy.  They recruited at least 95 lawyers from 53 law firms to pursue their unfounded and abusive litigation and organized hundreds of others to provide support.  Defendants and co-Conspirators also incorporated several Section 527 political organizations, including one called The Ballot Project, which they incorporated specifically for the purpose of coordinating and financing their nationwide assault of unfounded and abusive litigation.

6.      In addition to filing 24 state court complaints and five FEC complaints against the Nader-Camejo Campaign within 12 weeks, Conspirators organized and conducted campaigns of harassment, intimidation and sabotage to prevent the Nader-Camejo Campaign from complying with election laws in several states, and to fabricate grounds for the Conspirators' subsequent lawsuits.  In one state, for example, Conspirators acting fraudulently and under false pretenses took seats in Nader-Camejo's nominating convention but refused to sign their petitions, causing the convention to fall short of the requisite number of validated attendees.  In other states, Conspirators

sabotaged Nader-Camejo's nomination papers by crossing names out or otherwise invalidating their petitions and, on information and belief, by signing fake names.

7.      In violation of state rules of professional conduct, the conspiracy's bar members sent misleading letters to campaign petitioners, falsely threatening them with heavy fines and jail sentences if signatures they collected were invalidated, and also sought subpoenas ordering campaign petitioners on short notice to attend depositions and produce unreasonably burdensome amounts of personal documents. On numerous occasions, the Conspirators, including members of the bar, called campaign petitioners' homes, and even the homes of citizens and potential voters who signed Nader-Camejo's petitions. Private detectives also visited petitioners' homes, unannounced, and claimed to be investigating them. All of this activity was intended to harass and intimidate said petitioners and prevent them from collecting signatures – an effort that succeeded on dozens of occasions.

8.      In spite of a multi-million dollar legal team of co-Conspirators, and coordinated campaigns of harassment, intimidation and sabotage specifically intended to prevent Nader-Camejo from complying with state election laws, the Conspirators eventually lost the great majority of lawsuits they filed. In addition, the FEC dismissed all five of Conspirators' FEC complaints without taking action. Defendants and co-Conspirators nevertheless succeeded in draining Nader-Camejo's campaign of time, money and other resources, and in preventing them from gaining ballot access in several states, thereby denying voters in these states the choice of voting for them, as was their intent. Defendants and co-Conspirators also caused financial injury and other damages to Mr. Nader and Mr. Camejo personally, and did severe damage to the third-party and

independent candidacy structure which Mr. Nader had built at great expense in time, money and other resources.

9.      Although the 2004 election ended nearly three years ago, Conspirators continue to pursue their wrongful litigation against Mr. Nader to the present day.  To force Nader-Camejo off the ballot in Pennsylvania, Defendants and co-Conspirators enlisted at least 20 lawyers from three law firms, hired handwriting experts and other consultants, and recruited support from approximately 170 Democratic Party operatives.  On information and belief, many of these operatives were employees of the state of Pennsylvania who received taxpayer-funded compensation for their efforts to remove Nader-Camejo from the ballot.  Afterwards, Defendant Reed Smith, a law firm with close ties to the Kerry-Edwards Campaign, submitted a bill of costs in the amount of $81,102.19.  No state in the nation has ever assessed such a post-election penalty against candidates who defend their right to appear on the ballot, but the Commonwealth Court of Pennsylvania approved the bill without opinion.  Misreading the plain meaning of the statute, a divided Pennsylvania Supreme Court affirmed without citing a single case in which a candidate had been assessed such costs.

10.     While this case was before the Pennsylvania Supreme Court, unbeknownst to Mr. Nader and Mr. Camejo, Defendant Reed Smith began representing the Chief Justice as his defense counsel in an ethics investigation before the Pennsylvania Judicial Conduct Board.  In addition, Reed Smith and Conspirators' second law firm gave $10,000 in campaign contributions to a second Justice, who authored the majority opinion.  Reed Smith also has close and long-standing ties with a third Pennsylvania Supreme Court Justice, who served as of counsel at the firm immediately before joining

the court. Reed Smith did not disclose these facts at any time during the proceedings before the Pennsylvania Supreme Court, nor thereafter, when the firm induced Mr. Camejo to pay $20,000 to settle the claim against him. Reed Smith subsequently filed Writs of Attachment against Mr. Nader's personal accounts, and currently seeks to condemn $61,638.45 of Mr. Nader's personal funds in satisfaction of its unprecedented fraudulently and wrongfully obtained judgment.

11.     Defendants and co-Conspirators conspired to and did in fact abuse judicial processes and engage in other unlawful conduct in an effort to bankrupt the Nader-Camejo Campaign and terminate Nader-Camejo's candidacy during the 2004 presidential election. Conspirators filed 24 state law complaints and five FEC complaints in less than 12 weeks, with the specific intention of causing Plaintiffs financial injury and other damages and violating their constitutional rights. Defendants and co-Conspirators did in fact cause such damages, and co-Conspirators continue to cause such damages, by pursuing their unfounded and abusive litigation to the present day.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the matter raises federal questions under 42 U.S.C. § 1983, and 28 U.S.C. § 1332(a), as the matter in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists among the parties. Jurisdiction is further conferred on this Court pursuant to 28 U.S.C. §§ 1343 and 2201. Jurisdiction supporting Plaintiffs' claim for attorney fees is conferred by 42 U.S.C. § 1988.

13.     Venue in the Eastern District of Virginia is appropriate pursuant to 28 U.S.C. 1391(b).

## THE PARTIES

14.     Unless otherwise stated, the charges alleged herein do not necessarily apply to every Defendant and every Conspirator or co-Conspirator named in this complaint.

15.     Plaintiff Ralph Nader is a consumer advocate and 2004 independent candidate for President of the United States.  Mr. Nader's address is in Winsted, Connecticut, 06098.

16.     Plaintiff Peter Miguel Camejo is an entrepreneur and 2004 independent candidate for Vice President of the United States.  Mr. Camejo joins this complaint as to all Defendants except he asserts no claims against Defendant Reed Smith.  Mr. Camejo's address is in Folsom, California, 95630.

17.     Plaintiff D.B. Fanning is a registered voter in the state of Arizona.  Mr. Fanning's address is in Flagstaff, Arizona, 86001.

18.     Plaintiff C.K. Ireland is a registered voter in the state of Arizona.  Ms. Ireland's address is in Flagstaff, Arizona, 86001.

19.     Plaintiff Julie Coyle is a registered voter in the state of Ohio.  Ms. Coyle's address is in Toledo, Ohio, 43613.

