## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| **RALPH NADER, et al.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| v. | : | **Case No. 1:07 cv 1101 (JCC/TCB)** |
| | : | |
| **TERRY MCAULIFFE, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS TO TRANSFER

### INTRODUCTION

Defendants Terry McAuliffe and Steven Raikin have each filed separate motions to dismiss or, in the alternative, to transfer this action to the District Court of the District of Columbia. For brevity's sake and as a convenience to the Court, Plaintiffs address all of Defendants' arguments in this one Response in Opposition. Specifically, Plaintiffs' Response in Opposition addresses the following questions raised by Defendants: 1) whether Plaintiffs have stated a claim for civil conspiracy; 2) whether Plaintiffs' claims are barred by the statute of limitations; 3) whether Plaintiffs state a claim under 42 U.S.C. § 1983; 4) whether the *Rooker-Feldman* doctrine bars Plaintiffs' claims; 5) whether the *Noerr-Pennington* doctrine bars Plaintiffs' claims; 6) whether Plaintiffs have standing to bring their claims; 7) whether Plaintiffs' request for injunctive relief is moot; and 8) whether Defendants have carried their burden with respect to their motion to transfer. Because Plaintiffs have filed a motion for leave to amend their complaint in order to

dismiss their state law claims, this Response in Opposition does not address Defendants' arguments with respect to those claims.

By way of factual background to the merits of this case, Plaintiffs allege that Defendant McAuliffe, as former Chairman of the Democratic National Committee (DNC), and Defendant Raikin, as Director, Treasurer and Secretary of a Section 527 organization called The Ballot Project, orchestrated a nationwide conspiracy to prevent Plaintiffs Ralph Nader and Peter Miguel Camejo from participating in the 2004 general election as candidates for President and Vice President, respectively, and to deny Plaintiff-voters the choice of voting for them. Thus, within a period of only 12 weeks between June and September of 2004, Defendants and their co-conspirators filed 24 complaints against the Nader-Camejo Campaign in 18 state courts, as well as five complaints before the Federal Election Commission (FEC). This litigation was groundless, abusive, and conceived without probable cause, with the specific intention of draining the Nader-Camejo Campaign of time, talent, money and other resources in the months immediately preceding the 2004 general election. As The Ballot Project's co-director admitted, the litigation was not intended to vindicate valid claims, but rather, "to neutralize [Mr. Nader's] campaign by forcing him to spend money and resources defending these things," thereby denying voters the choice of voting for Mr. Nader and Mr. Camejo. Am. Comp. at ¶ 64.

Plaintiffs' complaint is replete with allegations involving state officials in several states. In addition, at least 95 lawyers from 53 law firms joined the conspirators' litigation nationwide. The Democratic National Committee, state Democratic Parties and The Ballot Project collectively paid these firms nearly $1 million, while co-conspirator

law firms contributed millions more in pro bono legal services. Despite this massive

expenditure of resources, the conspirators lost the great majority of lawsuits they filed.

The conspiracy nevertheless achieved its goals of draining the Nader-Camejo Campaign

of resources, denying Mr. Nader and Mr. Camejo ballot access in several states, and

denying Plaintiff-voters the choice of voting for them.

The conspiracy did not end there, however. To this day, co-conspirator law firms

continue to assert claims against Mr. Nader, and are now using the apparatus of the state

to attach his bank accounts and seize his personal funds in satisfaction of a judgment

which, Plaintiffs allege, was procured by means of a fraud upon the court.

Accordingly, Plaintiffs bring this action to redress the deprivation of rights

secured them by the First and Fourteenth Amendments, the Qualifications Clause and

other provisions of the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs seek

damages, injunctive and declaratory relief, and such other further relief as the Court shall

deem necessary and proper.

## ARGUMENT

### I.    The Pleading Standard Under Fed. R. Civ. P. 8 Is Liberal.

Under the liberal pleading standard set forth in Federal Rule of Civil Procedure

8(a)(2), in order to state a claim, Plaintiffs must provide "a short and plain statement of

the claim showing that the pleader is entitled to relief," in order to "give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atlantic*

*Corp. v. Twombly*, _ U.S. _, 127 S. Ct. 1955, 1964-65 (2007), quoting *Conley* v. *Gibson*,

355 U. S. 41, 47 (1957). To survive a motion to dismiss pursuant to Fed. R. Civ. P

12(b)(6), therefore, a complaint need not set forth "detailed factual allegations," but

rather, the allegations must only be sufficient "to raise a right to relief above the speculative level." *Id.*, citing 5 C. Wright & A. Miller, Federal Practice and Procedure §1216, pp. 235-36 (3d ed. 2004).

The stringent standard for evaluating a motion to dismiss a complaint under Rule 12(b)(6) is well settled. The factual allegations set forth in the complaint must be taken as true. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990). Furthermore, all reasonable inferences must be drawn in favor of the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Accordingly, provided that a complaint is well-pleaded, a motion to dismiss must be denied, even if it appears "that a recovery is very remote and unlikely." *Twombly*, 127 S. Ct. at 1965, quoting *Scheuer*, 416 U.S. at 236.

Plaintiffs' Amended Complaint well exceeds the liberal pleading standard set forth under the Federal Rules of Civil Procedure. Beyond the minimal requirements of Rule 8, Plaintiffs set forth in specific and comprehensive detail the tortious conduct of Defendants and the resulting injury to Plaintiffs. Because Plaintiffs' allegations must be taken as true, the only question before the Court on Defendants' motions to dismiss is whether Plaintiffs would be entitled to relief if they proved these allegations at trial. This question must be answered in the affirmative. Accordingly, Defendants' motions to dismiss fail as a matter of law.

**II.    Plaintiffs State a Claim for Civil Conspiracy.**

Defendants argue that Plaintiffs fail to state a claim for civil conspiracy on two grounds. First, Defendant Raikin argues that Plaintiffs fail to allege a conspiracy with sufficient particularity. Second, Defendant McAuliffe argues that Plaintiffs have failed to allege underlying wrongful conduct sufficient to support a claim for civil conspiracy.