20.     Plaintiff Herman Blankenship is a registered voter in the state of Ohio.  Mr. Blankenship's address is in Toledo, Ohio, 43608.

21.     Plaintiff Lloyd Marbet is a registered voter in the state of Oregon.  Mr. Marbet's address is in Boring, Oregon, 97009.

22.     Plaintiff Gregory Kafoury is a registered voter in the state of Oregon. Mr. Kafoury's address is in Portland, Oregon, 97204.

23.     Defendant Democratic National Committee is the national head of the Democratic Party, and works with national, state and local Democratic Party organizations to elect Democratic candidates. The DNC's address is 430 S. Capitol Street SE, Washington, D.C., 20003.

24.     Defendant Kerry-Edwards 2004, Inc. is the principal campaign committee of the Kerry-Edwards Campaign. The committee's address is 10 G Street NE, Suite 710, Washington, D.C., 20002. On information and belief, Kerry-Edwards 2004, Inc. maintained Virginia headquarters at 2112 West Laburnum Avenue, Suite 204, Richmond, Virginia 23227-4358, and regional offices at 2722 Merrilee Drive Suite 310, Fairfax, Virginia 22031-4400.

25.     Defendant Reed Smith, LLP is a law firm headquartered in Pittsburgh, Pennsylvania. Reed Smith's address is 435 Sixth Avenue, Pittsburgh, Pennsylvania, 15219. Reed Smith also maintains offices at 3110 Fairview Park Drive, Suite 1400, Falls Church, Virginia, 22042; 44084 Riverside Parkway, Suite 300, Leesburg, Virginia, 20176; and at 901 East Byrd Street, Suite 1700, Richmond, Virginia, 23219-4068.

26.     Defendant John Kerry is a United States Senator from Massachusetts and the 2004 Democratic Party candidate for President. Mr. Kerry's address is United States Senate, 304 Russell Building, Third Floor, Washington, D.C., 20510.

27.     Defendant Terry McAuliffe is former Chair of the DNC. Mr. McAuliffe's address is in McLean, Virginia, 22102.

8

28.     Defendant Steven Raikin is director, treasurer and secretary of The Ballot Project and a lawyer.  Mr. Raikin's address is in Springfield, Virginia, 22152.

## NON-DEFENDANT CO-CONSPIRATORS

29.     Non-defendant co-Conspirator The Ballot Project is a Section 527 organization established on June 2, 2004 to coordinate and finance Defendants' and co-Conspirators' litigation against Nader-Camejo.  The organization's address is that of consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

30.     Non-defendant co-Conspirator Service Employees International Union (SEIU) is a labor union with headquarters in Washington, D.C.  SEIU's address is 1313 L Street NW, Washington, D.C., 20005.

31.     Non-defendant co-Conspirator America Coming Together (ACT) is a Democratic Section 527 organization, funded in part by SEIU, which organized a campaign of harassment, intimidation and sabotage in an effort to deny Nader-Camejo ballot access.   ACT's current address is 1101 Vermont Avenue NW, 9th Floor, Washington, D.C., 20005.

32.     Non-defendant co-Conspirator Jack Corrigan is a lawyer who worked for the DNC and the Kerry-Edwards Campaign to plan and execute Defendants' and co-Conspirators' wrongful litigation against Nader-Camejo.  Mr. Corrigan also served as John Kerry's personal liaison to the 2004 Democratic National Convention.  Mr. Corrigan's address is 896 Beacon Street, Boston, Massachusetts, 02215.

33.     Non-defendant co-Conspirator Toby Moffett is president of The Ballot Project and a lobbyist with the Livingston Group.  Mr. Moffett's address is 499 South Capitol Street SW, Suite 600, Washington, D.C., 20003.

34.     Non-defendant co-Conspirator Elizabeth Holtzman is director of The Ballot Project and a lawyer.  Ms. Holtzman's address is 2 Park Avenue, New York, New York, 10016.

35.     Non-defendant co-Conspirator Robert Brandon and his firm Robert Brandon and Associates are consultants to the DNC and other clients.  Mr. Brandon's firm housed The Ballot Project in its offices.  Mr. Brandon's address is 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

36.     Non-defendant co-Conspirator Mark Brewer is Chair of the Michigan Democratic Party and Vice Chair of the DNC.  Mr. Brewer's address is 606 Townsend, Lansing, MI, 48933.

37.     Non-defendant co-Conspirators include the state Democratic Party affiliates of the national Democratic Party who combined and conspired with Defendants to achieve Defendants' unlawful objectives as herein alleged.

38.     Non-defendant co-Conspirators include the law firms and lawyers who combined and conspired with Defendants and who, acting as Defendants' agents, implemented Defendants' illegal scheme in various states nationwide.

39.     Non-defendant co-Conspirator Americans for Jobs is a Section 527 organization established by Timothy Raftis and David W. Jones in 2003 "to accept contributions and make expenditures to influence the election of federal candidates." Americans for Jobs' address is 2000 M Street NW, Suite 800, Washington, D.C., 20036.

40.    Non-defendant co-Conspirator The National Progress Fund is a Section 527 organization established on May 4, 2004 "to engage in election-related activity for the purpose of supporting progressive issues." The organization was officially terminated on December 31, 2005. The National Progress Fund's address was PO Box 57154, Washington, D.C., 20037.

41.    Non-defendant co-Conspirator United Progressives for Victory is a political committee registered on June 16, 2004 and terminated on September 21, 2005. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

42.    Non-defendant co-Conspirator Uniting People for Victory is a Section 527 organization founded by United Progressives for Victory and registered with the IRS on July 21, 2004. The organization's address is that of DNC consultants Robert Brandon and Associates, at 1730 Rhode Island Avenue NW, Suite 712, Washington, D.C., 20036.

43.    Non-defendant co-Conspirator Citizens for Responsibility and Ethics in Washington (CREW) is a 501(c)(3) legal organization that claims to promote "ethics and accountability in government and public life by targeting government officials – regardless of party affiliation – who sacrifice the common good to special interests." The overwhelming majority of individuals and organizations CREW targets, however, are real or perceived competitors of the Democratic Party. CREW's address is 1400 Eye Street NW, Suite 450, Washington, D.C., 20005.

44.    Non-defendant co-Conspirator Kathleen Sullivan is former Chair of the New Hampshire Democratic Party and a DNC official. Ms. Sullivan's address is 95 Market Street, Manchester, NH 03101.