Raikin Mem. at 12; McAuliffe Mem. at 25. Neither of these arguments has any merit.  To

state a claim for civil conspiracy, Plaintiffs must allege: 1) an agreement between two or

more persons; 2) to accomplish an unlawful purpose or a lawful purpose by unlawful

means; and 3) resultant damages to plaintiff. *See Firestone v. Wiley*, 485 F. Supp. 2d 694,

703-04 (E.D. Va. 2007) (applying Virginia law); *Executive Sandwich Shoppe, Inc. v.

Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. App. 2000) (applying District of Columbia

law). Plaintiffs' allegations are clearly sufficient to establish each of these elements.

Plaintiffs allege that the DNC, under the leadership of its then-Chairman,

Defendant McAuliffe, and a Section 527 organization called The Ballot Project, under the

leadership of its Director, Treasurer and Secretary, Defendant Raikin, orchestrated a

nationwide conspiracy to bankrupt the 2004 presidential campaign of Ralph Nader and

Peter Miguel Camejo, in an effort to deny voters the choice of voting for them in the

2004 general election. Am. Comp. ¶¶ 47-68. Plaintiffs allege that Defendants and their

co-conspirators reached this agreement "after the Democrats' defeat in the 2000

election," which they blamed upon Mr. Nader, and that they agreed to try to prevent him

from running again if he announced his candidacy in 2004. *Id.* at ¶ 47. Having reached

this agreement, approximately three dozen leaders of the conspiracy "met privately to

discuss their plans on July 26, 2004 at the Four Seasons Hotel in Boston." *Id.* at ¶ 48.

Defendant Raikin's Ballot Project co-directors Toby Moffett and Liz Holtzman attended,

along with Robert Brandon, whose offices housed The Ballot Project. *Id*. Defendant

McAuliffe's DNC paid for the meeting. *Id.*

At the Four Seasons meeting, the conspirators discussed their plan to sue and

otherwise obstruct Nader-Camejo in as many states as possible, in an effort "to drain [Mr.

Nader] of resources and force him to spend his time and money." *Id.* at ¶ 49 (quoting Defendant Raikin's Ballot Project co-director Moffett). The Ballot Project was incorporated "specifically for the purpose of coordinating and financing" this nationwide conspiracy. *Id.* at ¶ 5. Plaintiffs further allege that the aforementioned conspirators later attended the Democratic National Convention, where they distributed a detailed action memo outlining their plan, solicited donations and recruited others into their conspiracy. *Id.* at ¶¶ 51-54. Finally, plaintiffs allege that, in furtherance of the conspiracy, the conspirators filed 24 state court complaints and five FEC complaints against the Nader-Camejo Campaign within 12 weeks between June and September 2004, and engaged in numerous acts of harassment, intimidation and sabotage, all of which had the purpose and effect of causing Plaintiffs financial injury and other damages and violating their constitutional rights. *Id.* at ¶¶ 69-234.

Defendant Raikin correctly notes that a plaintiff cannot merely "state that a conspiracy took place," but rather must allege "some details of time and place and the alleged effect of the conspiracy." Raikin Mem. at 12, *citing Johnson v. Kaugars*, 14 Va. Cir. 172, 176 (Cir. Ct. 1988). Defendant McAuliffe also correctly notes that, in order for the conspiracy to be actionable, a plaintiff must allege an underlying "unlawful purpose, such as torts or violations of 42 U.S.C. § 1983." McAuliffe Mem. at 25. Plaintiffs have done so. Plaintiffs need not allege an express agreement among all co-conspirators, however, because courts generally infer such agreement from indirect evidence. *See Hobson v. Wilson*, 737 F.2d 1, 54 (D.C. Cir. 1984); *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983). Likewise, Plaintiffs need not allege that Defendants planned, participated, or even knew about each wrongful act for which they are to be held liable,

but only that Defendants shared "a single plan, the essential nature and general scope of which were known" to them. *Hobson*, 737 F.2d at 51-52; *see Halberstam*, 705 F.2d at 481, 486. Plaintiffs therefore satisfy their burden by alleging that Defendants: 1) agreed; 2) to cause financial injury and other damages to Plaintiffs and to violate their constitutional rights; and 3) that Defendants did in fact cause such harm. Am. Comp. ¶¶ 47-68; s*ee Firestone*, 485 F. Supp. 2d at 703-04; *Executive Sandwich Shoppe, Inc.*, 749 A.2d at 738. Accordingly, Plaintiffs have stated a claim for civil conspiracy.

**III.    Plaintiffs' Claims Are Actionable.**

    **A.  Tortious Conduct in Furtherance of Defendants' Conspiracy
       Occurred Within the Limitations Period and Remains Ongoing.**

Defendants both concede that the conspirators' FEC actions were not resolved until April 21, 2006, well within two years of the date that plaintiffs filed their complaint, on October 31, 2007. Raikin Mem. at 6, 11; McAuliffe Mem. at 7. According to Defendants' own position, therefore, Plaintiffs' claims are not time barred.

Additionally, the barrage of litigation that Defendants unleashed upon Plaintiffs, with the specific intention of causing them financial injury and other damages and violating their constitutional rights, continues to the present day in the form of attachment proceedings that co-conspirator Reed Smith initiated in an effort to seize $61,638.45 from Mr. Nader's personal accounts, in satisfaction of a judgment that is without precedent in the history of American jurisprudence, and which, Plaintiffs allege, was wrongfully procured by means of a fraud upon the court. Am. Comp. ¶¶ 181-207. Defendants' conspiracy thus constitutes a continuing tort, and Plaintiffs' claims are actionable on the alternative ground that wrongful acts in furtherance of the conspiracy remain ongoing. *See Ocean Acres Limited Partnership v. Dare County Board of Health*, 707 F.2d 103,

106 (4ᵗʰ Cir. 1983) ("A continuing violation is occasioned by continual unlawful acts");
*Lewis v. Gupta*, 54 F. Supp. 2d 611, 616 (E.D. Va. 1999) ("Under a continuing tort
theory, the statute of limitations does not begin to run until the tortious conduct ceases"),
*citing Williams v. Norfolk and Western Ry. Co.*, 530 F.2d 539, 542 (4th Cir. 1975) (civil
rights claim actionable where alleged discrimination is continual); *see also Poe v.
Lynchburg Training School and Hospital*, 518 F. Supp. 789 (W.D. Va. 1981) (following
*Williams* in civil rights action).