45.    Non-defendant co-Conspirator Daniel Schneider is, on information and belief, an attorney in Washington, D.C. who filed an FEC complaint against the Nader-Camejo Campaign.  Mr. Schneider's address is unknown.

46.    Non-defendant co-Conspirators include the officers and affiliates of the Section 527 organizations and 501(c)(3) organization named herein, including: David W. Jones; Tricia Enright; Chris Kofinis; Karl Frisch; Ginny Hunt; John Hlinko; Katie Aulwes; Karen Mulhauser; Helen Hunt; and Melanie Sloane.

## FACTUAL ALLEGATIONS

**I.    Defendants Conspired to Abuse Judicial Processes with Intent to Cause Plaintiffs Financial Injury and Other Damages and Violate Their Constitutional Rights.**

47.    After the Democrats' defeat in the 2000 election, Defendants and co-Conspirators decided to try to prevent Mr. Nader from running for president if he announced his candidacy in 2004.  The Conspirators had already settled on a strategy to accomplish this goal when Mr. Nader made his announcement on February 22, 2004.  "Our intent was to drain and distract him," The Ballot Project president Toby Moffett later explained to the *Hartford Courant*.  Defendants and co-Conspirators therefore agreed and conspired to launch a nationwide legal assault on Mr. Nader's campaign, which would drain the campaign of money, time and other resources, in a deliberate attempt to use the sheer burden of litigation itself as a means to prevent Mr. Nader from running for public office.  Defendants and co-Conspirators reached this agreement with wrongful intent, before they could possibly have any reason to believe litigation against Mr. Nader was warranted or justified, and before there was any colorable or potential legal basis for such litigation.

12

48.     Having settled on that strategy, the organizers and leaders of the conspiracy met privately to discuss their plans on July 26, 2004, at the Four Seasons Hotel in Boston.  DNC consultant Robert Brandon organized the meeting and, on information and belief, the DNC paid for it.  Approximately three dozen people attended, including The Ballot Project president Toby Moffett, The Ballot Project director Liz Holtzman and Democratic consultant Stanley Greenberg.

49.     At said Four Seasons meeting, the leaders and organizers of the conspiracy discussed polling, research, and strategy to undermine the Nader-Camejo Campaign in key states where they believed it would adversely affect Democratic candidates John Kerry and John Edwards most, including Arizona, Florida, Iowa, Michigan, Nevada, Oregon, Pennsylvania, Virginia, West Virginia and Wisconsin.  The leaders and organizers of the conspiracy specifically agreed to sue and otherwise obstruct Nader-Camejo not only in these "battleground" states, but also in as many other states as possible.  According to Conspirator Moffett, however, the purpose of this litigation was simply "to drain [Mr. Nader] of resources and force him to spend his time and money."

50.     Conspirator Moffett had conducted a limited campaign against Mr. Nader's candidacy in the 2000 election.  Conspirator Moffett considered that effort a failure, because Mr. Nader was listed on most state ballots in 2000.  "We're not going to let him do it again," Conspirator Moffett vowed at the said Four Seasons meeting.

51.     The Democratic National Convention began the same day as the Conspirators' Four Seasons meeting, and was taking place across town at Boston's Fleet Center. The Conspirators planned to use the convention as a platform to introduce their

litigation strategy to delegates from state Democratic Parties, and to solicit financial support from major party donors.

52.     The Conspirators prepared a memo for this purpose, which they planned to circulate at the convention.  This memo outlined the Conspirators' comprehensive plan of attack against the Nader-Camejo Campaign, which involved not only a nationwide legal assault, but also a communications campaign intended to convince voters not to vote for Nader-Camejo.  The memo further stated that Conspirators would coordinate and finance their activities with three 527 organizations they had established.  One was The Ballot Project, and the other two were called the National Progress Fund and Uniting People for Victory.

53.     The Conspirators distributed their memo to donors and delegates at the convention and discussed the perceived threat of Nader-Camejo's candidacy.  They briefed donors and delegates about their litigation plans and solicited contributions to their 527 organizations.  The Conspirators also recruited state Democratic Party officials to join their effort, and specifically instructed the officials to bring groundless and abusive lawsuits in their states as part of a nationwide strategy to bankrupt the Nader-Camejo Campaign and force Nader-Camejo from the race.  "This guy is still a huge threat," Conspirator Moffett said at the convention, in reference to Mr. Nader.  "We're just not going to make the same mistake we made in 2000."

54.     Conspirator Moffett told New Mexico Democratic Party Chair and DNC official John Wertheim that he should appoint someone to spearhead the effort to keep Nader-Camejo off the ballot in that state.  Mr. Wertheim agreed to do so.  "This is a central focus of my own duties as chairman," Mr. Wertheim told *The New Mexican*.

55.     At the close of the Democratic convention, on July 29, 2004, Defendant McAuliffe reiterated his claim that "We can't afford to have Ralph Nader in the race." *Business Week* reported Defendant McAuliffe's statement under the headline, "The Dems' Game Plan to Create a Two-Man Race."  That "Game Plan," which Defendants jointly planned and executed with their co-Conspirators, was to file groundless and abusive lawsuits and otherwise obstruct the Nader-Camejo Campaign as many times in as many states as possible during the 2004 election.

56.     Eighteen state or local Democratic Parties eventually joined Defendants' and co-Conspirators' conspiracy and either initiated or materially supported unfounded and abusive lawsuits filed against the Nader-Camejo Campaign, or intervened in proceedings to deny Nader-Camejo ballot access.  The state Democratic Parties of Arkansas, Colorado, Florida, Maine, Michigan, Mississippi, Nevada, New Hampshire, Washington and Wisconsin initiated such lawsuits, while the state Democratic Parties of Arizona, Illinois, Iowa, New Mexico, Ohio, and Pennsylvania materially supported such lawsuits filed in their states.  In Oregon, state Democratic Party officials intervened in proceedings to deny Nader-Camejo ballot access.  In West Virginia, local Democratic Party officials filed a complaint seeking to compel the Secretary of State to refer Nader-Camejo's nomination papers to the Attorney General's office for investigation.

57.     In addition to the state law complaints, Conspirators filed five FEC complaints against the Nader-Camejo Campaign.  CREW filed two complaints, Michigan Democratic Party Chair Mark Brewer filed one, New Hampshire Democratic Party Chair Kathleen Sullivan filed one, and District of Columbia-based attorney Daniel Schneider filed Conspirators' fifth FEC complaint.