 Courts in the District of Columbia hold that the "prosecution of a lawsuit can
constitute a continuing tort." *Jung v. Mundy, Holt & Mance, P.C.*, 372 F.3d 429, 433
(D.C. Cir. 2004), quoting *Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992). This is
because:

> [A] lawsuit is a continuous, not an isolated event, because its effects persist from
> the initial filing to the final disposition. . . . A defendant subject to a lawsuit is
> likely to suffer damage not so much from the initial complaint but from the
> cumulative costs of defense and the reputational harm caused by an unresolved
> claim.

*Id.* The courts' rationale applies with even greater force in this case, where the tortious
"chain of conduct" arises not from just one lawsuit, but from 18 different lawsuits and
five administrative proceedings, all initiated pursuant to a conspiracy to bankrupt the
same adversarial party. *See Whelan*, 953 F.2d at 674 ("The commencement of a lawsuit is
only the first link in a chain of conduct that does not end until the complaining party
ceases prosecution of the suit"). In such cases, District of Columbia courts hold that the
tortious conduct is actionable provided that at least one injurious act occurred within the
limitation period. *See id.* at 673, citing *DeKine v. District of Columbia,* 422 A.2d 981,
988 n.16 (D.C. 1980) (stating elements of continuing tort); *see also Whelan*, 953 F.2d at

673 (statute of limitations on abuse of process claim begins to run not when abusive

claim is asserted, but when it ceases to be asserted) (citation omitted).

Courts in Virginia follow the same rule. Where a defendant wrongfully asserts a

claim against a plaintiff, the statute of limitations on plaintiffs' cause of action "does not

begin to accrue as long as the defendant maintains the claim." *Warren v. Bank of Marion*,

618 F. Supp. 317, 321 (W.D. Va. 1985) (applying rule to claim for slander of title).

> To hold otherwise would anomalously cut off plaintiff's opportunity to pursue her
> rights against the defendants prior to the time that defendants had exhausted their
> remedial efforts against her, which are the very efforts giving rise to plaintiff's
> present action. Moreover, the court's holding in this matter is supported by
> analogous decisions by state and federal courts applying Virginia statutes of
> limitations in which it has been held that in the event of a continuing tort the
> statute of limitations does not commence running until such tortious conduct has
> ceased.

*Id.* at 322, citing *Fenton v. Danaceau*, 255 S.E.2d 349 (Va. 1979) (statute of limitations

in medical malpractice suit runs only after termination of continuous treatment);

*Williams*, 530 F.2d at 542 (statute of limitations in civil rights suit runs only after

termination of continuous discrimination); *Poe*, 518 F. Supp. 789 (same). Again, this

rationale applies with particular force to the present case. Defendants here argue that

Plaintiffs' claims are "time barred," at the same time that their co-conspirators continue

to assert the very claims that give rise to Plaintiffs' cause of action. McAuliffe Mem. at 7;

Raikin Mem. at 11. Defendants cannot acquire a right to continue their tortious conduct,

however, simply by arguing that Plaintiffs' claims arising from such conduct are time

barred. *See Warren*, 618 F. Supp, at 321; *Whelan*, 953 F.2d at 674. Rather, courts

applying Virginia law in such cases hold that "the rule most appropriate is that…the

victim of the illegal activity should be entitled to bring suit as soon as he can do so, but

should not be required to bring suit until the illegal activity has ceased." *Chester Railing*

*v. United Mine Workers of America*, 429 F.2d 780, 783 (4th Cir. 1970) (where defendant union employees engaged in unlawful concerted action against employer, including strikes, pickets and destruction of equipment and property, plaintiffs' cause of action in tort did not accrue until "the last date of continuing illegal conduct").

Because Plaintiffs have alleged facts that establish a continuing tort, as well as ongoing acts in furtherance thereof, Defendants' argument that Plaintiffs' claims are time barred is wrong as a matter of law. McAuliffe Mem. at 7 (citing Virginia's two-year statute as applicable); Raikin Mem. at 9 (same). Defendants conspicuously ignore Plaintiffs' allegations tying them directly to these ongoing acts. Am. Comp. ¶ 207 (citing payments from Defendant Raikin's organization, The Ballot Project, and from Defendant McAuliffe's organization, the DNC, to co-conspirator law firms who continue to assert, as the true parties in interest, claims against Plaintiff). Regardless, as co-conspirators, Defendants are vicariously liable for injurious acts in furtherance of the conspiracy, *Halberstam*, 705 F.2d at 479, and Defendants may not avoid such liability by pleading the statute of limitations while such acts are ongoing. *See Chester Railing*, 429 F.2d at 783; *Warren*, 618 F. Supp. at 321.

## B. Defendants Fraudulently Concealed Their Conduct.

Defendants' argument that Plaintiffs' claims are time barred also fails because Plaintiffs allege fraudulent concealment by the conspirators. Am. Comp. at ¶¶ 66-67; *see generally Richards v. Mileski*, 662 F.2d 65, 70 (D.C. Cir. 1981) ("fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of action from the plaintiff, although any word or act tending to suppress the truth is enough"); *Grimes v. Suzukawa*, 551 S.E.2d 644, 646 (Va. 2001) (fraudulent concealment

established under statute if "defendant undertook an affirmative act designed or intended, directly or indirectly, to obstruct the plaintiff's right to file her action"). An act of fraudulent concealment by one conspirator generally tolls the statute of limitations as to all co-conspirators, and also to the underlying substantive claims. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir. 1989). A question of fact therefore exists with respect to the date on which Plaintiffs' cause of action accrued. *See Bireline v. Seagondollar*, 567 F.2d 260, 262 (4th Cir. 1977) (cause of action accrues when plaintiff "knows or has reason to know of the injury which is the basis of his action"). Accordingly, Defendants' affirmative defense with respect to the statute of limitations is inappropriate to raise in a motion to dismiss, because "it is…likely that plaintiffs can raise factual setoffs." *Richards*, 662 F.2d at 73 ("a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense"). Because Plaintiffs do in fact raise such "factual setoffs," including allegations of fraudulent concealment that Defendants completely fail to address, Am. Comp. at ¶¶ 66-67, Defendants' statute of limitations affirmative defense must fail. *See Richards*, at 73 n.13, citing *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 235 (1959) (question of plaintiff's diligence "cannot be decided at this stage of the proceedings," on a motion to dismiss); *Jones v. Rogers Memorial Hospital*, 442 F.2d 773, 775 (D.C. Cir. 1971) (statute of limitations defense cannot be decided on a motion to dismiss "unless it appears beyond doubt" that plaintiff can prove no facts to entitle him to relief); *Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1319, 1324 (D.D.C.1977) (issue of due diligence requires a

finding of fact and thus is not suitable for determination on motion for judgment on the pleadings).