58.    Of the 24 state court complaints Conspirators filed against Nader-Camejo nationwide, DNC officials filed seven in their own names, including Scott Maddox of Florida, Dorothy Melanson of Maine, Mark Brewer of Michigan, Wayne Dowdy of Mississippi, Kathleen Sullivan of New Hampshire (two) and Paul Berendt of Washington.  In addition, DNC official James Edmundson of Oregon intervened in the proceedings filed in that state, and on information and belief, DNC officials Michael Madigan of Illinois and John Wertheim of New Mexico assisted in complaints filed in their states.  Finally, DNC official Anna Burger is Secretary-Treasurer of SEIU, which helped execute Defendants' and co-Conspirators' unlawful plans in Oregon.  Thus, on information and belief, at least ten DNC officials directly participated in the Conspirators' nationwide legal assault.

59.    Furthermore, unidentified DNC officials specifically directed state party officials to initiate litigation against Nader-Camejo.  The DNC also hired and paid for several state parties' lawyers and, on information and belief, coordinated with The Ballot Project to secure *pro bono* counsel in other states.  High-level DNC staff developed and coordinated the conspiracy's nationwide litigation strategy, while rank-and-file DNC staff helped prepare the Conspirators' complaints.

60.    For example, an email DNC employee Caroline Adler sent to DNC staff contained an attachment entitled "Script for Nader Petition Signers," which DNC employees used to help Conspirators manufacture evidence upon which to challenge Nader-Camejo's nomination papers.  The electronic document's properties indicate that DNC and Kerry-Edwards Campaign consultant Jack Corrigan authored this document.

61.     The Kerry-Edwards Campaign also joined the conspiracy, coordinating with lawyers and directly participating in the conspiracy's litigation. For example, an email from Judy Reardon, the Kerry-Edwards Campaign's deputy national director for northern New England, indicates Ms. Reardon herself drafted one of the Conspirators' complaints and coordinated with the Democratic Party officials and attorneys who filed it, including New Hampshire Democratic Party Chair Kathleen Sullivan.

62.     The Ballot Project directed the conspiracy in conjunction with the DNC and the Kerry-Edwards Campaign, all headquartered in the District of Columbia, and coordinated with state Democratic Parties to recruit attorneys to provide counsel for the conspiracy's nationwide legal assault.  As Conspirator Moffett told the *New York Times*, "We're doing everything we can to facilitate lawyers in over 20 states."

63.     At least 95 lawyers from 53 law firms eventually joined the litigation. The DNC, state Democratic Parties and The Ballot Project collectively paid these firms nearly $1 million, while their co-Conspirator bar members contributed in excess of $2 million in *pro bono* legal services.

64.     Despite their massive expenditure of resources and their campaigns of harassment, intimidation and sabotage, the Conspirators eventually lost the great majority of lawsuits they filed.  The FEC also dismissed all five complaints Conspirators filed. The Conspirator's intent, however, was not to vindicate valid claims, but to use the sheer burden of litigation itself as a means to bankrupt and disrupt the Nader-Camejo Campaign, to keep Nader-Camejo off the ballot, and to suppress the candidates' speech and the Plaintiff-voters' rights of association.  As Conspirator Moffett admitted to the *Washington Post* in August 2004, "We wanted to neutralize his campaign by forcing him

17

to spend money and resources defending these things, but much to our astonishment we've actually been more successful than we thought we'd be in stopping him from getting on at all."

65.    After the 2004 election, Conspirator Moffett reaffirmed Defendants' and co-Conspirators' unlawful intent.  "We had a role in the ballot challenges," Conspirator Moffett told *The Guardian UK* in December 2004.  "We distracted him and drained him of resources.  I'd be less than honest if I said it was all about the law.  It was about stopping Bush from getting elected."

66.    During the election, however, Defendants and co-Conspirators denied and fraudulently concealed their involvement in Conspirators' groundless and abusive litigation against Nader-Camejo.  In September 2004, for example, DNC spokesman Jano Cabrera told the Associated Press, "Our state parties made the decision to make sure that if Ralph Nader wanted to get on the ballot, that he was playing by the rules."  Mr. Cabrera also specifically denied that the DNC was funding the state parties' litigation.  In fact, FEC records now confirm, the DNC hired several of the state parties' law firms.

67.    John Kerry likewise denied involvement in Conspirators' wrongful litigation.  "I respect [Mr. Nader].  I'm not going to attack him in any way," Mr. Kerry told the Associated Press in April 2004.  "I'm just going to try to talk to his people and point out that we've got to beat George Bush.  And I hope that by the end of this race I can make it unnecessary for people to feel they need to vote for someone else."  In fact, however, despite John Kerry's prior disavowal, the Kerry-Edwards Campaign directly participated in at least one lawsuit Conspirators filed against Nader-Camejo.

68.     Defendants' and co-Conspirators' conspiracy against the Nader-Camejo Campaign in 2004 was unprecedented in its magnitude and scope. The DNC, the Kerry-Edwards Campaign, The Ballot Project, 18 state or local Democratic Parties, at least 95 lawyers from 53 law firms, and hundreds if not thousands of Democratic Party operatives conspired with the specific intent of using legal and administrative processes to bankrupt the Nader-Camejo Campaign and prevent Nader-Camejo from running for President and Vice President, thereby denying millions of Americans the choice of voting for them. Accordingly, Defendants and co-Conspirators unlawfully conspired to abuse legal and administrative processes to achieve four distinct but related improper purposes:

   i.    Defendants and co-Conspirators unlawfully conspired to cause financial injury and other damages to the Nader-Camejo 2004 presidential campaign;

   ii.   Defendants and co-Conspirators unlawfully conspired to cause financial injury and other damages to Mr. Nader and Mr. Camejo personally;

   iii.  Defendants and co-Conspirators unlawfully conspired with state actors and acted under color of state law to violate Nader-Camejo's constitutional rights by preventing them from appearing on the ballot as candidates in the 2004 presidential election;

   iv.   Defendants and co-Conspirators unlawfully conspired with state actors and acted under color of state law to violate Plaintiff-voters' constitutional rights, and those of others similarly situated, by denying voters their free choice of candidates in the 2004 presidential election.

## II.    Defendants or their co-Conspirators Engaged in Acts of Harassment, Intimidation and Sabotage in Furtherance of Their Conspiracy.

69.     The Conspirators knew that litigation alone would be insufficient to prevent Nader-Camejo from gaining ballot access in certain states. Therefore, to support their legal assault, Conspirators in these states engaged in acts of harassment, intimidation and sabotage, often under fraudulent or false pretenses. These acts were

specifically intended to prevent Nader-Camejo from complying with state election laws, and to manufacture legal grounds for the Conspirators' otherwise baseless claims.