### IV.    Plaintiffs State a Claim Under 42 U.S.C. § 1983.

Defendants argue that Plaintiffs fail to state a claim under 42 U.S.C. § 1983 because Plaintiffs fail to allege "state action." McAuliffe Mem. at 8-12; Raikin Mem. at 7-8. Defendants' argument, essentially, is that Defendants McAuliffe and Raikin are both "private actors" who cannot be held liable under Section 1983 for their "misuse" of state statutes, because liability under Section 1983 depends upon a finding that the defendant acted "under color of" state law. McAuliffe Mem. at 11; Raikin Mem. at 8; *see* 42 U.S.C. § 1983. This contention ignores a long line of precedent holding that apparently private actors may be held liable under Section 1983, provided that their conduct is "fairly attributable" to the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), citing *Terry v. Adams*, 345 U.S. 461 (1953) (applying a "public function" test); *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 170 (1970) (applying a "state compulsion" test); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) (applying a "nexus" test); *Flagg Brothers, Inc. v. Brook*, 436 U.S. 149 (1978) (applying a "joint action" test). The inquiry in such cases is necessarily fact-bound: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.*, quoting *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961).

Plaintiffs allege that Defendants conspired to prevent Mr. Nader and Mr. Camejo from running for public office in the 2004 general election, and to deny Plaintiff-voters the choice of voting for them, by combining with 18 state or local Democratic Parties, the

Democratic National Committee and others to abuse state nomination procedures for independent candidates as a means to bankrupt the Nader-Camejo Campaign. Am. Comp. at ¶¶ 1, 56, 62. Plaintiffs' Amended Complaint is also replete with allegations that state actors in several states, including Illinois, Oregon, New Mexico, Pennsylvania and West Virginia, engaged in acts that furthered the goals of the conspiracy. *Id.* at ¶ 103 (assistance of Illinois state employees in preparation of complaint); at ¶ 146 (disqualification of nomination papers by New Mexico judge who failed to disclose donation to Democratic nominee); ¶¶ 176-77 (disqualification of validated signatures by secretary of state in Oregon); ¶¶ 183-84 (recruitment of "volunteers" by Democratic elected officials in Pennsylvania);[1] ¶¶ 196-97 (assessment of litigation costs by judges who failed to disclose conflicts of interest in Pennsylvania); ¶¶ 204-05 (institution of attachment proceedings in Washington, D.C.); ¶¶ 218-221 (initiation of *quo warranto* proceeding by attorney general in West Virginia). Taken together, Plaintiffs' allegations are sufficient to establish state action under a "public function" test, a "nexus" test, or a "joint action" test. *See Terry*, 345 U.S. 461; *Jackson*, 419 U.S. 345; *Flagg Brothers, Inc.*, 436 U.S. 149. Accordingly, Defendants cannot prevail on their motion to dismiss, because they cannot prove, as a matter of law, that Plaintiffs' allegations fail to establish state action. *See Moseke v. Miller and Smith, Inc.*, 202 F. Supp. 2d 492 (E.D. Va. 2002) (in deciding a motion to dismiss, a court must accept the facts pled by the plaintiff as true and construe them in the light most favorable to the plaintiff).

---

[1] Plaintiffs have moved for leave to amend their complaint to include allegations that an ongoing investigation by the Attorney General of the State of Pennsylvania disclosed, in December 2007, emails and payroll documents indicating that employees of the State of Pennsylvania may have received taxpayer-funded compensation for their efforts to remove Mr. Nader and Mr. Camejo from Pennsylvania's ballot.

The facts in this case are closely analogous to another "quasi-private conspiracy" involving "misdeeds perpetrated by defendants on election day" which, the Fourth Circuit Court of Appeals found, "both the First Amendment and 42 U.S.C. § 1983 exist in significant part to deter." *See Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003). In *Rossignol*, the defendants conspired to suppress dissemination of the election day edition of a local newspaper, because they believed the newspaper's criticism would harm their preferred candidates in the election. *See id.* at 521. The defendants thus drove throughout the county on the eve of election day, buying up every available copy of the newspaper. The defendants videotaped themselves purchasing the newspapers and collected receipts to prove that they had paid for each one, but the Court nevertheless found a clear constitutional violation:

> [T]here can be no question that, if defendants acted under color of state law, they violated [the publishers'] constitutional rights. The seizure clearly contravened the most elemental tenets of First Amendment law. First, defendants targeted [the] newspaper for suppression and retaliation because they disagreed with its viewpoint and intended to prevent its message from being disseminated. This by itself was sufficient to violate the Constitution.…Second, the category of speech that defendants suppressed occupies the core of the protection afforded by the First Amendment.  Discussion of public issues and debate on the qualifications of candidates for public office have always been integral to the operation of the system of government established by our Constitution.

*Id.* at 521-22 (citations omitted).

The defendants in *Rossignol* were two candidates for public office, one running for State's Attorney and the other an incumbent sheriff running for re-election, as well as several off-duty deputies, each of whom dressed in plainclothes and drove their own personal automobiles when they purchased the newspapers. The Court nevertheless found that the "apparently private actions" of these defendants had a "sufficiently close nexus with the State to be fairly treated as that of the State itself." *Id.* at 523 (citations omitted).