70.     In Ohio, where Mr. Nader received 117,857 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by collecting 5,000 signatures, Conspirators orchestrated a massive campaign of harassment and intimidation to prevent Nader-Camejo petitioners from collecting signatures.  Defendants or co-Conspirators hired private investigators to visit petitioners' homes and warn them that they were the subject of a "background check" the investigators were conducting.  Conspirators' lawyers also attempted to subpoena 27 different petitioners, and repeatedly called them at home to demand their compliance.  The subpoenas' demands were so unreasonable and burdensome that compliance would have prevented petitioners from doing anything else – including collecting signatures.  Specifically, the subpoenas demanded that petitioners on short notice report to the offices of law firms throughout the state and produce:

> (1) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, and part-petitions, relating to the obtaining of signatures from Ohio residents for part-petitions and/or the Statement of Candidacy and Nominating Petition filed by Ralph Nader;

> (2) All documents, including but not limited to correspondence, memoranda, notes, and/or electronic mail, relating to communications with: any persons affiliated with Ralph Nader; and any persons acting as solicitors to obtain signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

> (3) All documents, including but not limited to correspondence, memoranda, notes, electronic mail, contracts, bank checks, and bank account statements, relating to your being paid for obtaining signatures for Ralph Nader to qualify him for certification to the ballot for the general election as an independent candidate in Ohio;

> (4) All documents, including but not limited to, voter registration cards, drivers' licenses, bank account statements, leases, deeds, property tax assessments, and utility bills, evidencing your residence since January 1, 2000; and

(5) All documents, including but not limited to, voter registration cards, evidencing the states in which you have been registered to vote."

71.    In Oregon, where Mr. Nader received 77,357 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by holding a nominating convention with 1,000 attendees, Conspirators openly admitted their intention to interfere.  "If we think it gets to a point where we need to step in and mobilize to make sure he doesn't get on the ballot, then we will," a spokesperson for America Coming Together (ACT), a Democratic 527 founded by SEIU, told CBS News in April 2004.  ACT, SEIU, Oregon Democratic Party members and at least one local Oregon Democratic Party official subsequently engaged in a coordinated effort to disrupt two Nader-Camejo nominating conventions, held in April and in June, causing them to fail.  When Nader-Camejo later tried to gain ballot access by collecting signatures on nominating petitions, ACT and SEIU organized teams of operatives to sabotage the petitions under false pretenses, by deliberately signing them in the wrong place, thereby invalidating the entire sheet.  Conspirators then resorted to the same harassment and intimidation tactics they employed in Ohio.  Private detectives visited petitioners' homes and threatened them with jail time, while their co-Conspirator attorneys sent misleading letters falsely threatening petitioners with "conviction of a felony with a fine of up to $100,000 or prison for up to five years" if they submitted signatures that were later invalidated.

72.    In Pennsylvania, where Mr. Nader received 103,392 votes in 2000, and where Nader-Camejo could gain ballot access in 2004 by submitting 25,697 signatures, on information and belief Conspirators sabotaged Nader-Camejo's petitions under false pretenses by signing thousands of fake names.  Nader-Camejo petitioners expunged

approximately 7,000 such names, but did not detect a small number (687 or 1.3% of the total) among the 51,273 signatures they submitted.  The Conspirators later used this manufactured evidence as a basis for their lawsuit and subsequent demand for $81,102.19 in litigation costs.

73.    The Conspirators' campaign of harassment, intimidation and sabotage was decisive to the success of their litigation against Nader-Camejo.  The Conspirators won their lawsuits in Ohio, Oregon and Pennsylvania, and Illinois, but lost in every other state.  Nader-Camejo also withdrew in Arizona, where the Conspirators sued first, due to the prohibitive cost of defending the litigation.  Mr. Nader was on the ballot in each of these states as a candidate in the 2000 presidential election, and Nader-Camejo would have been in 2004 but for the Conspirators' unlawful interference.

### III.    Defendants or Co-Conspirators Acted in Concert with Officials and Employees of the State of Pennsylvania to Remove Nader-Camejo From Pennsylvania's Ballot.

74.    On August 9, 2004, Philadelphia resident Ralph Dade filed a class action complaint against the Nader-Camejo Campaign in Philadelphia Court of Common Pleas, alleging that he and several others were owed approximately $200 each for signatures they had collected for the campaign.  The complaint identified Louis Agre, a Philadelphia Democratic Party Ward leader, and Thomas Martin as attorneys for the plaintiffs.  Nader-Camejo disputed the claim on the ground that plaintiffs had submitted invalid signatures, and the complaint was dismissed.

75.    On August 9, 2004, Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen-Scott, Donald G. Brown and

Julia O'Connell, registered Democrats in Pennsylvania, filed a second complaint in the Pennsylvania Commonwealth Court, challenging Nader-Camejo's nomination papers under 25 PS § 2937. The complaint identified Gregory Harvey, another Philadelphia Democratic Party Ward leader, and Efrem Grail, Daniel Booker, Cynthia Kernick, Brian A. Gordon, Reed Smith LLP, Montgomery McCracken, Walker and Rhoads LLP, and the law offices of Brian A. Gordon as attorneys for the plaintiffs.

76.    The complaint challenged approximately 35,000 of the 51,273 signatures on Nader-Camejo's nominating petition on technical grounds, and alleged numerous procedural grounds for disqualifying Nader-Camejo from Pennsylvania's ballot. The Pennsylvania plaintiffs' attorneys prepared the complaint in cooperation with Pennsylvania Democratic Party leaders, including state House Minority Leader Bill DeWeese and former Democratic Whip Mike DeWeese, and with support from approximately 170 Democratic Party operatives Mr. DeWeese and Mr. Veon recruited. On information and belief, many of these operatives were employees of the state of Pennsylvania, who received taxpayer-funded compensation for their efforts to remove Nader-Camejo from Pennsylvania's ballot.