14

The dispositive factor, the Court reasoned, was that the "defendants were driven by a desire to retaliate against [the newspaper's] past criticism of their fitness for office and to censor future criticism along the same lines." *Id.* at 525. The Court concluded:

> We would thus lose sight of the entire purpose of § 1983 if we held that defendants were not acting under color of state law. Here, a local sheriff, joined by a candidate for State's Attorney, actively encouraged and sanctioned the organized censorship of his political opponents by his subordinates, contributed money to support that censorship, and placed the blanket of his protection over the perpetrators.…If we were to sanction this conduct, we would point the way for other state officials to stifle public criticism of their policies and their performance.

*Id.* at 527-28.

*Rossignol* is distinguished from the present case because the defendants were off-duty sheriff's deputies, and the Court based its holding on a finding that the defendants' private conduct had a "sufficiently close nexus" with their public office to be treated as state action. *Id.* at 523. The Court found, however, that the "requisite nexus" arose initially out of defendants' "censorial motivation":

> Defendants executed a systematic, carefully-organized plan to suppress the distribution of [the newspaper]. And they did so to retaliate against those who questioned their fitness for public office and who challenged many of them in the conduct of their official duties. The defendants' scheme was thus a classic example of the kind of suppression of political criticism which the First Amendment was intended to prohibit.

*Id.* Plaintiffs here allege that Defendants had precisely the same motivation and engaged in precisely the same scheme – to silence political criticism and to suppress a political competitor – only writ large on a national scale. Am. Comp. at ¶¶ 47-68. Like the defendants in *Rossignol*, Defendants here allegedly "encouraged and sanctioned" that suppression and contributed money to support it. *Id.* at 527; Am. Comp. at ¶ 47, ¶¶ 62-63. Moreover, while Defendants did not conspire with off-duty sheriff's deputies, Defendants

allegedly did conspire with 18 state or local Democratic Parties – organizations which, the Court has recognized, may act in the state's stead when they operate within the electoral arena. Am. Comp. at ¶ 56; *see Terry*, 345 U.S. 461 (holding Jaybird Democratic Association subject to constitutional restraints); *Smith v. Allwright*, 321 U.S. 649 (1944) (holding Texas Democratic Party subject to constitutional restraints).

*Terry* and *Allwright* involved racially discriminatory primary elections in Texas at a time when the Democratic Party completely dominated the electoral process in that state. *See id.* Thus, excluding blacks from the primary election effectively excluded them from the general election. *See id.* Since then, however, the Court has also found state action in the choice of a private political party to charge nondiscriminatory candidate filing fees. *See Bullock v. Carter*, 405 U.S. 134, 140 (1972) ("the mechanism of [primary] elections is the creature of state legislative choice and hence 'state action' within the meaning of the Fourteenth Amendment"). Likewise, the Court has found state action in the choice of a private political party (in a two-party state) to charge a registration fee to delegates attending its convention. *See Morse v. Republican Party of Virginia*, 517 U.S. 186, 195 (1996) ("the Party exercised delegated state power when it certified its nominee for automatic placement on Virginia's general election ballot"). In *Morse*, the Court made explicit the thread running through these cases: "the operative test" for determining whether to attribute state action to a private political party, the Court reasoned, is whether the party "exercises power over the electoral process." *Id.* at 218.

A nationwide effort by the Democratic Party to prevent a competing candidate from gaining ballot access, to which numerous state actors are allegedly connected, therefore implicates state action as an exercise of power over the electoral process. *See id.*

16

In this case, unlike *Morse*, the Democratic Party did not exercise power specifically delegated to the two major parties, because the state statutes under which conspirators brought their challenges to the Nader-Camejo nomination petitions generally grant the right to bring such challenges to any voter. *See id.* at 195. Yet these same statutes do not provide minor party and independent candidates with a reciprocal power to challenge the qualifications of major party candidates. In effect, therefore, a major party that uses such statutes in a concerted effort to prevent a competing candidate from running for office is wielding power delegated to it by the state, and is liable as a state actor.

 A finding of state action in this case is further justified by the joint participation of state officials in several states. To the extent that Defendants and their co-conspirators are "willful participant[s] in joint action with the state or its agents," they are liable under Section 1983 as state actors. *Manship v. Trodden*, 2007 U.S. Dist. LEXIS 78913, 8-9 (E.D. Va. 2007); *see also West v. Atkins*, 487 U.S. 42, 49 (1988) ("[S]tate employment is generally sufficient to render the defendant a state actor").

 In short, under the facts of this case, Defendants cannot prove, as a matter of law, that Plaintiffs fail to allege state action. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (a finding of state action "is a matter of normative judgment, and the criteria lack rigid simplicity"); *Hicks v. Southern Maryland Health Sys. Agency*, 737 F.2d 399, 402 n.3 (4th Cir. 1984) (there is no specific formula for defining state action); *Goldstein v. Chestnut Ridge Fire Dept.*, 218 F.3d 337, 343 (4th Cir. 2000) (facts "which would convert the private party into a state actor [vary] with the circumstances of the case"), quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Therefore, Defendants cannot prevail on their motion to dismiss.

V.    **The Rooker-Feldman Doctrine Does Not Bar Plaintiffs' Claims.**

Defendant McAuliffe argues that Plaintiffs' claims should be dismissed pursuant to the *Rooker-Feldman* doctrine. McAuliffe Mem. at 20, citing *Shooting Point, L.L.C. v. Cumming*, 238 F. Supp. 2d 729 (E.D. Va. 2002). As an initial matter, this Court decided *Shooting Point* prior to two decisions of the Supreme Court emphasizing the narrow scope of the *Rooker-Feldman* doctrine, which has been extended "far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (reversing dismissal on *Rooker-Feldman* grounds), quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005) (same). Indeed, the Supreme Court noted that it had applied the doctrine only twice, in the two cases from which the name derives. *Exxon Mobil Corp.*, 544 U.S. at 283, citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). To the extent that Defendant McAuliffe relies on *Shooting Point* to extend the *Rooker-Feldman* doctrine as announced in those two cases, therefore, his argument must be rejected. *See id.*

In *Exxon*, the Court held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. The doctrine is therefore plainly inapplicable to the present case. Plaintiffs do not seek review by this Court of the 18 state court proceedings in which

Defendants and their co-conspirators challenged Nader-Camejo nomination papers in the 2004 general election, nor do Plaintiffs seek rejection of those state court judgments. Rather, Plaintiffs seek vindication of their constitutional rights, which they allege Defendants violated by pursuing the state court litigation in furtherance of a conspiracy to cause Plaintiffs financial injury and other damages and to violate their constitutional rights. Am. Comp. at ¶ 1.