77.    On numerous occasions before, during and after the litigation, Mr. DeWeese, Mr. Veon and other party officials stated that the purpose of their lawsuit was to help John Kerry win the election. In July 2004, before Plaintiffs filed their complaint, Pennsylvania Democratic Party Executive Director Don Morabito told the *Philadelphia City Paper*, "we want to make sure" Nader-Camejo doesn't detract votes from Mr. Kerry. On August 2, 2004, Mr. DeWeese told the *Pittsburgh Post-Gazette*, "Working with the AFL-CIO, we will do everything humanly possible to fight [Nader-Camejo]….You don't

need a Ph.D in mathematics to understand that 100 percent of the vote [Nader-Camejo] gets will be skimmed from Senator Kerry's total." On August 9, 2004, the day plaintiffs filed their complaint, Mr. DeWeese told the *Post-Gazette*, "We are being completely open about our intentions. Our goal is to help elect John Kerry the next President of the United States." After the election, Mr. DeWeese and Mr. Veon issued a press release stating, "our efforts to strike [Nader-Camejo] from the ballot proved successful for John Kerry in Pennsylvania."

78. On August 30, 2004, the Pennsylvania Commonwealth Court set aside Nader-Camejo's nomination papers and ordered their names stricken from the Pennsylvania ballot, because they were running as independent candidates in Pennsylvania and as candidates of a political party in other states.

79. On September 2, 2004, Nader-Camejo appealed to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court reversed and vacated the Commonwealth Court's order on September 20, 2004, and remanded to the Commonwealth Court for hearings. The Commonwealth Court immediately scheduled hearings in approximately 48 counties and 13 courtrooms; seven hearings were scheduled simultaneously in six different counties, with two hearings in Philadelphia.

80. On September 22, 2004, Nader-Camejo's attorneys notified the court that they lacked staff to attend voter review hearings in 48 counties, and that they lacked attorneys to appear in 13 different courtrooms, because the Conspirators' nationwide legal assault had severely depleted the campaign's resources. Nader-Camejo's attorneys therefore requested the court to hold hearings in only one or two courtrooms. The

Commonwealth Court rejected this request on September 23, 2004. Several hearings therefore proceeded without counsel present on behalf of Nader-Camejo.

81.     To prepare for these hearings, the Conspirators simply recruited more attorneys. On August 19, 2004, attorney Daniel Booker of Reed Smith told the *New York Times* that "eight to ten lawyers in his firm were working on the case, 80 hours each a week for two weeks, and could end up working six more weeks." Attorney Booker indicated that his firm had also taken on more than 100 volunteers to work on the case. On information and belief, at least some of these "volunteers" were employees of the state of Pennsylvania, who received taxpayer-funded compensation for their work.

82.     In fact, Attorney Booker's estimate was low: Reed Smith attorneys Ira Lefton, Christopher K. Walters, Milind Shah, Jeremy Feinstein, Mark Tamburi, James Doerfler, John McIntyre, Lisa Campoli, Barbara (Kiely) Hager, Andrea (Simonson) Weingarten, Jeffrey Bresch, Kim Watterson, Melissa Oretsky and James Williamson joined the litigation, for a total of at least 17 Reed, Smith attorneys. On October 1, 2004, *American Lawyer* reported that these attorneys had logged 1,300 *pro bono* hours on the case. "And that's just the pre-election challenge," the magazine reported.

83.     On October 13, 2004, following three weeks of hearings in counties across Pennsylvania, Commonwealth Court Judge James Gardner Colins, who was elected to the bench as a Democrat, issued an opinion invalidating more than 30,000 of Nader-Camejo's signatures on technical grounds. For example, approximately 9,000 signatures were invalidated because qualified electors – who could vote – had not yet registered on the day they signed Nader-Camejo's nomination petition (even though Pennsylvania law specifies no such requirement). Another 6,000 signatures were

invalidated because voters' current addresses didn't match their registered addresses. Thus, after striking a total of 32,455 signatures on these and other technical grounds, Judge Colins concluded that only 18,818 signatures were valid, and set aside Nader-Camejo's nomination papers.

84.    On October 14, 2004, Judge Colins issued an order directing Mr. Nader and Mr. Camejo personally to pay all litigation costs arising from plaintiffs' challenge. No state in the nation – including Pennsylvania – has ever ordered candidates to pay such costs after defending their right to ballot access.

85.    On October 19, 2004, a divided Pennsylvania Supreme Court affirmed the Commonwealth Court's order removing Nader-Camejo from the Pennsylvania ballot. The United States Supreme Court denied Nader-Camejo's petition for a writ of certiorari on October 23, 2004.   Nader-Camejo did not appear on the Pennsylvania ballot as candidates in the 2004 presidential election.

86.    On December 3, 2004, attorneys Efrem Grail, Daniel Booker and Cynthia Kernick of Reed Smith, Gregory Harvey of Montgomery, McCracken, Walker and Rhoads, and Brian A. Gordon, a solo practitioner, submitted a bill of costs to the Commonwealth Court of Pennsylvania in the amount of $81,102.19.   The attorneys claimed that the bill "is true and correct and accurately reflects costs incurred by [plaintiffs]."   In fact, however,  the plaintiffs did not incur any costs, being nominal parties Conspirators recruited to sue the Nader-Camejo Campaign.  As the true party in interest seeking to collect the costs, Reed Smith nevertheless submitted its bill on the plaintiffs' behalf, claiming "Justice requires that this Court award [plaintiffs] the costs incurred."   Reed Smith's attorneys never informed the Pennsylvania Commonwealth

Court that the DNC had already paid the firm $136,142, nor did they clarify or correct their many public claims to be working on the case pro bono.

87.    Reed Smith lawyers also falsely claimed, in the brief they filed before the Pennsylvania Supreme Court in support of their bill of costs, that Nader-Camejo's nomination papers included "literally thousands of forged petition signatures." In fact, however, Judge Colins counted only 687 out of 51,273 signatures (or 1.3 percent) as "forgeries," which were submitted by people engaged in mischief or sabotage. Pennsylvania Supreme Court Justice Thomas Saylor previously emphasized this fact in a dissenting opinion, in an effort to correct prior distortions of the record. Justice Saylor also noted that the record contained "no evidence" to support Reed Smith's allegations of fraud by anyone associated with the Nader-Camejo Campaign.

88.    To the contrary, Nader-Camejo Campaign staff voluntarily expunged approximately 7,000 apparently fictitious names from Nader-Camejo's nomination petitions, in an effort to lessen the Commonwealth Court's burden. On information and belief, Conspirators including Ralph Dade and the other plaintiffs in the dismissed class action complaint signed these names under false pretenses, in a deliberate attempt to sabotage Nader-Camejo's petitions and manufacture evidence to support their Commonwealth Court complaint.

89.    On January 14, 2005, Judge Colins entered an order approving the bill of costs without opinion, despite the fact that the record contains "no evidence" – much less a finding – of wrongdoing by anyone associated with the Nader-Camejo Campaign. A divided Pennsylvania Supreme Court nevertheless affirmed without citing a single case

as precedent for the order, thus upholding what appears to be the first post-election penalty assessed against a candidate in the history of American jurisprudence.