In *Shooting Point*, the Court noted that federal courts are prohibited from exercising jurisdiction over issues actually decided by a state court, as well as those issues that are "inextricably intertwined with the questions ruled upon by a state court." *Shooting Point*, 238 F. Supp. 2d at 736, quoting *Feldman*, 460 U.S. at 483. Defendant McAuliffe asserts that Plaintiffs' claims are "inextricably intertwined" with the state court decisions on the merits of the Nader-Camejo nomination papers, but provides no support for the claim. This Court, however, clarified that federal claims are "inextricably intertwined" with a state court decision only "if success on the federal claim depends upon a determination that the state court wrongly decided the issues before it." *Id.* at 736-37, quoting *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202-03 (4th Cir. 1997). Plaintiffs' claims do not depend in any way upon such a determination, and Defendants have not asserted that they do. Under this Court's *Shooting Point* analysis, therefore, the *Rooker-Feldman* doctrine does not bar Plaintiffs' claims. *See id.*

### VI.    The *Noerr-Pennington* Doctrine Does Not Bar Plaintiffs' Claims.

Defendant Raikin urges the Court to find that Defendants' alleged conduct in this case is "protected by the First Amendment right to petition the government," and consequently, that it is subject to immunity under the *Noerr-Pennington* doctrine. Raikin

Mem. at 13, citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510

(1972) (extending *Noerr-Pennington* immunity to protect coordinated action in

petitioning administrative agencies and courts). Defendant Raikin does not suggest that

conspirators' alleged acts of harassment, intimidation and sabotage are also protected

under *Noerr-Pennington*, Am. Comp. at ¶¶ 69-73, but asserts that Plaintiffs can establish

liability for those acts only by providing evidence that each conspirator's actions were

specifically intended to further the wrongful conduct. Raikin Mem. at 13-14, citing

*N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 919 (1982).

Defendant Raikin's argument tortures the law on which it relies. While *California*

*Motor Transport* extended *Noerr-Pennington* immunity to protect coordinated action in

petitioning the courts, the Court noted that First Amendment rights may not be used as a

means or pretext for achieving "substantive evils," such as abuse of the petitioning

process.  *See California Motor Transport*, 404 U.S. at 515.

> One claim, which a court or agency may think baseless, may go unnoticed; but a
> pattern of baseless, repetitive claims may emerge which leads the factfinder to
> conclude that the administrative and judicial processes have been abused. That
> may be a difficult line to discern and draw. But once it is drawn, the case is
> established that abuse of those processes produced an illegal result.

*Id. at* 513. "[A]ctions of that kind," the Court concluded, "cannot acquire immunity by

seeking refuge under the umbrella of "political expression."" *Id.* Thus, as the Court

subsequently explained, *California Motor Transport* "held that the complaint showed a

sham not entitled to immunity when it contained allegations that a group sought to harm

its competitors by "instituting proceedings and actions…with or without probable cause,

and regardless of the merits of the cases." *Professional Real Estate Investors v. Columbia*

*Pictures Industries, Inc.*, 508 U.S. 49, 57 (1993), quoting *California Motor Transport*, 404 U.S. at 512.

The import of *California Motor Transport* is that Defendants in this case may not acquire absolute immunity for their conduct merely by asserting that it is petitioning activity, and therefore protected as a form of political expression. *See California Motor Transport*, 404 U.S. at 513. As the Court noted, the true nature of Defendants' conduct is a question of fact, and "what the proof will show is not known." *Id.* at 515. For purposes of a motion to dismiss, however, Plaintiffs' allegations must be taken as true, and these allegations, "on their face…come within the "sham" exception in the *Noerr* case, as adapted to the adjudicatory process." *Id.* at 515-16; *see also Pendleton Const. Corp. v. Rockbridge County, Virginia*, 652 F. Supp. 312, 319 (W.D. Va. 1987) (*California Motor Transport* "suggested that the sham exception would encompass other unethical conduct in the setting of the adjudicatory process such as bribery, perjury, misrepresentation, or the bringing of baseless, repetitive claims amounting to abuse of process").

Defendant Raikin's reliance on *Claiborne Hardware* to shield himself from liability for conspirators' acts of harassment, intimidation and sabotage is also unfounded. Raikin Mem. at 13-14. In *Claiborne Hardware*, a group of merchants sued two civil rights groups and several individuals in tort for lost earnings the merchants sustained over the course of a boycott that the groups and individuals had organized. *See Claiborne Hardware*, 458 U.S. 886. The Mississippi Supreme Court held the entire boycott unlawful, and imposed joint and several liability on the groups and individuals for all damages resulting from the boycott. *See id.* The Supreme Court reversed, holding

that the state could not impose liability on individuals based on nothing more than their association with a group. *See id.* at 918-20.

Defendant Raikin misreads *Claiborne Hardware* to hold that a conspirator cannot be held liable for wrongful acts in furtherance of a conspiracy unless the conspirator specifically intended the wrongful act "according to the strictest law." Raikin Mem. at 13. *Claiborne Hardware* does not stand for this rule. Rather, *Claiborne Hardware* holds that, to impose liability on individuals based only on their association with a group, evidence must indicate that they have a specific intent to further the group's unlawful goals. *See Claiborne Hardware*, 458 U.S. at 919-20. *Claiborne Hardware* is therefore plainly inapplicable. Defendants' liability in this case is not premised upon their mere association with a group, but rather derives from their conduct as leaders of organizations that planned, financed and executed a conspiracy. Am. Comp. at ¶ 62. As such, Defendants are vicariously liable for damages caused by acts in furtherance of the conspiracy. *Halberstam*, 705 F.2d at 479.