90.     During the proceedings before the Pennsylvania Supreme Court, Reed Smith never disclosed several ties the firm had with Justices of the court, which give rise to an obvious appearance of impropriety that would have provided grounds for Nader-Camejo to seek the Justices' disqualification.  Specifically:

- Reed Smith represented Chief Justice Ralph Cappy as his defense counsel in an ethics investigation that was ongoing while this case was before the Pennsylvania Supreme Court;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave $10,000 in campaign contributions ($5,000 from each firm) to Justice Sandra Newman, who authored the majority opinion, in November 2005, while this case was before the Pennsylvania Supreme Court, and Reed Smith gave Justice Newman another $6,100 during her previous election;

- Reed Smith extended an open-ended offer of employment to Justice Ronald Castille in 1985, which he accepted in 1991 and served of counsel at Reed Smith for nearly three years immediately before he joined the Pennsylvania Supreme Court in 1993;

- Reed Smith and Montgomery, McCracken, Walker and Rhoads gave at least $67,900 in campaign contributions to four out of five Justices who voted to affirm judgment in Reed Smith's favor, and to one Justice who concurred and dissented; at least $58,900 of this total came from Reed Smith and its lawyers.

91.     The appearance of impropriety arising from these ties between Reed Smith and the Justices of the Pennsylvania Supreme Court is manifest and unmistakable. In this case, moreover, the appearance of impropriety is compounded by Reed Smith's status not merely as plaintiffs' counsel, but also as the true party in interest seeking to collect a money judgment in the proceedings.  Nevertheless, at no time during these proceedings did Reed Smith disclose its ties with four out of five Justices who voted to affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

92.     By contrast, the lone dissenter, Justice Thomas Saylor, has no apparent ties to Reed Smith.  Justice Saylor dissented on the ground that Pennsylvania law – like the laws of every other state in the nation – simply does not authorize a taxation of costs against candidates who defend their nomination papers, but only against parties who challenge candidates' nomination papers.

93.     Reed Smith's concealment of its ties with the Pennsylvania Supreme Court Justices thus constitutes a fraud upon the court, because the firm induced its judgment in a manner that deprived Nader-Camejo of the opportunity to move for the Justices' disqualification, in violation of basic principles of fairness, impartiality and due process.

94.     Even while concealing their own fraud, Reed Smith's attorneys repeatedly slandered Mr. Nader in the news media with accusations of fraud, and libeled him on the *pro bono* page of their website, where they published the following defamatory statement:

> Our intensive effort to remove Ralph Nader from the 2004 Presidential ballot in Pennsylvania won national headlines, with the courts upholding our claim that 30,000 signatures supporting Mr. Nader were forged or otherwise fraudulent.

95.     On March 8, 2007, Mr. Nader wrote to the partners of Reed Smith to protest this ongoing defamation, as well as the fraud and misrepresentation by which the firm obtained its judgment.  Mr. Nader had not yet discovered that the judgment itself was tainted by an overwhelming appearance of impropriety arising from the foregoing undisclosed ties with the Pennsylvania Supreme Court Justices.  Reed Smith immediately removed the libelous language from its website, but otherwise did not respond.

96.     Neither Mr. Nader nor Mr. Camejo discovered Reed Smith's ties to the Pennsylvania Supreme Court Justices until September 2007.  Thus, prior to that time, Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, without disclosing the fraud upon the court the firm had perpetrated.  Mr. Nader did not settle. Reed Smith therefore commenced attachment proceedings against his personal accounts.

97.     On July 13, 2007, Reed Smith served Amalgamated Bank with an Application for Writ of Attachment, filed with the Superior Court of the District of Columbia, stating that "any money, property or credits of Ralph Nader in Amalgamated Bank's possession are hereby seized by this Writ of Attachment."  In fact, however, the Superior Court had entered no such writ.  Amalgamated Bank nevertheless froze Mr. Nader's accounts on July 13, 2007.

98.     On July 17, 2007, the Superior Court of the District of Columbia entered writs of attachment against Amalgamated Bank, M&T Bank and PNC Bank as garnishees of Mr. Nader's accounts.  Pursuant to these writs, Amalgamated Bank froze $27,420.16, and PNC Bank froze $34,218.29, for a total of $61,638.45.  Reed Smith filed a motion to condemn these funds on August 28, 2007, which was denied, and another on September 25, 2007.  On October 25, 2007, the Superior Court of the District of Columbia entered judgment in Reed Smith's favor.  On November 7, 2007, Mr. Nader filed a motion to vacate the judgment, which is pending.

99.     Reed Smith attorneys repeatedly told the news media in 2004 that the Democratic Party had not retained or paid Reed Smith, thereby fraudulently concealing the firm's involvement in Defendants' and co-Conspirators' conspiracy.  In fact, however, the DNC retained Reed Smith and paid the firm $136,142 for "political

consulting" and "legal consulting" during the election.   In addition, Reed Smith has represented John Kerry, Teresa Heinz Kerry, the HJ Heinz Corporation and the Heinz Family Foundation.   Reed Smith most recently defended Senator Kerry in a civil lawsuit for defamation, which arose out of the 2004 election and was decided in August 2006. Furthermore, "Heinz is still a major and active client," *Legal Business* reported in December 2006/January 2007.

100.    On August 3, 2004, The Ballot Project paid attorney Gregory Harvey's firm Montgomery, McCracken, Walker and Rhoads $6,000 for reimbursed costs.   In October and November of 2004, the DNC paid Reed Smith $136,142 in legal and political consulting fees.   In addition, in 2004 the DNC transferred at least $182,825 to the Pennsylvania Democratic Party, and at least $5,132,220 to Pennsylvania Victory 2004.   On information and belief, Conspirators used a portion of these funds to finance acts done in furtherance of the conspiracy.

### IV.    Defendants' and co-Conspirators' Conspiracy Caused Plaintiffs Financial Injury and Other Damages and Violated their Constitutional Rights.

101.    Defendants' and co-Conspirators' conspiracy caused severe financial injury to Nader-Camejo's 2004 presidential campaign.   Defendants' and co-Conspirators' nationwide legal assault in the form of abuse of process and malicious prosecution forced Nader-Camejo to secure counsel in 18 states, while their campaign of harassment, intimidation and sabotage consumed Nader-Camejo Campaign staffers' time.   Nader-Camejo's campaign manager herself was personally compelled to attend depositions and other legal proceedings rather than running the campaign.   In short, Defendants' and co-Conspirators' efforts to bankrupt the Nader-Camejo Campaign produced its intended

31

effect: in October 2004, Mr. Nader was forced to loan the campaign $100,000 to cover legal bills, staff salaries and operating expenses. The campaign has not repaid this loan.