**VII.  Plaintiffs Have Standing to Bring Their Claims.**

Defendant McAuliffe argues that Plaintiffs do not have standing to bring their claims. McAuliffe Mem. at 14-19. As a preliminary matter, this "argument" consists largely of objections to factual allegations which, for purposes of Defendants' motions to dismiss, the Court must accept as true. *See Roe 1 v. Prince William County*, 2007 U.S. Dist. LEXIS 88405, 6-7 (E.D. Va. 2007) ("In passing on a motion to dismiss, the material allegations of the complaint are taken as admitted [and] the complaint is to be liberally construed in favor of plaintiff"). Furthermore, Defendant McAuliffe fails to address Plaintiffs' allegations that the conspiracy caused Mr. Camejo at least $20,000 in

damages, and that the conspiracy has placed Mr. Nader in imminent jeopardy of losing $61,638.45. Am. Comp. at ¶ 231. These errors and omissions render much of Defendant McAuliffe's argument standing inapplicable.

Defendant McAuliffe's most plausible assertion is that Plaintiff-voters lack standing because they assert only a "generalized grievance." McAuliffe Mem. at 15. "Nothing distinguishes the voter Plaintiffs from all other voters" in the 17 states that denied Nader-Camejo ballot access in 2004, Defendant McAuliffe asserts. *Id.* The superficial appeal of this assertion fades, however, when examined in the context of Plaintiffs' actual allegations: Plaintiffs do *not* allege that Defendants attempted to deny *all* voters their preferred choice of candidates, but only those voters who wished to vote for the Nader-Camejo ticket. Am. Comp. at ¶ 1. Moreover, Defendants specifically targeted this discrete minority of voters precisely *because* they wished to vote for Nader-Camejo. As members of the targeted class of voters, therefore, Plaintiff-voters do not allege a generalized grievance, but rather, a concrete injury specific to the minority of voters who wished to vote for Nader-Camejo in the 2004 general election. *See Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (voters who live within racially gerrymandered voting district have standing to challenge legislation that created the district); *but see United States v. Hays*, 515 U.S. 737, 738 (1995) (voters who do not live within racially gerrymandered district do not have standing to challenge legislation that created the district).

Defendant McAuliffe next asserts that Defendants did not cause the alleged harm, because Defendants did not cause any state officer to deny Mr. Nader and Mr. Camejo ballot access, and because Defendants did not cause Mr. Nader to loan $100,000 to his

campaign. *Id.* at 17-19. Here, Defendant McAuliffe simply denies allegations that must be taken as true for purposes of ruling upon the motion to dismiss. *See Roe 1*, 2007 U.S. Dist. LEXIS 88405 at 6-7. Plaintiffs allege that Defendants conspired to cause them concrete and specific harm, and that Defendants did in fact cause such harm. Defendant McAuliffe offers alternative theories of causation to explain Plaintiffs' harm, but these alternative theories simply are not relevant. *See Friends for Ferrell Parkway v. Stasko*, 282 F.3d 315, 324 (4th Cir. 2002) ("the "fairly traceable" standard is not equivalent to a requirement of tort causation"); *Roe 1*, 2007 U.S. Dist. LEXIS 88405 at 6-7 (the complaint is to be liberally construed in favor of plaintiff).

Finally, Defendant McAuliffe asserts that Plaintiffs' alleged harms are not redressable. *Id.* at 19. Plaintiffs allege that Defendants violated their constitutional rights and caused them financial injury and other damages by means of a conspiracy to pursue unfounded and abusive litigation against Plaintiffs, and that acts in furtherance of the conspiracy are ongoing. Notwithstanding Defendant McAuliffe's persistent denial of these allegations, which must be taken as true, Plaintiffs have standing based upon these allegations alone, and they are entitled to recover damages, or nominal damages, even without proof of actual damages. *See Carey v. Piphus*, 435 U.S. 247 (1978).

**VIII.   Plaintiffs' Request for Injunctive Relief Is Not Moot.**

Defendant McAuliffe argues that Plaintiffs' request for injunctive relief is moot because the 2004 election "has completely and irrevocably prevented the Defendants from engaging in the alleged violations that the requested injunctive relief would prevent." McAuliffe Mem. at 26. Defendant McAuliffe also argues that the "capable of repetition, yet evading review" exception does not apply, but cites no law to support this

position. *Id.* Defendant McAuliffe's omission is understandable, because his position

misstates the legal issue. The relevant question is not whether the 2004 election might

recur, but whether Defendants' wrongful conduct during that election might recur. *See*

*Murphy v. Hunt*, 455 U.S. 478, 482 (1982); *Weinstein v. Bradford*, 423 U.S. 147, 149

(1975). Because such conduct "truly could be capable of repetition, yet evading review,"

Plaintiffs' claims are not moot. *Roe v. Wade*, 410 U.S. 113, 124-25 (1973); *see Honig v.*

*Doe*, 484 U.S. 305, 318-19 n.6 (a "reasonable expectation" or recurrence suffices to avoid

mootness, even if there is no "demonstrated probability" of the conduct recurring).

     In addition, an action for injunction does not become moot merely because the

conduct immediately complained of has terminated, if there is a sufficient possibility of a

recurrence that would be barred by a proper decree. *See*, *e.g.*, *United States v.*

*Concentrated Phosphate Export Ass'n*, 393 U.S. 199 (1968). Here, Plaintiffs allege that a

Section 527 organization called The Ballot Project was incorporated specifically for the

purpose of coordinating and financing a conspiracy to sue Plaintiff Ralph Nader's

presidential campaign, and that the organization did in fact do so. Am. Comp. at ¶¶ 5, 62.

A sufficient possibility therefore exists that such conduct will resume if Mr. Nader

decides to run for office again. Accordingly, Plaintiffs' request for injunctive relief is not

mooted by Defendants' voluntary cessation. *See City of Erie v. Pap's A.M.*, 529 U.S. 277,

287 (2000) (plaintiffs' claims not moot where defendant was "still incorporated" and

"could again decide" to engage in offending conduct); *Iron Arrow Honor Society v.*

*Heckler*, 464 U.S. 67, 72 (1983) ("[d]efendants face a heavy burden to establish

mootness" in voluntary cessation cases "because otherwise they would be "free to return

to [their] old ways" after the threat of a lawsuit had passed") (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).