102. Not content merely to try to bankrupt Nader-Camejo's campaign, Defendant Reed Smith sought to collect payment on a wrongfully obtained, fraudulently induced judgment from Mr. Nader and Mr. Camejo personally. Reed Smith induced Mr. Camejo to pay the firm $20,000 to settle its claim, and currently seeks to condemn $61,638.45 of Mr. Nader's funds, which it has already attached.

103. Furthermore, although Nader-Camejo prevailed in the great majority of lawsuits filed against them, Defendants' and co-Conspirators' conspiracy largely succeeded in achieving its unlawful objectives. Five states denied Nader-Camejo ballot access as a direct result of Defendants' and co-Conspirators unlawful conduct. Moreover, the burden of defending their right to ballot access in lawsuits in 18 states – many of them simultaneous – prevented Nader-Camejo from dedicating resources necessary to gain ballot access in a dozen others. Denial of ballot access in these states also deprived Nader-Camejo of valuable fundraising opportunities to solicit voters for contributions as qualified candidates.

104. More than 1.3 million Americans living in the 17 states that denied Nader-Camejo ballot access in 2004 voted for Mr. Nader in 2000. Hundreds of thousands signed Nader-Camejo's petitions in 2004. Defendants and co-Conspirators therefore denied Plaintiff-voters and every other voter similarly situated in 17 states their free choice of candidates in the 2004 presidential election. Defendants' and co-Conspirators' conspiracy thus violated not only Mr. Nader's and Mr. Camejo's constitutional rights, but also those of Plaintiff-voters and millions of other voters.

105.    In summary: Defendants and co-Conspirators conspired to and did in fact cause financial injury and other damages to Ralph Nader's and Peter Miguel Camejo's 2004 presidential campaign and to the third-party and independent candidacy structure previously built by Mr. Nader; Defendants and co-Conspirators conspired to and did in fact cause financial injury and other damages to Mr. Nader and Mr. Camejo personally; Defendants and co-Conspirators conspired to and did in fact violate Ralph Nader's and Peter Miguel Camejo's constitutional rights by unlawfully interfering with and obstructing their campaign in the 2004 presidential election; and Defendants and co-Conspirators conspired to and did in fact violate Plaintiff-voters' and millions of other voters' constitutional rights by denying them their free choice of candidates in the 2004 presidential election, all in an effort to preserve their electoral monopoly and perceived entitlement to votes.  The 2004 election has long since concluded, yet Defendant Reed Smith persists in its flagrant and willful abuse of process in an effort to enforce an unprecedented, wrongfully obtained, fraudulently induced and unquestionably tainted judgment.  Defendants and co-Conspirators thus leave Plaintiffs no alternative but to seek relief from this Court.

**COUNT I**
**Conspiracy To Violate 42 U.S.C. Sec. 1983, The Qualifications Clause And The First And Fourteenth Amendments Of The United States Constitution**

106.    Plaintiffs incorporate by reference paragraphs 1 through 105 as if set forth fully herein.

107.    Defendants conspired and agreed with co-Conspirators to use court processes and other means to violate Plaintiffs' constitutional rights guaranteed by the

Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

108.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

109.    In furtherance of the conspiracy, the DNC under the leadership of Defendant McAuliffe, among other things, directed and agreed with state Democratic Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states. Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project under the direction of Defendant Raikin.

110.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

111.    Plaintiffs were damaged by Defendants' acts.

**COUNT II**
**Violation of 42 U.S.C. Sec. 1983, The Qualifications Clause And The First**
**And Fourteenth Amendments Of The United States Constitution**

112.    Plaintiffs incorporate by reference paragraphs 1 through 111 as if set forth fully herein.

113.    Defendants abused court processes and engaged in malicious prosecution and used other means to violate Plaintiffs' constitutional rights and cause them financial injury and other damages.   Defendants violated Plaintiffs' rights guaranteed by the Qualifications Clause, the First and Fourteenth Amendments, and otherwise secured by the United States Constitution.

114.    Defendants' purpose was to use unfounded and abusive litigation as a means to bankrupt the Nader-Camejo Campaign and force Mr. Nader and Mr. Camejo from the 2004 presidential election, thereby denying voters the choice of voting for them. Defendants' motive was to help John Kerry and John Edwards win the election by unlawfully forcing their political competitors from the race.

115.    In furtherance of the conspiracy, the DNC under the leadership of Defendant McAuliffe, among other things, directed and agreed with state Democratic Party officials to file unfounded and abusive lawsuits against the Nader-Camejo Campaign in their states.   Eighteen state or local Democratic Parties did in fact sue or materially support such litigation against the Nader-Camejo Campaign with the aid and assistance of the DNC, the Kerry-Edwards Campaign and The Ballot Project under the direction of Defendant Raikin.

116.    Defendants engaged in state action and acted under color of state law and acted jointly and in concert with individuals who acted under color of state authority. Defendants' actions unlawfully burdened Plaintiffs' constitutional rights guaranteed to them through the Fourteenth Amendment and 42 U.S.C. §1983.

117.    Plaintiffs were damaged by Defendants' acts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1) Compensatory damages in an amount to be determined at trial;

2) Punitive damages in an amount to be determined at trial;

3) Permanent injunctive relief against all ongoing and future violations of law by Defendants and co-Conspirators as set forth herein;

4) Attorneys' fees pursuant to 42. U.S.C. § 1988(b) and as otherwise permitted;

5) Court costs; and

6) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action.

Dated: Alexandria, VA
        February 5, 2008

Respectfully Submitted,

/s/
_____

Michael Sgarlat, Esquire
VA. Bar No. 18158
Attorney for Plaintiffs
Law Office of Michael J. Sgarlat
801 North Pitt Suite 109
Alexandria, Virginia 22314
Tel: (703) 549-2000
Fax: (703) 549-3748
Email: msgarlat@aol.com

Oliver B. Hall, Esquire
D.C. Bar No. 976463
1835 16th Street NW
Washington, D.C. 20009
(617) 953-0161
*Of Counsel*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Gonzalez & Leigh, LLP
Matt Gonzalez, Esquire
G. Whitney Leigh, Esquire
Bryan Vereschagin, Esquire
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*