Finally, Defendant McAuliffe asserts that Plaintiff-voters request injunctive relief only, and that consequently they should be dismissed from the case. McAuliffe Mem. at 27. This argument is wrong as a matter of fact and as a matter of law. Plaintiff-voters seek damages for the deprivation of their constitutional rights, and they are entitled to such recovery. *See Carey*, 435 U.S. at 266 ("By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed"). Accordingly, Defendant McAuliffe's argument must fail, because Plaintiff-voters' claims are not moot.

## IX.     Defendants' Motions to Transfer Should Be Denied.

In the alternative to their motions to dismiss, Defendant McAuliffe and Defendant Raikin both move, pursuant to 28 U.S.C. § 1404(a), to transfer this action to the District of Columbia. McAuliffe Mem. at 27-28; Raikin Mem. at 14-17. Defendants argue that transfer is warranted primarily because it would promote judicial economy by avoiding duplicative litigation arising from the same factual allegations and legal issues. McAuliffe Mem. at 28; Raikin Mem. at 15. In fact, however, Plaintiffs have already moved to consolidate their federal claims before this Court by filing a motion for leave to amend their complaint to add parties defendant, and by dismissing their federal claims in the District of Columbia. There is no danger of conflicting judgments, therefore, because the District of Columbia action arises exclusively from state law claims, which Plaintiffs moved to remand to the Superior Court on January 23, 2008. That motion is pending.

Defendants seek to defeat Plaintiffs' choice of forum in this Court by moving to transfer this action to a federal forum in which no federal claims are pending, where proceedings have not yet begun, and where Plaintiffs' motion to remand their state law claims is pending. Defendants seek a transfer despite the fact that both Defendants are residents of the state of Virginia, and despite the fact that the action in this federal forum was first-filed. *See* 15 Charles Alan Wright, et al, Federal Practice and Procedure § 3854 (3d ed. 2007) ("as a general proposition, the forum in which the first-filed action is lodged has priority"). Plaintiffs filed this action on October 31, 2007. Defendants in the District of Columbia action did not remove that case to federal court until November 27, 2007. Under these facts, Defendants cannot meet their burden of defeating the presumption in favor of Plaintiffs' choice of forum. *See Samsung Electronics v. Rambus*, 386 F. Supp. 2d 708, 718 n.15 (E.D. Va. 2005) ("As the moving party, [defendant] bears the burden of demonstrating that the Eastern District of Virginia is an inconvenient forum in which to litigate").

Plaintiff's choice of forum is typically entitled to substantial deference. *See Intranexus, Inc., v. Siemens Medical Solutions Health Services Corporation*, 227 F. Supp. 2d 581, 583 (E.D. Va. 2002), citing *Cognitronics Imaging Sys., Inc. v. Recognition Research Inc.*, 83 F. Supp. 2d 689, 696 (E.D. Va. 2000). Only when a plaintiffs' choice of forum bears "little or no relation to that forum" is plaintiffs' choice not entitled to such substantial deference. *Mullins v. Equifax Information Services, LLC*, 2006 U.S. Dist. LEXIS 24650, 17 (E.D. Va. 2006) (citations omitted). "But, even then, the plaintiff's choice of forum is certainly a relevant consideration so long as there is a connection between the forum and the plaintiff's claim that reasonably and logically supports the

27

plaintiff's decision to bring the case in the chosen forum." *Id.* at 17-18. At a minimum, the residence of both Defendants in Virginia meets this standard. Plaintiffs' choice of forum in this case is therefore entitled to deference, and Defendants must establish that the "convenience of the parties and witnesses and the interest of justice weigh strongly in favor of transfer." *Id.* at 28.

Although Defendants cite the relevant factors that the Court must consider with respect to a motion to transfer, they offer no evidence from which the Court could conclude that such factors weigh in favor of transfer. Specifically, Defendants offer no evidence with respect to 1) ease of access to sources of proof; 2) the cost of obtaining the attendance of witnesses; 3) the availability of compulsory process; and 4) the court's familiarity with applicable law. The reason for this omission is that these factors do not weigh in favor of transfer, because Plaintiffs' allegations are national in scope. Defendants also cannot claim to be inconvenienced by litigating in their home forum, nor can they claim that litigation in the District of Columbia arising exclusively from state law claims presents "the possibility of inconsistent adjudications in separate courts." *Samsung Electronics v. Rambus*, 386 F. Supp. 2d 708, 722 (E.D. Va. 2005) (citations omitted). Accordingly, because Defendants fail to carry their burden to demonstrate that the relevant factors "weigh heavily" in favor of transfer, their motion should be denied. *Mullins*, 2006 U.S. Dist. LEXIS 24650 at 28.

Dated: February 20, 2008                          Respectfully Submitted

                                                  /s/ Michael Sgarlat
                                                  _____

                                                  Michael Sgarlat
                                                  VA. Bar No. 18158

Attorney for Plaintiffs
801 North Pitt, Suite 109
Alexandria, Virginia 22314
Tel: (703) 549-2000
Fax: (703) 549-3748
msgarlat@aol.com

Oliver B. Hall
1835 16th Street, N.W.
Washington, D.C. 20009
(617) 953-0161
*Of Counsel*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Gonzalez & Leigh, LLP
Matt Gonzalez, Esquire
G. Whitney Leigh, Esquire
Bryan Vereschagin, Esquire
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2008 I electronically filed the foregoing

Response in Opposition to Defendants' Motions to Dismiss and Motions To Transfer

with the Clerk of the Court using the CM/ECF system, and served a copy either by the

CM/ECF system or by first class mail, postage-prepaid, on the following parties:

John Hardin Young
Attorney for Defendant Terry McAuliffe
SANDLER, REIFF & YOUNG, P.C.
50 E Street, S.E. #300
Washington, D.C. 20003
Tel: (202) 479-1111
Fax: (202) 479-1115
young@sandlerreiff.com

Warren Thomas Allen, II
Attorney for Defendant Steven Raikin
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM, LLP
1440 New York Ave., N.W.
Washington, D.C. 20005-2111
Tel: (202) 371-7126
wtallen@skadden.com


/s/ Michael Sgarlat
Michael Sgarlat
Attorney for Plaintiffs